## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **S.H. a minor child, and all others similarly situated, et al.,** | : | **Case No. 2: 04-CV-1206** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **THOMAS STICKRATH,** | : | **STIPULATION FOR INJUNCTIVE RELIEF** |
| | : | |
| **Defendant** | : | |
| | : | |
| | : | |
| | : | |

## I.  INTRODUCTION

1. This Stipulated Judgment is entered into by the parties to resolve all of the claims made in this action and seeks to build on initiatives already commenced by Ohio Governor Ted Strickland and Ohio Department of Youth Services ("DYS") Director Thomas Stickrath to fundamentally improve the care and treatment of youth in DYS custody.  In this case, the Plaintiffs S.H., a minor child by and through her next friend Brenda Woods; D.J, a minor child by and through her next friend Vera Johnson, and B.F., a minor child, by and through his next friend Rod Fuller, bring a number of claims on behalf of the class of all youth who are or will be in the custody of and under the supervision of DYS, relating to their care and treatment by Defendant, Thomas Stickrath, Director of DYS.

2. This action was filed by Plaintiffs on December 20, 2004.  Plaintiffs allege a system-wide failure regarding conditions of confinement within facilities operated by DYS that endanger Plaintiffs' physical health and safety; threaten Plaintiffs'

emotional and psychological well-being; deprive Plaintiffs of adequate

programming, education, medical and mental health care, and dental care; and

deprive Plaintiffs of due process of law.    On July 9, 2007, the court entered an

order certifying this case as a class action and naming Alphonse A. Gerhardstein,

Kimberly Brooks Tandy, Jennifer M. Kinsley, Maria Ramiu, and David Singleton

as class counsel.  The class is defined as:

> All persons who are or who will be committed to the legal custody of the
> Department of Youth Services (DYS) and housed in one of its eight facilities at
> Circleville Juvenile Correctional Facility, Cuyahoga Hills Juvenile Correctional
> Facility, Freedom Center, Indian River Juvenile Correctional Facility, Marion
> Juvenile Correctional Facility, Mohican Juvenile Correctional Facility, Ohio
> River Valley Correctional Facility, Scioto Juvenile Correctional Facility, or
> housed in Lighthouse Youth Center, Paint Creek, a private facility.

(Order 7/09/07, Doc. 67)

3. On May 18, 2007, the Court approved a case management plan under which the

parties agreed to a joint fact finding team.  The fact finding team was headed by

Fred Cohen, Esq., and it proceeded with a thorough, independent, neutral

examination of the facts related to the duration and conditions of confinement at

facilities operated by DYS, including but not limited to excessive use of force;

arbitrary and excessive use of isolation and seclusion; arbitrary and excessive

discipline; abusive violation of privacy; inadequate mental health care; inadequate

health care; inadequate educational services; inadequate programming; failure to

adequately train and supervise staff; failure to protect from harm; failure to provide

an adequate grievance process; and failure to provide equal access to placement and

services for females.  The Team filed its report with the court in a timely fashion on

December 31, 2007.  (Cohen Report).  The parties agree with the Report's major

findings concerning use of force, use of seclusion, and provision of medical, mental

health, and education services.  The Report, which is hereby incorporated, establishes that the conditions of confinement for the members of the class fall below the constitutional and statutory standards in all categories addressed by the Fact Finding Team.  The Report served as the basis for the extensive, informal negotiations that followed.

4.  By entering into this Stipulation, the Defendants do not waive, and are not authorized to waive, the sovereign immunity of the State of Ohio, or the State's immunity from suit guaranteed by the Eleventh Amendment.

5.  The parties have conducted extensive informal negotiations since the filing of the Fact Finding Report.  These negotiations have included the parties as well as legal and medical experts in juvenile treatment and care.  These negotiations have been undertaken in good faith and at arm's length allowing the parties to reach agreement on the procedures and substantive criteria the parties will follow for ensuring the delivery of constitutionally and legally adequate services.  The parties freely and voluntarily, and with the advice of counsel, enter into this Stipulated Judgment for that purpose.

6.  The Defendants agree to use their best efforts to obtain the necessary funding to improve the juvenile system and to otherwise comply with the standards of care included in this Stipulation.

7.  This Stipulation is narrowly drawn to meet the applicable constitutional and statutory standards and the following terms and conditions are to serve as the basis for the injunctive relief encompassed herein.

## II. DEFINITIONS

8.  In this Stipulation, the following definitions apply:

A.  "Cool Off" means isolating a youth in his/her own room because, and only so long as, the youth poses a significant risk of danger to himself or others.

B.  "Circleville" means the Circleville Juvenile Correctional Facility, located at 640 Island Road, P.O. Box 598, Circleville, Ohio, and any facility that is built to replace or supplement the Circleville Juvenile Correctional Facility.

C.  "Clinicians" or "clinical staff" with respect to mental health services means psychologists, licensed master's level social workers, master's level psychology assistants, and psychiatric nurses. This would include licensed social workers and professional counselors under appropriate supervision.

D.  "Comfort Room" means a closely supervised room on mental health or other treatment units equipped with sensory motor manipulatives designed specifically to allow youth the opportunity to engage their five senses to develop and practice more positive coping strategies.

E.   "Cuyahoga Hills" means the Cuyahoga Hills Juvenile Correctional Facility, located at 4321 Green Road, Highland Hills, Ohio, and any facility that is built to replace or supplement Cuyahoga Hills Juvenile Correctional Facility.

F.   "DYS" means the Ohio Department of Youth Services.

G.   "Effective Date" means the date this Stipulation is entered by the Court.

H.  "Evidence-based" means grounded in peer-review quality empirical research that measures outcomes and demonstrates effectiveness.

I.  "Facilities" means Scioto, Indian River, Ohio River Valley, Cuyahoga Hills, Circleville, Freedom Center, Paint Creek, Marion, and any other facilities that are built or utilized to house members of the class during the term of this Stipulation, collectively.

J.  "Freedom Center" means Freedom Center Residential Treatment Center located at 8101 Dublin Road, Delaware, Ohio, and any facility that is built to replace or supplement Freedom Center Residential Treatment Center.

K.  "Implement" means to give practical effect and ensure actual fulfillment by concrete measures, including appropriate training of relevant staff.

L.  "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

M.  "Indian River" means the Indian River Juvenile Correctional Facility located at 2775 Indian River Road S.W., P.O. Box 564, Massillon, Ohio, and any facility that is built to replace or supplement Indian River.

N.  "Isolation," "isolate," and "isolating" mean placement of a youth alone in a room from which the youth's ability to exit is blocked. The term isolation does not apply to locking a youth in a room during normal hours of sleep.

O.  "JCOs" mean the Juvenile Correctional Officers who work at one of the facilities.

P.  "Marion" means the Marion Juvenile Correctional Facility located at 332 Marion Williamsport Road, Marion, Ohio, and any facility that is built to replace or supplement Marion.

Q.  "Mohican" means the Mohican Juvenile Correctional Facility located at 1012 ODNR, Mohican 51, Perryville, Ohio, and any facility that is built to replace or supplement Mohican.

R.  "Monitor" means an individual having experience and education or training in the field of juvenile justice who is appointed by the court to oversee the implementation of this Stipulation by evaluating and reporting on the State's progress.

S.  "Ohio River Valley" means the Ohio River Valley Juvenile Correctional Facility, located at 4696 Gallia Pike, P.O. Box 1000, Franklin Furnace, Ohio, and any facility that is built to replace or supplement Ohio River Valley.

T.  "Over-familiarity" means any inappropriate or unduly intimate or informal conduct between juveniles and staff or employees including conduct that may lead to a romantic or sexual relationship, such as exchanging letters, providing special favors, or inappropriate touching.

U.  "Paint Creek" means Paint Creek Youth Center, located at P.O. Box 586, Bainbridge, Ohio, and any facility that is built to replace or supplement Paint Creek.

V.  "Qualified mental health professional" means a mental health care provider sufficiently trained and currently licensed to provide the services he or she undertakes to provide.

W.  "Quality Assurance/Improvement Program" means a system of self-auditing and improvement to assess the implementation and effectiveness of all remedies

instituted pursuant to this Stipulation, to identify deficits that may exist, and to effectuate new measures to cure deficits identified.

X. "Rehabilitative Services" means programming provided to all youth in the Facilities designed to create or restore to the youth socially acceptable behaviors and values.

Y. "Restraints" means any chemical or mechanical device used to control the behavior of a youth.

Z. "Scioto" means the Scioto Juvenile Correctional Facility located at 5993 Home Road, Delaware, Ohio, and any facility that is built to replace or supplement Scioto.

AA. "Seclusion" has the same meaning as the term "isolation".

BB. "Serious Incidents" means critical incidents such as uses of force with injuries requiring more than first-aid treatment; allegations of child abuse, of over-familiarity or other, inappropriate staff relationships with youth, of staff-on-youth violence, of serious youth-on-youth violence, of significant actual or significant attempted self harm, of serious youth-on-staff violence, inappropriate staff relationships with youth, sexual misconduct between youth and abusive institutional practices or any other incident determined by the Director.

CC. "Special needs youth" means youth who are in need of accommodation due to mental retardation, mental illness, physical disability, developmental disability or other similar condition or status.

DD. "State" means the Defendants as described in Paragraph 1, above, also referred to as DYS.

EE.  "Suicide Precautions" means any level of watch, observation, or measures to prevent self-harm.

FF.  "Superintendent" means an individual who is appointed to oversee all aspects of facility operations and is responsible for all staff and youth at that facility.

GG.  "Train" means to instruct in necessary skills, such that the trainee has the demonstrated proficiency to implement those skills as and when called for in the training. "Trained" means to have achieved such proficiency.

HH.  "Treatment" means an evidence-based or a promising practice supported by research intervention designed to meet a youth's needs within a continuum of care to promote well-being and successful reentry into the community.

II.  "Unified Case Plan (UCP)" means the primary DYS document used to establish and describe youth and staff responsibilities regarding rehabilitative services, reentry preparation, release authority and court expectations.  The UCP shall document special concerns and summarize youth progress and completion of programs in all areas.

JJ.  "Youth" means any juvenile or juveniles committed by a court to the custody of DYS, and residing at, the Facilities during the operation of this Stipulation.

### III. SUBSTANTIVE REMEDIAL MEASURES GENERALLY

### A.  SCOPE

9.  This Stipulation encompasses all youth who are or will be in the custody of and under the supervision of DYS.  The facility at Paint Creek did not share the problems found at the other facilities.  Therefore the youth housed at the Paint Creek Facility shall be subject to the sections entitled Guiding Principles; Release

from DYS Custody; Grievances; Monitoring; Fees and Miscellaneous.  As additional DYS facilities are opened during the term of this Agreement the parties shall agree on which provisions of this Agreement shall apply to such facilities. This Stipulation does not cover youth who are released from custody and on parole in the community.

## B.  GUIDING PRINCIPLES

10. DYS shall provide youth in its charge with a safe and humane environment. DYS shall provide youth individual care, treatment, and rehabilitative services in the least restrictive setting consistent with the youth's needs, documented security concerns, and generally accepted professional standards of care.   In no event will the level of care in such areas such as safe environment, mental health, special education, programming or any other requirement encompassed in this Stipulation fall below the level described or required in this Stipulation, and the State aspires to consistently exceed these levels.

11. The parties agree with the DYS mission statement:  *"The mission of the Ohio Department of Youth Services is to encourage positive change in the lives of youthful offenders through collaborative partnerships and culturally relevant therapeutic and academic interventions that support public safety and prepare youth to lead productive lives."*

12. The parties recognize that while certain aspects of this Stipulation are aspirational, all short term, intermediate and long term decision making must follow an established set of guiding principles that meet the letter and spirit of this Stipulation. Those principles are set forth herein.

13. **Comprehensive Continuum of Care in a Regionalized Services Delivery System.** DYS shall develop a continuum-of-care system that emphasizes prevention, intervention and treatment in local communities using evidenced-based or promising practices based on evidence programming, academic and therapeutic based residential care, and a strong system of aftercare to assist youth with successful re-entry after incarceration. A regional service delivery system should be created that supports the use of small (12-48 bed) community-based facilities in order to keep appropriate juveniles as close to home as possible, and make use of community services. DYS shall reduce the population of the current facilities in accordance with a plan and schedule to be prepared by DYS in consultation with plaintiffs. The goal regarding the existing facilities shall be that no living unit in any DYS facility shall house a population that exceeds that unit's rated capacity. The goal of the regional plan is to expand regional beds while downsizing or closing existing facilities. The following factors shall be addressed by the parties in the development of a plan to achieve these goals:

   a. The impact of beds to be added by the opening of regional facilities;

   b. The impact and implementation of the uniform risk assessment tool that is expected to be in use by Ohio Juvenile Judges in 2009;

   c. DYS agrees to provide population numbers to the Monitor at intervals determined by the parties, including the Monitor. If upon review of the population numbers the Monitor determines that notification to the parties is warranted, said notification will be the sole responsibility of

10

the Monitor.

d. Regular communication with the juvenile judges and other stakeholders regarding the limitations on state resources and the need to be efficient with said resources;

e. Ongoing assessment of the plan on public safety;

f. Ongoing assessment of the plan on local detention facilities, CCFs, and other community facilities and programs;

g. Ongoing review of the Reclaim formula in order to facilitate the achievement of the goals;

h. Implementation of the commitment to plan for re-entry with each youth; from the moment he/she enters DYS custody;

i. Impact of any changes in method of determining release from custody;

j. Impact of the security classification of all of the youth.

k. Whether, on agreement of the parties, based on appropriate juvenile correctional reasons, the goal with respect to a particular living unit should be modified; provided, however, that no modification would present a threat to security or delay the delivery of services to any youth.

14. **Task Force.** In order to assist the parties to accomplish the regional service delivery goal and the goal of reducing institutional population set out in paragraph 13, above, the existing Cognitive Behavioral Therapy (CBT) Task Force of stakeholder representatives will continue its work of developing and opening small (12-48 bed) regional facilities to serve youth committed to DYS

that are appropriate for placement in regional facilities.  The appropriate task
force subcommittee will continue to explore the extent to which existing
Community Correctional Facilities (CCF) should be addressed in the ultimate
plan for DYS.  The transition plan shall be completed no later than six months
after the effective date of this Stipulation.  The task force, using CBT and other
concepts, shall work broadly to establish a plan to retain juvenile offenders in
the community when possible; substantially reduce the current reliance on
institutional confinement; and, where appropriate, return those juveniles who
must be institutionalized to the community through a series of graduated
programs responsive to individual needs. It is anticipated that the parties and
Monitor or a representative shall participate in the task force.

15. **Least Restrictive Alternatives.**  The DYS continuum of care for youth should
provide rehabilitation while protecting the community.  DYS secure facilities
should normally be utilized to incarcerate and treat high-risk, serious and
chronic juvenile offenders.  The least restrictive appropriate alternative should
always be preferred in order to decrease the number of youth in secure care,
including community correctional facilities or other residential programs.  This
principle shall be communicated to Ohio's juvenile judges, who shall be
encouraged to exercise their discretion consistent with this principle.

16. **Cost Effective Measures.**  The system developed should maximize cost
effectiveness and the use of taxpayer's money.

17. **Equitable Treatment for All Youth.**  The continuum of care should promote
equal and equitable treatment for all youth. DYS must focus on the

disproportionate commitment of youth of color and work to identify and reduce disparities.  DYS must also develop programming that is culturally sensitive, gender sensitive, and disability-responsive.

18. **Effective and Consistent Admission Assessment and Ongoing Assessments.**  Placement and treatment decisions must be formed by validated risk and need assessment instruments that are multi-pronged and ongoing to respond to the changing needs of youth; to ensure that youth are placed in the least restrictive environment possible; and to ensure that youth are not incarcerated longer than necessary for successful reentry.

19. **Youth-Focused Care.**  The DYS system of care must reflect the individual, familial, social, educational, developmental and psychological needs of youth served.  DYS shall implement individualized, dynamic treatment planning and programming informed by principles of adolescent development and facilitated through active youth involvement.

20. **Quality Treatment Interventions.**     DYS shall employ interventions that incorporate appropriate professional standards of care to include outcome measures to support effectiveness.

21. **Engagement of Families.**  DYS shall strive to involve family, family surrogate, or other significant adult relationships at all levels in the youth's care, and maintain ongoing, family-friendly, open communications regarding youth throughout their stay.  DYS' family-centered philosophy shall include youth offenders who are themselves parents and seek to be a caregiver in their children's lives.

22. **Qualified Work Force Properly Deployed.**  Professional and correctional staff must be trained, retained and supervised through effective leadership to be a workforce that is youth-focused and strength-based in its approach. Hiring, training and ongoing management of personnel to build adolescent development expertise, cultural competence and a genuine sense of care and concern for the youth is essential.  DYS shall expand and refine the role of JCOs beyond their current, nearly exclusive function as custodial staff. DYS shall continue to support and shall adequately staff unit management in the current facilities.

23. **Education Opportunities.**  An education system that provides opportunities for continued educational and/or vocational training is essential.  The education component should be designed with appropriate assessments and opportunities to advance students at their own pace, taking into account any special needs that have been identified.  Educational services must necessarily be balanced with security needs, but nonetheless must comply with all state and federal laws and regulations.

24. **Grievance System.**  An effective grievance process that is responsive to youth needs and concerns, and which timely investigates complaints and communicates with youth is essential.  Youth must have ready access to the grievance system without fear of intimidation or reprisal if they use it.

25. **Access to Advocates/Attorneys.**  Youth must have easy access to advocacy organizations and attorneys to ensure they are informed about their rights and can exercise their rights.  Youth have a constitutional right to challenge the

14

fact, duration or conditions of their confinement, and must have the assistance
of attorneys to aid them in making legal challenges. Reasonable attorney
access shall not be hampered.

26. **Strong Re-entry Programs.**  Re-entry efforts should begin at the time of
admission and utilize a wrap-around case management function which includes
residential options for youth who cannot return home to their families.

27. **Fair and Effective Release Process.**  A system for decision making regarding
release must be based upon accurate and current information regarding a
youth's risk and needs, the due process rights of the youth, timely and ongoing
communication with treatment staff, parents or other responsible adults, and
must comply with notifications as required by law.  Release decisions should
be fair, consistent, and result in youth that are held no longer than necessary
for successful re-entry.  There should be accountability and oversight of
decision making regarding release.

28. **Accountability and Monitoring.**  A strong system of accountability must be
put in place through systematic monitoring and evaluation of programs and
treatment of juveniles.

### C.  IMPLEMENTATION PRIORITIES

29. In accordance with the findings in the Cohen Report, the parties agree that use
of force by staff, isolation practices, the absence of acceptable mental health
care and other appropriate programming, overcrowding, and the deficiencies in
education are such that class members are at risk physically, psychologically,
and educationally.

30. All policies and procedures (P & P) in the areas described in paragraph 29
    shall immediately be subject to review and revision as a joint effort by DYS
    and the Monitor conducted in consultation with the class counsel.

31.  All personnel, environmental, training, and other necessary changes required
    to implement the revised policy and procedures in the above described areas
    shall be undertaken and completed with all deliberate speed and in accordance
    with specific schedules submitted by DYS and after consultation with class
    counsel.

32. Plan for Reforming Release: The parties shall work with the Monitor and
    prepare a plan for reforming release standards and procedures.   This plan will
    explore potential revisions of the release authority statute and/or rules; the
    impact of sentencing that requires mandatory time for certain crimes; whether
    court jurisdiction should extend over each youth throughout commitment, and
    other issues related to release that may seem relevant to the task force.  This
    plan shall be completed within sixty days of the effective date of this
    Stipulation.  After the plan is completed those measures within the power of
    DYS to implement shall be promptly implemented.  The parties shall work
    together to secure the agreement of other branches of government with respect
    to those measures that require the cooperation of other branches of government
    for implementation.  While this planning process is underway the stay of the
    litigation in *J.J. v. ODYS*, No. 2:07-cv-170 (S.D. Ohio) will continue.  Should
    the parties reach an impasse regarding release from custody one or both of the
    parties may move to lift the stay and litigate that case.

### D.  REVIEW OF RECENT CHANGES

33. Within thirty days of the effective date of this Stipulation, DYS shall submit to the Monitor and serve on class counsel a list and detailed description of all changes or additions made by the agency from May 18, 2007.

34. Unless it is self-evident or included as part of the text of listed changes or additions, DYS shall include a brief description of the history of the program upon request by the Monitor.

### E.  POLICIES & PROCEDURES

35. All existing Policies and Procedures (P& P) not encompassed by the provisions of Section C will be reviewed and revised as needed.  The policy and procedures will be designed to meet or exceed the minimum level of care required by the relevant statute or constitutional Amendment.  The initial policy and procedures review shall be initiated by DYS officials working with the Monitor, subject to review by class counsel.

36. The policy and procedures review and revision should be completed within nine (9) months of the effective date of this Stipulation.  Upon completion of review and revision, DYS shall begin the process of formal adoption and implementation, and shall modify all post orders, job descriptions and performance evaluation instruments in a manner consistent with the revised policy and procedures.

37. Following formal adoption, DYS shall launch a training program designed to familiarize all relevant personnel, including clinical treatment staff, unit staff and JCOs with new policies and procedures.  To the extent possible, training

on the revised policy and procedures shall occur prior to implementation.

38. Staff training on policy and procedures shall be included in the annual in-service training and shall emphasize those aspects of the policy and procedures specific to staff roles in the facilities.  All DYS training programs shall include provisions for testing those completing the training programs.

39. Mental Health and Medical policy and procedures shall be general and system-wide as well as site-specific.  Site-specific measures are deemed particularly important at facilities serving a special population (e.g., Scioto girls, facilities with special mental health units).

40. Site-specific measures may not be inconsistent with the system-wide policy and procedures.

41. Following adoption and implementation of the revised policy and procedures, Central Office will annually review each policy and procedures.  The review shall not be pro forma.  Subject to modification within the discretion of the Monitor, documentation will identify the participants, basis for the review, and the rationale for each change to be made and for the continuation of existing provisions left without change.

42. This section requires overall review and revision of policy and procedures and subsequent sections will contain more specific principles or content for particular areas.

## IV.  INTAKE AND CLASSIFICATION

43. **Admissions and Intake**: DYS shall develop and implement policies, procedures, and practices to establish a consistent, orderly admissions intake system that is

conducive to gathering necessary information about youth; to disseminating information to staff providing services and care for youth; and to maintaining youth safety. DYS shall ensure that all staff is attentive to the heightened risk of suicide on facility intake units.

44. **Assessment and Screening**.  To the extent possible assessments completed at the local level shall be used to minimize time in the reception center.  DYS shall ensure that trained personnel implement a standardized process for assessments and screenings to capture information in a number of areas  including, but not limited to,  positive adaptations to past treatment experiences;  coping mechanisms, strengths and resiliencies; family history;  work experience and career goals; cognitive assessment and adaptive functioning/school behavior; and diagnoses linked to functional problems. DYS should continue to consider the inclusion of additional validated assessment instruments.

45. **Orientation**.  The orientation shall clearly set forth the rules youth must follow while at DYS; explain how to access medical and mental health care and the grievance system; include simple directions for reporting abuse and assuring youth of their rights and responsibilities to be protected from retaliation for reporting allegations of abuse, and provide information pertinent to the youth's participation in DYS programs. The rules for all programs should also be posted conspicuously in the living units.

46. **Introductory Handbook**: DYS shall revise the Introductory Handbook to reflect DYS' mission.

47. **Classification and Housing.**  Youth shall be housed pursuant to a validated

security classification system that assures placement in a housing unit appropriate to the treatment and programming needs of the youth and the risks of harm associated with that youth.

## V. HOUSING UNITS

48. **Unit Staff Central to Service Delivery**.  Each youth shall continue to be assigned to a specific housing unit.  Units shall be staffed by a unit manager and social worker(s).  All services delivered to the youth shall be coordinated through the unit manager.  Reentry planning for the youth shall start as soon as the youth enters the unit and continue through release.  Unit staff shall be responsible for communicating with the family or significant adult and engaging those family or family surrogate figures in the life of the youth in a meaningful way.  Unit staff shall also participate as appropriate in the Interdisciplinary Team and/or rehabilitation teams associated with the youth on the unit.

49. **Unit Staffing**.  There shall be sufficient staff at the unit level to perform these functions in a manner that allows timely reports, assessments, meetings and information sharing regarding each youth.  Ordinarily, no unit social worker should have more than twenty youth on his/her caseload at any one time.

50. **Phones in Units**.  The phone system within each unit shall allow adequate low cost contact with family or family surrogates, and significant others via telephone, in particular when distances between a youth's home and the JCF are great.

51. **Records**.  DYS shall establish a policy and procedure requiring that appropriate unit staff have access to all records necessary for adequate delivery of services on the unit.

## VI. REHABILITATION AND PROGRAMMING

52. **All Youth Entitled to Rehabilitation**.  Rehabilitation refers to the process of creating or restoring to the individual socially acceptable behaviors and values, and is not dependent on a clinical diagnosis.

53.  **Unified Case Plans**.  Every youth in the custody of DYS is entitled to a unified case plan and the staff and physical resources designed to implement such plan.

54. **All Staff Participate in Rehabilitation**.  All staff members who have regular contact with youth shall have a defined role in the rehabilitative effort.

55. **Routine Interactions With Youth Designed to Promote Positive Behaviors.**

DYS shall maintain an environment within each facility that creates a socio-cultural context that supports social adjustment and the development of pro-social skills. Behavior will be managed through the recognition that adolescents learn from one another as well as adults in authority, via observation, imitation and modeling.  The rehabilitation planning for youth shall take into consideration cognitive, behavioral and environmental influences.  DYS shall develop behavior management strategies that will support social development and social adjustment of youth.  DYS shall develop and implement policies, procedures and practices that ensure effective resources to assist all staff in the creation of a youth monitoring system that is consistent throughout all facilities.   Behavior intervention methods will be utilized as part of the daily activity of youth in a fair, firm, and consistent manner throughout all DYS facilities.  Implementation of adopted methods will encourage the increase of positive behaviors and improved social adjustment and the decrease of attention-seeking negative and self-destructive behaviors.

56. **Structured Programming**.  The DYS rehabilitation plan for each youth shall be implemented in the context of a system-wide range of structured rehabilitative services, including an appropriate mix of physical, recreational, or leisure activities, during non-school hours and days ("Structured Programming"). DYS shall develop and implement Structured Programming at each facility from the end of the school day until youth go to bed, and on weekends. For youth housed in closed room environments, Structured Programming shall be designed to ensure that youth are not confined in locked rooms except: (a) from after Structured Programming to wake-up; (b) as necessary where the youth poses an immediate risk of harm to self or others; or (c) following an adequate disciplinary hearing, pursuant to an appropriate disciplinary sanction. Structured Programming shall be designed to modify behaviors, provide rehabilitation to the types of youth committed to each facility, address general health and mental health needs, and be coordinated with youth's individual behavioral and treatment plans. DYS shall also ensure that large muscle exercise is available consistently for all youth for a minimum of one hour daily. DYS shall also ensure that youth receive programming activities that are required for parole eligibility in a timely manner.

57. **Volunteers**.  The Rehabilitation program shall continue expanding the use of volunteers.

58. **Special Needs Youth.**  DYS shall ensure that youth with special needs (e.g., youth with mental illness, mental retardation, developmental disabilities, or physical disabilities) obtain appropriate care, programming, and group therapy (as appropriate), including any accommodations in other programming related to their

special needs.

59. **Comfort Rooms.**  DYS also shall ensure that there is a clearly articulated program with policies and procedures for utilizing any comfort room.

60. **Quality Assurance for Rehabilitation.**  DYS shall develop quality assurance mechanisms to assess whether the program is implemented correctly and consistently across all settings and to assess the effectiveness of interventions used. DYS shall annually survey facility staff and youth to secure feedback on program implementation.

61. **Rehabilitation Program Development and Staffing**.  Within 180 days of the effective date of this Stipulation, DYS shall prepare a detailed rehabilitation program describing the behavior management plan, Structured Programming and all components thereof (e.g., structured recreation, weight loss, arts and crafts, etc.) and the proposed staffing both in terms of quantity, training and education, and allocation.  The rehabilitation program shall be reviewed by the Monitor and class counsel. Staffing for rehabilitation programming and the allocation of such staff shall be the subject of a detailed annual review and report by the Monitor, who shall include any specific recommendations for change.

62.  **Sex Offender Programming.**  All youth entering DYS who have been adjudicated for a sexually oriented offense shall receive assessments and testing specific to their needs.  Upon completion of the assessment process, licensed professionals shall recommend programming specific to the youth's treatment needs that is normed for adolescent populations, and reliant upon objective, evidence-based criteria.  A Unified Case Plan as described in

23

paragraph 53 shall be developed in collaboration with the youth, the youth's

family, licensed professionals and the youth's Inter/Multi Disciplinary Team

to identify how the individual needs of the youth shall be met.  DYS shall

develop a sex offender program to be delivered in a hierarchical system of

care approach to address the individual needs of the youth and the level of

the offense.  All professionals working with the sex offender population

shall receive annual training specific to their level of intervention with the

youth.  Policies, procedures, practices and quality assurance measures shall

be created to address program service delivery specific to the sex offender

population.

63. **Sex Offender Programming and Release**. DYS shall ensure that release

decisions for those who receive Sex Offender programming are consistent

with the process employed with other offenders, and properly accommodate

any special criteria imposed by state or federal law.  Juvenile offender

registrants are not required to comply with the residency restriction codified

in R.C. 2950.034 and DYS shall not enforce a residency restriction against

such juvenile offenders[1].

64. Ordinarily, no youth should have his/her stay at DYS extended because of a

delay in providing services at the facility level.  Short extensions may be

appropriate if a youth is very close to achieving a GED or finishing a

program if completion of that program in the community would cause the

---

[1] The residency restriction only applies to an offender "who has been convicted of, is convicted of, has pleaded guilty to, or pleads guilty to a sexually oriented offense or a child-victim oriented offense."  R.C. 2950.034 (A).  By definition, a juvenile offender registrant "means a person who is *adjudicated* a delinquent child."  R.C. 2950.01(M) (Emphasis added).

youth an undue hardship.  An extension may also be appropriate where necessary to complete a program required by a statute as part of the disposition.

## VII. SAFE ENVIRONMENT: STAFFING, FORCE, CRISIS MANAGEMENT, RESTRAINT, INVESTIGATIONS

65. **Generally.**  DYS shall, at all times, provide youth in the facilities with safe living conditions. As part of this requirement, DYS shall take appropriate measures to ensure that youth entrusted to DYS shall receive individual care, treatment, and rehabilitative services in the least restrictive setting, consistent with the youth's needs, documented security concerns, and generally accepted professional standards of care.

66. **JCO Staffing.**  Adequate staffing is critical to safety for youth and staff alike.  DYS shall ensure maintenance of staff levels permitting staff to supervise youth safely, protect youth from harm, allow youth reasonable access to medical and mental health services, and provide adequate time for out-of-room activities.  DYS shall complete its current JCO staffing study and attempt to fill the positions identified in that study within 180 days of the effective date of this Stipulation.  The staffing study and implementation efforts shall be submitted to Class Counsel for review and to the Monitor for evaluation and review upon the effective date of the Stipulation.  The parties recognize that DYS is attempting to reduce the youth population by the effective date of this Stipulation.  DYS shall have a period of one year from the effective date of this Stipulation to report on whether the staff hired pursuant to its JCO staffing study is adequate to meet the goals of this Stipulation.  Class Counsel shall review said report and provide input to the Monitor, who shall

determine whether the goal of adequate JCO staffing has been achieved.

67. **JCO Qualifications**.  DYS shall take all reasonable means to employ only individuals fit to work with youth residents as JCOs.  DYS shall conduct an appropriate background check, including a criminal record check on all candidates for employment.

68. **JCO Duties and Training**.  JCO duties shall include tutoring, homework assistance and other participation in youth programming and activities.  Training shall be directed to improving the JCO's skill development from a strength-based or positive perspective.  JCO training must embrace the rehabilitation program and philosophy surrounding services to youth.

69. **Staff Training**. DYS shall train all institutional staff in behavior management, de-escalation techniques, appropriate communication with youth, and crisis intervention before staff may work in direct contact with youth. Training for all staff shall have lesson plans that exist separate from PowerPoint and contain training objectives, useful participant handouts, and an evaluation experience that identifies participants who have not acquired the basic skill levels through the training. DYS shall upgrade and expand its training materials, particularly audiovisual resources that are juvenile specific.  The Training Department should review the juvenile justice training resources at the University of Illinois at Springfield and at the Kentucky Department of Juvenile Justice as models for use at DYS.  DYS shall collect feedback and information from each JCF regarding local training needs for staff.  DYS shall conduct focus groups to evaluate and improve On the Job Training.

70. **Use of Force – Generally – Legal Standard Adopted.**  The State shall, at all times, provide youth in the Facilities with safe living conditions.  As part of this requirement, the State shall take appropriate measures to ensure that youth are protected from abuse and neglect, use of excessive force, undue seclusion, undue restraint, and over familiarization. The State shall develop and implement comprehensive policies, procedures and practices limiting use of force on youth to situations where it is objectively reasonable and necessary.  Staff shall be required to adequately and promptly document and report all uses of force.

71. **Guiding Principles for Use of Force Policies.**  In developing use of force policies, procedures and training materials, DYS will be guided by the following:

   a.  DYS policies, procedures and practices should require use of the least amount of force appropriate to the risk posed by the youth and that require staff to adequately and promptly document and report all uses of force by staff;

   b.  force should be limited to situations where the youth is currently physically violent and poses an immediate danger to himself/herself or others; or the youth is affirmatively physically resisting institutional rules; or

   c.   the institution has attempted and exhausted a hierarchy of non-physical alternatives;

      i.  the attempt to use non-physical alternatives has been documented; and

      ii.  a supervisor is present and supervising the use of force;

    d.  policies should:

          i.  limit the amount, form, and duration of uses of force to the minimum necessary to prevent harm to persons or obtain compliance with institutional rules (where compliance is necessary under the circumstances), and require that all staff implementing such force be trained appropriately; and

          ii.  explicitly state that verbal abuse and physical punishment are never acceptable, and expressly prohibit use of force practices that are incompatible with minimum actions necessary to prevent harm or obtain compliance with reasonable and proper orders including but not limited to practices such as inappropriate shoving, pushing, kicking, or striking youth, or inappropriately holding youth in a manner inconsistent with the techniques formally approved and taught to staff at the facilities; and

    e.  policies should ensure that JCO's are closely supervised and monitored, that all staff are held accountable for the use of excessive force or abuse through appropriate disciplinary action, and that all staff persons who are mandatory reporters of abuse under Ohio law have reviewed and signed a statement setting forth those obligations.

72. **Gangs.** DYS shall utilize strategies that are appropriate and fair to staff and youth alike for management of the problems caused by youth gangs within the facilities.

73. **Video Monitoring**. DYS shall ensure that adequate video camera coverage is provided throughout all facilities, including in sallyports and other isolated areas, to

enhance necessary monitoring and to avoid the risks of self-harm and other potential abuse.

74. **Crisis Management Generally.** DYS shall ensure that Safety Plans, Special Management Plans (SMPs), isolation and any other procedure designed to decrease severe and/or chronic problem youth behavior, including assaultive and/or threatening behavior, are individualized, strength-based, tied to treatment goals, and provide adequate incentives for changing youth behavior. DYS shall ensure that such procedures are time limited, with graduated punishments and incentives, and are carefully monitored and supported by a representative of the Interdisciplinary Team.

75. **Special Management Plans and Isolation.** DYS shall ensure that SMPs and other comparable procedures for youth will involve a member of the Interdisciplinary Team to signoff in non-mental health units. DYS shall ensure that such procedures for youth who are on the mental health caseload or who are being followed by Psychology, require approval by a psychologist and are reviewed on at least a weekly basis. DYS shall ensure that SMPs and other comparable procedures for youth involve a careful assessment of facts beyond the immediate charge or violation. DYS shall ensure that such procedures are reviewed to determine the frequency and outcomes of any previously-used plans, that the procedures are designed to meet individual youth needs even when the only consideration is discipline or correction of a recurring problem behavior, and that the plans offer acceptable behaviors or new skill development to resolve problems effectively.

76. **Crisis Management Policies.** DYS, with consultation from the Monitor and class

counsel, and as part of a plan to revise policies regarding seclusion, isolation and crisis management, will dramatically reduce and eventually close the intensive programming units as currently operated.  Said plan will be developed within 60 days of the effective date of this Stipulation.  The principles that will guide development of this plan include:

a.  Ensure that any youth placed in restraint beyond one hour is assessed by a trained medical professional, in a documented manner, and is regularly monitored by a JCO trained in the administration of restraint.

b.  Clearly specify the factors warranting the imposition of each approved form of isolation; specify the manner in which isolation shall be imposed, supervised, terminated, and documented; expressly prohibit unapproved forms of isolation; and require authorization from the Superintendent (or his/her designee) for isolation beyond three hours.

c.  Prohibit use of isolation as an immediate punishment or as informal discipline, and, to the extent possible, use isolation only when less restrictive means of obtaining compliance with programming requirements or lawful orders have been properly, but unsuccessfully, attempted.

d.   If isolation is used for discipline it must be appropriate for the youth, and the youth must receive a due process hearing prior to the imposition of said discipline.

e.  Release youth from cool off promptly after they no longer pose a significant risk of danger to themselves or others, or no longer pose an immediate threat of elopement.

77. **Custodial Restraints Generally**.  DYS shall immediately develop policy and procedures that specify the manner in which restraints for control shall be imposed, supervised, terminated, and documented; expressly prohibit unapproved forms of restraints including as punishment; and specify that restraints are only used in those circumstances necessary for safety and security and, to the extent possible, when less restrictive means have been properly, but unsuccessfully, attempted.  The policy shall require that staff use appropriate safeguards against asphyxia when applying restraints. Except as necessary for control after an event, the policy shall limit the use of handcuffs and leg restraints for point-to-point movement within facilities.  A restraint device intended to immobilize should be an extraordinary event that is clearly defined, ordered by an appropriate supervisor with clinical oversight, of very limited duration, and thoroughly documented.

78. **Restraints – Training.**  DYS shall require that staff be appropriately trained in restraint techniques before applying restraints, and that such training include the risks of asphyxia associated with prone restraint and prone containment.

79. **Investigations of Serious Incidents.**  DYS shall develop and implement appropriate policies, procedures, and practices to ensure that appropriate investigations are conducted of all incidents of use of force with injuries requiring more than first aid treatment, staff-on-youth violence, of significant actual or significant attempted self harm, serious youth-on-staff violence, serious youth-on-youth violence, inappropriate staff relationships with youth, sexual misconduct between youth and abusive institutional practices or any other incident at the discretion of the Director.  Investigations shall be conducted by persons who do not

have direct or immediate indirect responsibility for the conduct being investigated. Sufficient staff shall be employed to provide adequate, prompt and thorough investigations.  Said policies shall be completed by DYS within 60 days of the effective date of this Stipulation and shall be reviewed by class counsel and the Monitor.

80. **Investigation Policy – Guidelines**.  Said investigation policies shall be developed in light of the following guidelines:

    a.  Except  as otherwise directed by the Superintendent of a facility, all instances and allegations of use of force will be immediately and thoroughly investigated and documented as follows:

        i.  when, where and under what circumstances the use of force occurred;

        ii.  who participated in or witnessed any use of force or precursors to it;

        iii.  what non-physical interventions were first attempted, by whom, for how long, with what effect; and

        iv.  what force was used, by whom, for how long, with what effect; and

    b.  Each investigation shall be conducted by a person(s) who  shall, at a minimum:

        i.  not, due to their assignments and/or relationships with involved staff or youths, have or appear to have a conflict of interest in conducting the investigation;

   ii.  for serious incidents and/or incidents wherein the subject is placed on administrative leave, at least 50% of the investigators must have successfully completed substantial law enforcement training in performing investigations and have experience in such investigations or comparable experience . All of the investigators must have also successfully completed training in administrative investigations by DYS that is developed in consultation with the plaintiffs and the Monitor;

  iii.  conduct private, in-person interviews of the youth(s) subjected to the use of force within 12 hours of the incident unless circumstances do not permit[2];

  iv.  obtain a written statement from staff involved in the use of force before those staff leave the facility;

   v.  gather written statements from and, as warranted by the facts, conduct in-person recorded interviews of all witnesses to the incident;

  vi.  as appropriate, consider trends based on previous incidents or allegations of incidents involving any of the staff or youth who participated in or witnessed the use of force currently under review;

 vii.  prepare within fourteen business days of the incident, a written report that shall include, at a minimum:

---

[2] Any delay in conducting the interview shall be documented and the reason for the delay thoroughly explained.

1. a summary of relevant facts;

2. a summary of all steps taken during the investigation;

3. all witness statements;

4. summaries of interviews with tapes of the entire interviews;

5. proposed findings addressing, as applicable, whether:

   the use of force or other conduct under investigation was

   objectively reasonable; and whether the force actually used

   or other conduct was appropriate and consistent with

   approved and trained techniques and the DYS use of force

   policy.

c. The Superintendent shall adopt, modify and adopt, or reject each of the

   proposed findings and shall provide a written basis as to any finding that is

   not adopted without modification. Any extension of time required for

   completion of the investigation shall be approved in writing by the

   superintendent with an explanation and also approved by the Chief

   Inspector.

81. **Backlog.** DYS shall eliminate the backlog of investigations for serious incidents

   within 30 business days of the effective date of this Agreement.

82.  **Staffing.**  DYS, in consultation with class counsel and the Monitor, shall retain

   sufficient staff to accomplish investigative goals as required by this Agreement.

83. **Abuse.**  All allegations of abuse shall be investigated in a timely and thorough

   manner.  DYS represents that it will act in collaboration with local offices of Child

   Protective Services and with local law enforcement to implement policies and

procedures regarding the steps to be taken and referrals to be made in the event of a report of alleged abuse of a youth, including steps that must be taken immediately upon the reporting of an allegation of abuse in order to preserve evidence and to protect youths pending an investigation of abuse. DYS represents that staff, including medical staff, has been trained in these policies and procedures.

84. **Quality Assurance – Investigations**. DYS shall ensure that as part of its facility and system-wide quality assurance program there will be a thorough analysis of use of force and other serious incidents and that DYS will comply with the terms of this Agreement.

### VIII. MENTAL HEALTH CARE

85. **General.** DYS shall provide youth with a reasonably safe environment designed to effect proper development and prevent psychological deterioration. DYS shall provide youth with a reasonable opportunity to accomplish the purpose of their confinement, including development of mental and emotional capacities for successful conduct and reentry into the community, such as the ability to take responsibility for the consequences of their actions; to respond appropriately to others (coping skills); to manage anger; and to develop a positive sense of accomplishment.

86. **Mental Health – scope**. DYS shall promote rehabilitation by developing, staffing, and implementing a comprehensive plan for a continuum-of-care mental health system that is attentive to the distinctive nature of adolescent cognitive, intellectual, emotional, social, and moral development. The system of care shall incorporate individualized, accurate, evidence-based or research-supported promising practices

35

assessment and treatment of each youth. DYS shall ensure that adequate staff, space, and time are provided for the necessary planning, implementation, and oversight of mental health services.

87. **Mental Health Policies and Procedures.**  DYS shall establish adequate policies and procedures that meet professional practice standards for every major area of mental health governance and service delivery. These guidelines for service delivery shall help to define what services should be provided to which youth. They must be explicitly articulated, internally consistent, and communicated or disseminated to ensure that clinical administration and staff have clear, current, working knowledge of existing policies and procedures, expectations, and consequences for non-compliance.  DYS shall ensure that facility mental health programs (policies, procedures, protocols, staffing, space, etc.), including review and approval by the clinical mental health hierarchy through Central Office, shall promote informed decision-making and consistent staff expectations and accountability. Clinical supervisors of units and/or unit clinicians should be an integral stakeholder in this endeavor.

88. **Mental Health Screening, Assessment, and Referral.**  DYS shall ensure that all youth have access to necessary inpatient psychiatric treatment at an appropriate facility.  Within one year and subject to consultation with class counsel and the Monitor, DYS shall redesign and restructure mental health screening, assessment, and referral processes to ensure that all youth at risk of unmet and untreated mental health needs, including mental disability, behavioral, and substance abuse diagnoses, are identified and referred for appropriate, prompt, and effective care

appropriate to their length of stay and consistent with professional judgment. DYS shall strive to prevent deterioration or exacerbation of mental health symptoms and to limit the behavioral manifestations of illnesses to potentially jeopardize youth and/or staff safety or to cause inappropriate punishment or needless isolation for behaviors caused by mental health issues.

89. **Special Mental Health Units**. Within one year of the effective date of this Stipulation, and subject to consultation with class counsel and the Monitor, DYS shall revise and clarify the screening, assessment, and referral protocols that govern the definition and operation of the Special Needs, Intensive, and Non-intensive Mental Health Units.

90. **Mental Health Discharge.** DYS shall ensure that criteria for discharge from the mental health caseload are clearly articulated**.**

91. **Mental Health Resources and Staff Generally.** DYS shall provide adequate trained personnel, space, and time to accomplish these goals, including the addition of clinicians; independently licensed, or appropriately supervised master's prepared social workers; psychiatric nurses; and clerical staff. DYS shall ensure that JCOs are included as integral members of the team in order to provide a coordinated and consistent treatment response.

92. **Mental Health Clinical Staff.** Clinical staffing goals shall be 1 clinician for each 15 girls diagnosed as mentally ill and in need of treatment; 1 clinician for each 20 boys diagnosed as mentally ill and in need of treatment; and 1 clinician for each 20 mentally ill youth in the general population. Clinical staffing in any Intensive Mental Health Unit or residential mental health unit shall include at least 3 full-time

mental health clinicians and a treatment team leader whose clinical profession and training shall be at the discretion of DYS.  Deployment of clinical staff also is at the discretion of DYS but the delivery of service is subject to the review of the Monitor. Clinical Staffing has increased at the Intensive Mental Health Unit at Marion.  DYS shall hire eight additional clinical staff in July, 2008.  A staffing analysis shall be performed using the Ohio mental health and licensure criteria to determine the appropriate staffing considerations based on acuity.  A staffing proposal will be completed by September 2008.

93. **Staffing Additional Mental Health Units**.  The clinical staffing of additional, other type treatment units shall initially be at the discretion of DYS, whose plan for any such unit and its staffing shall be reviewed by Class Counsel and the Monitor.

94. **Annual Review of Mental Health Staffing**.  Clinical staffing and the allocation of such staff shall be the subject of a detailed annual review and report by the Monitor who shall include any specific recommendations.

95. **Occupational and Recreational Therapy**.  DYS shall ensure that the mental health program will provide occupational therapy (OT) and general activity therapy in adequate number and quality, especially those on units with more intensive mental health needs, to promote fine and gross motor activities, tasks which focus attention and have a high probability of success, and increased self-esteem and self-confidence, for mentally ill youth who are frequently unable to participate in the more challenging schedule of general population. Occupational Therapists will work with the General Activity Therapist (GAT) to design programming.

96. **Support Staff**.  DYS shall ensure that facilities have the clerical support essential

for timely clinical communication, documentation, record-keeping, and monitoring, in order for Team members to provide appropriate program placement decisions and treatment response and to maximize the efficient use of valuable clinical time and expertise.

97. **Mental Health for General Population.**  DYS shall provide youth who are not on the mental health caseload with frequent, regular access to social work or other staff trained in the detection of depression and anxiety disorders, in order to prevent under-diagnosis due to masking or failure to report symptoms by youth who fear looking weak.  DYS shall ensure that youth with mental health needs that can be served in the general population receive adequate clinical staffing, mental health resources, and program support for the provision of clinical services. DYS shall ensure that these youth receive necessary ongoing monitoring, brief intervention, and/or continuing mental health services as needed.

98. **Mental Health Treatment Design.**  DYS shall ensure that treatment planning is based on professional standards, to include problem identification, solutions tied to the problem, identification of treatment response and any current assets.  DYS shall ensure that treatment programs are highly structured, consistent, intensive, and focused on changing specific behaviors and development of basic social skills.

99. **Mental Health Treatment and Families.**  DYS acknowledges that family involvement generally enhances positive outcomes.  DYS shall ensure that clinical staff, including Psychology, expand and strengthen contact with the families, family surrogates, or other significant adults in the lives of youth from reception through treatment and discharge planning.  All opportunities to build such relationships

should be exploited, including but not limited to attendance at Family Day, videoconferencing, and other forms of regular communication. Efforts to involve families should be required by policy and documented in the mental health record.

100. **Mental Health Treatment and Girls.** DYS shall ensure that a mental health clinician meets regularly with girls on the mental health caseload for individualized non-crisis oriented treatment, and with the non-mental health caseload youth, in order to promote the early detection and treatment of depression. DYS shall strive to provide appropriate treatment for adolescent female depression.

101. **Discipline for Youth on Mental Health Caseload.** Any youth who is currently on the mental health caseload or otherwise appears in need of assistance shall be provided with an advocate to assist such youth at any disciplinary hearing. The advocate, who shall have appropriate training for this role, shall be selected from a group of employees and not directly involved in the disciplinary event. The advocate shall make certain the youth charged understands the charges against him or her and the consequences of a guilty plea. Policy and procedures regarding discipline shall further elaborate on the disciplinary process and youth who are not fully able to comprehend or participate in such proceedings. The parties, in consultation with the Monitor shall agree to participate in a pilot program designed to determine any expansion of the role of the advocate that is deemed to be appropriate. This pilot program shall also help determine the scope of any appropriate training for the advocate.

102. **Quality Assurance and Peer Review Procedures for Mental Health.** DYS shall establish, disseminate, and monitor clear, detailed protocols for quality

assurance and peer review in the provision of mental health care.  DYS shall

establish a plan to identify and use the most effective, evidence-based mental health

and rehabilitative care treatment modalities, efficacy studies, bed utilization studies,

and formulary policies as part of a well-researched, established, clearly outlined

system of care.

103.  **Mental Health Staff Capacity and Performance.**  DYS shall ensure that data

collection efforts such as the Performance-based Standards Project are expanded

system-wide.  DYS shall develop and implement methods for evaluating staffing

competencies, performance indicators and outcome measures, and formal systems

of care coordination (integrated treatment plans and meetings, records, logs, internal

communications, family contacts).  DYS shall require competence in specifying and

assessing progress in individual treatment plans, in clinical performance, and in the

integration of the disciplines (see Adequacy of Mental Health Records below) in

order to increase quality improvement systems, clarity of clinical vision or purpose,

ability to monitor performance, and the systematic capacity to identify and improve

problems.

104.  **Mental Health Leadership.**  DYS will ensure that mental health leadership at

the Central Office level adequately recognizes and responds to the serious and

complex needs of the mentally ill youth in the DYS system; has a demonstrated

knowledge of pertinent issues; and exercises strong leadership and commitment to

advocate for critical mental health system needs and required change.

105.  **Training and Supervision of Mental Health Staff.**  DYS shall develop and

implement its own core clinical training curriculum in order for all clinical staff to

41

have requisite training and skills that are expected and supported by the agency. DYS shall provide adequate mental health in-service for clinicians as well as for all levels of staff to ensure their ability to respond effectively to the serious mental health needs that the DYS population presents. In-service opportunities must provide consistent messages, tied to clear expectations, including but not limited to newly articulated policies and protocols. For training to be effective, credible, and productive, it must be clearly coordinated, planned, and delivered.  DYS shall provide clinical staff with system-wide, consistent clinical enhancement training. DYS shall provide outside training opportunities that will assist treatment professionals within DYS. DYS also shall continue and expand current opportunities for clinical staff to pursue additional clinical training of their own initiative and choosing and staff will be encouraged to utilize workforce development funds.

106. **Mental Health Records and Team Coordination.**  DYS acknowledges that effective treatment of youth requires integrated treatment planning, communication, and documentation. DYS shall ensure that clinical staff develop specific individual treatment plans and goals for youth and assess progress toward these goals. Plans must include interventions that are strength-based, work toward specific individualized goals, and include families whenever possible in treatment planning and delivery. Progress notes will be in standardized (SOAP) format. DYS shall ensure that record-keeping is unified, accurate, and supportive of each youth's integrated treatment plan and a coordinated and purposeful treatment response. DYS shall ensure that administration and staff clearly understand the nature of

treatment plans in general and coordinated treatment plans in particular, in order to promote integrated and effective planning and treatment. DYS shall ensure that records from all programming are integrated as appropriate and support the clinical treatment plan.

107. **Suicide**. In the development of policy and procedures for suicide prevention, DYS shall emphasize the need to distinguish a suicide gesture from an authentic attempt. DYS shall address the use of suicide threats as a means to seek protection and determine if specific policies and procedures are needed regarding protective custody. Youth on Suicide Watch shall be seen daily by a psychologist during the week to provide appropriate intervention and support to assist the youth in developing the coping skills necessary to be removed from supervision and manage suicidal ideation. The policy and procedures will address the physical characteristics of rooms or areas used for suicide watch, the various levels of intensity for suicide watch, appropriate duration of suicide watch, activities, educational opportunities, and similar matters incorporated by national standards.

108. **Mental Health Care Facilities/Physical Plant.** DYS shall eliminate the open two-tier design and vertical rail bars of the Circleville Non-Intensive Mental Health Unit.[3] Within 60 days of the effective date of this Stipulation, DYS shall prepare a plan for the appropriate configuration, outfitting and use of any and all safety rooms (including rubber rooms) which shall be subject to review by Class Counsel and the Monitor.

---

[3] DYS should encase the railings so there are no spaces and no ability to leap over the second floor railing. DYS also should remove or repair loose and broken floor tiles, which can pose a potential risk for being used for cutting self or used as a weapon.

## XI. MEDICAL CARE

### A. General Principles

109. DYS acknowledges that every youth in the custody of DYS is entitled to receive treatment for their medical problems; that consequences of medical failures for youth can be more serious and more long-lasting than for adults; and that such youth are entitled to a broad array of preventive care and education.

110. DYS shall ensure, subject to approval by the Monitor, that medical services provided to youth meet the specific needs of adolescents as defined by nationally accepted practice standards.

111. Within 60 days of the effective date of the Stipulation and subject to review by class counsel and review and approval by the Monitor, DYS shall develop and implement chronic care clinics for youth with chronic diseases. DYS shall monitor these clinics to ensure compliance with nationally established guidelines for adolescent care.

### B. Leadership

112. DYS shall ensure that the Central Office provides strong leadership and oversight on medical issues, with an emphasis on continuity of care, open communication, and collaboration. DYS shall ensure that the Medical Director has recognized authority to design and promulgate policies that govern the practice of medicine in DYS facilities.

113. DYS shall clearly define the collaborative relationship between the Medical Director and the Director of Nursing.

114. The Medical Director and Director of Nursing should drive policy and procedure

development and review for all medical matters and submit that material for

Departmental approval through the Deputy Director for Treatment and

Rehabilitation Services.

115.  DYS shall provide the time, staff, training, and resources for the Medical Director

to conduct peer review, quality assurance, policy development, and other activities

associated with medical leadership and administration.  DYS shall establish and

implement a monitoring system to ensure that the Medical Director performs these

activities in a manner sufficient to ensure that medical practice standards are being

met.

### C.  Medical Assessments

116.  All references to the development of policy, procedures and protocols contained

in the section on Medical Care shall be subject to review by class counsel and the

Monitor.  Unless expressly stated otherwise, the policy, procedures and protocols in

this section shall be developed and subject to review within 180 days from the

effective date of this Stipulation.

117.  DYS shall develop policy and procedures that shall ensure that all medical

assessments, from intake through discharge planning, are monitored for quality and

accuracy and connect the youth to each receiving facility and to his home

community on discharge.  Such policy and procedures shall ensure that physicians

have a role in designing initial health care appraisals so that critical areas of

adolescent development and health history are adequately addressed, along with

family history and personal history of medical and mental health.

118.  DYS shall immediately design, implement, and monitor protocols requiring

documentation of available information and connection of that information to the youth's current health status. DYS shall revise policies on Health Care Appraisal and Examination (403.11) and Special Needs Health program (403.15 III and IV) as well as the Transfer Health Appraisal (403.12) to ensure that clinical impressions are documented and that health care providers integrate information that is available in order to provide timely and adequate care.

119. DYS shall develop protocols for quality improvement and to monitor the quality, accuracy, and timeliness of initial health appraisals, with the awareness that delays or inaccuracies may inhibit youth from enrolling in the educational program and in receiving necessary medical and mental health treatment.

120. DYS policy and procedures shall ensure that initial health care screens may be completed by an LPN but health appraisals are completed by RNs with an area for the physician's signature and comments. DYS shall strive to ensure there is correlation of information documented to confirm the physician's impressions from the record review.

121. DYS policy and procedures will ensure that the history provided by families is correlated with initial or subsequent medical and mental health assessments completed at parent institutions. DYS shall ensure that the initial appraisal includes assessments of physical and sexual development based on age and the youth's current nutritional status. Hearing and vision screens are to be completed as parts of the initial physical examination process and recorded in the medical file.

122. DYS policy and procedures will ensure the timely and accurate communication of medical information during any transfer process. DYS shall ensure that physicians'

progress notes document the review of available information and the physician's
conclusions based on that information, including but not limited to health status;
immunization status; significant youth or family history of chronic disease or
mental health issues; identified medical problems; problem status; response to
treatment; and timeframe for reassessment and examination.   Determining that an
acute or chronic disease is not present should also be consistently documented.

123.  Policy and procedures will ensure that the medical transfer summary must be
completed by the sending facility and accompany all youth at the time of transfer.
These must include: a summary of findings, a summary of care and treatment
provided with the youth's response, a list of current medications and compliance
and a list of specialty appointments completed or pending.  The receiving facility
RN shall document a review of the materials received on the transfer intake
screening form and correlate that information with the youth's health status at the
time of the initial examination by the physician.

124.  DYS policy and procedures will ensure that there are clear guidelines for clinical
assessment and physician referral for serious injuries, whether caused by youthful
exuberance, staff or youth assaults or athletic activities.  Youth injury assessments
must include a description of the activity or event that led to the nurse's
examination as well as the description of injuries and the action taken.

125.  DYS policy and procedures should routinely monitor qualitative reviews of the
medical information collected and used, and take corrective action, including policy
and procedure review, education, and training, where assessments are incomplete,
accurate information is not relayed in a timely manner, or follow-up is not

documented.

126.  DYS policy and procedures will provide for additional attention to the special needs of female adolescents in all aspects of programming and care. Developmental milestones for physical and emotional development should be identified and used in the provision of care and education.

### D.  Medication

127.  DYS policy and procedures will ensure that medication administration, including the prescription, distribution, and storage of medication, meets current national nursing, pharmacological, and physician standards; that medications prepared in advance shall be administered by the nurse who prepared them; and that medications shall be recorded at the time they are administered.  Blank spaces on the medication administration records ("MARs") shall be reported as medication errors as required by DYS policy.

128.  DYS policy and procedures will ensure that there is an assessment of the impact of any medication error, regardless of the nature of the error (*inter alia,* wrong medication, medication administered to the wrong person, effects of a double dose due to recording errors, or not giving the medication because it was not available).

129.  Medications may be ordered on an as needed basis, *e.g.,* to deal with recurring pain or asthma.  The physician's order may specify the number of hours that must lapse between doses ("example: one dose every three to four hours") or the maximum number of doses that can be administered within a 24- hour period (example: a maximum of eight doses).  DYS shall continue to make this type of medication available upon request at breakfast, lunch and dinner, which are regular

medication times. These medications must be available by request and consistent with the assessed need for them 24 hours per day, as ordered.

130. DYS policy and procedures will require the routine monitoring of pharmacy services, especially for those facilities contracting with Ohio Department of Mental Health, for timeliness and accuracy of deliveries. Joint monitoring of the pharmacy contract and its provisions should be conducted not less than quarterly with facility staff and the pharmacy provider.

### E. Laboratory Services

131. DYS policy and procedures will require the monitoring, timely completion, and accurate reporting of laboratory services. Progress notes shall address variances from the laboratory norms and the impact, if any, on the care to be provided.

### F. Infection Control

132. DYS policy and procedures will ensure that infection control is routinely addressed at the facility level, and will provide for infection control through monitoring and reporting of infectious diseases, including sexually transmitted diseases and Methicillin Resistant Staphylococcus (MRSA) and Methicillin Sensitive Staphylococcus infections per Ohio Department of Health Guidelines.

### G. Physical Plant & Equipment

133. DYS shall ensure that adequate space is provided for the storage of medications at all facilities and allow for adequate hand washing and infection control practices for the preparation and administration of medications.

134. DYS shall regularly review the status and use of medical equipment so that adequate planning and timelines for replacement can be established.

## H. Documentation

135. DYS shall ensure that medical records are accessible to all treatment providers, complete, accurate, and follow youth from intake through placement and discharge/reentry. The requisite medical and mental health individual plans are to be available for the Multidisciplinary Treatment Team. DYS shall revise its policy and procedures to make each youth's medical record a complete document that is an effective means of communication between shifts and disciplines.

136. The medical record shall be a chronological and complete record or 'story' including elements of history (medical, psychiatric, developmental), complaints, problems or needs, assessments and diagnosis and document the treatment and response or outcome of care provided to the youth.

137. Problem lists should be located in the same, readily apparent area in each file and they should be current and list acute and chronic problems. The youth's current status with regard to chronic disease should be clearly identified on the problem list and in the plan of care. Issues that have been treated and resolved should be so identified.

138. Medical records shall be reviewed quantitatively and qualitatively to ensure that information is complete, accurate, and available to all members of the treatment team. Physician notes must include the course of care, the problem, the treatment, and the outcome of each treatment provided. Notes should address the history and testing used to reach a diagnosis as well as a description of findings upon physical examination. The degree of control should be identified for chronic diseases and the level of acuity should be clearly stated for new diseases.

139.  DYS shall ensure that vital signs that are significantly above or below the normal range for adolescents are assessed for a defined period of time with guidelines for the frequency of reporting results/findings to the physician.  The physician's review of these results should identify the relationship to an existing or new problem or disease.

140.  An acute episode of illness, a specialty appointment or hospitalization requires a face-to-face appointment with the physician or nurse as appropriate, and the youth to present and discuss the results of any consult and the plan of care. Documentation of this meeting should be available in the progress notes as well as the individual plan of care that may be implemented.  Symptoms reported by youth should be verbatim and without interpretation.  Interval histories and contacts with medical services need to be made available for physicians at the time of appointments.  This is especially important for youth with chronic diseases. Outside Dental and Oral Surgery Consultations should follow-up with the referring Dentist.

## I. Quality Improvement

141.  DYS shall implement a systematic, data-driven quality improvement program adapted to an adolescent population, including but not limited to quality assessment and monitoring for facility clinical and program services.  DYS shall conduct needs assessments of the population to ensure that programming matches those needs. DYS will monitor outcome measures for medical and mental health treatment. DYS shall ensure that all quality assessments are supported by documentation in youth medical files.  The provision of care should be monitored and assessed on a regular basis.  The program should include peer review at regular intervals and qualitative

and quantitative medical record reviews at a minimum.

### J. Health Education

142.  DYS, in cooperation with the Monitor, shall develop, implement, and monitor a coherent, system-wide, integrated protocol for preventive care, including a health education program.

143.  DYS shall ensure that health care staff are prepared to answer youths' questions truthfully, explaining the reasons for necessary procedures or medications, offering alternatives if they exist and are appropriate, and documenting the key points presented and the youth's comprehension and ability to apply the information to his/her care.  DYS shall encourage inclusion of the health educational program in the Science and Health classes.

144.  DYS shall ensure that informed consent forms and notification processes for youth and family are developed specifically for adolescents with pictures and/or uncomplicated terminology that can be understood and used by youth. DYS should consider providing classes or other forms of education on the purpose, use, risks and benefits of medication, with documentation of participants, the information presented, and the individual's educational reading level.

145.  DYS shall prepare a protocol that will ensure that family, family surrogates, or other significant adults are engaged in care and receive timely notification of medications and other medical services requiring more than first-aid treatment and that these notification processes are fully and timely documented in the youth's medical record.  Such protocol will be reviewed by class counsel and the Monitor.

### K. Nutrition

146.  DYS shall ensure that the nutrition program is regularly assessed to ensure compliance with appropriate standards including but not limited to the National School Lunch Program and the American Diabetes Association to determine the efficacy of the program for individual youth, and to ensure that pregnancy diets are adequate.  Dietary and physical activity behaviors should be monitored and designed to engage youth in healthy lifestyle choices that can transfer to a community setting.

### L. Staffing

147.  DYS shall ensure adequate staffing allocations for nurses, physicians, and related support staff; medical records technicians; phlebotomists; and secretarial support for the current number of youth housed in DYS facilities requiring a safe environment, education, and treatment for medical and mental health issues. Staffing levels will be monitored and staff will be allocated to provide youth with timely access to the appropriate clinical staff in order to receive a diagnosis and treatment in a facility or designated area designed for the type and level of care required.

148.  DYS shall include a relief factor for 24/7 nursing positions that is consistent with DYS benefit/leave policies.  DYS should continue to make every attempt to minimize mandated overtime for medical staff.  Given the priority of the educational program during daytime hours, DYS should consider non-traditional schedules for clinical staff.

149.  DYS policy and procedures will clearly define the roles and responsibilities of

medical care providers and support staff, with the goal of providing a safe, healthy environment. DYS P&P shall clearly define zero tolerance for aggression from youth and staff alike. DYS shall train staff members and encourage youth to lead and provide behavioral values in the course of daily tasks. DYS shall require rules that are simple, clear, and consistently and fairly enforced but not designed to delay or remove access to care.

150. DYS shall evaluate the competitiveness of current levels of pay and benefits with the private sector, and consider adjustments in order to fill existing vacancies in facilities with competent staff. DYS also shall reconsider the current organizational structure to encourage creative thinking and the sharing of effective ideas or decision-making that benefit youth. Encouraging the growth of professional staff and providing evidence that creative thought and approaches are valued should also contribute to successful recruitment and retention of competent and committed staff. The evaluation and reconsideration noted in this paragraph shall be completed within 180 days of the effective date of this Stipulation, reviewed by class counsel and the Monitor.

151. DYS shall ensure that health care providers are credentialed and have experience consistent with the population served, e.g., family practice physicians.

152. DYS shall ensure that competency of all staff is regularly assessed and consistent with program expectations as described in position descriptions, and that peer review is completed for each professional employee on a regular basis.

153. DYS shall improve health care staffing according to population needs. Increased staffing should be considered as necessary to meet security needs. DYS may

include nurse practitioners as physician extenders.

## XII. DENTAL CARE

### A.  General Principles

154.  All youth in the custody of DYS have a right to adequate dental care that shall

include a program of preventive care and cleaning, oral health education, and

immediate access to care for urgent or painful conditions.

155.  DYS shall ensure that the policy and procedures governing the level and quality

of dental care for youth meet or exceed national standards.

156.  DYS shall ensure compliance with the following general standards of dental care:

a.  All aspects of the standard are addressed by written policy and defined

procedures.

b.  Oral screening by the dentist or qualified health care professionals

trained by the dentist is performed within 7 days of admission to the

correctional system.

c.  Instruction in oral hygiene and preventive oral education are given

within 14 days of admission.

d.  An oral examination is performed by a dentist within 60 days of

admission.

e.  Oral treatment, not limited to extractions, is provided according to a

treatment plan based upon a system of established priorities for care.

f.  Radiographs are appropriately used in the development of the

treatment plan.

g.  Consultation through referral to oral health care specialists is available as needed.

h.  All youth have access to the preventive benefits of fluorides in a form determined by the dentist to be appropriate for the needs of the individual.

i.  Where oral care is provided on site, contemporary infection control procedures are followed.

j.  Extractions are performed in a manner consistent with community standards of care and adhering to the American Dental Association's (ADA) clinical guidelines.

**B.  Policy & Procedures, Protocols, Other Written Dental Procedures**

157.  Unless otherwise specifically provided, in every Section and sub-section that follows where there is to be developed a policy, procedure, protocol, or other procedure, DYS shall take the initiative in the drafting, consulting with the Monitor as DYS deems it desirable, and shall then submit the draft for review by class counsel and the Monitor.

**C.  Access to Care**

158.  **Orientation and Supplies**:  DYS shall develop a policy promoting youth access to acute and routine dental treatment. Dental care providers will work together to develop a system for patient education, and DYS shall provide specific, detailed, verbal and written information upon intake to ensure that all youth entering DYS facilities understand their entitlement to, and how to access, routine and emergency dental care. DYS shall ensure that all youth have ADA-approved dental care

supplies, including a toothbrush, toothpaste, and dental floss, throughout their stay in DYS facilities.

159. **Urgent Care**:  Youth with urgent dental conditions must be able to access care within 24 hours.  DYS shall provide training for nurses in triaging and stabilizing dental pain. Nurses should consistently document the assessment of patients requesting dental care, and the dentist and nurses should document emergency or essential / urgent dental care visits using the SOAP format.

160. **Appointments**:  DYS shall strive to eliminate delays in dental treatment at all facilities, and to ensure that youth are available for treatment during all the hours the dentists are present in a DYS facility. DYS shall ensure that every facility keeps daily records of the number of dental patients seen and the number and type of procedures performed.  Any inability to have a juvenile transported to the dental clinic should be documented to ensure that youth arrive for their dental appointments consistently and on time.

### D.  Quality of Care

161. **Routine Care.**  Every youth is eligible for a routine dental examination, cleaning, and continuing oral health education at the end of each twelve (12)-month period of custody.  Youth orientation will specify and clarify this opportunity indicating clearly and precisely how and when appointments for routine care shall be made through verbal instruction and a written description in the Orientation Handbook.

162. **DYS Dental Policy and Procedures**:  DYS shall rewrite dental policy 403.13 to ensure full compliance with governing standards and to create and update care provision instructions, including but not limited to procedures for screening and

examination; treatment planning; categories of care; emergent, urgent and routine dental care; prevention and dental prophylaxis; fluoride treatments, and caries control; and infection control.

163. **Screenings and Examinations**: DYS shall ensure full compliance with DYS Dental Screening Examination Policy 403.13, including documentation of the screening and examination on the Dental Record (DYS DMH-0059). Documentation will include identified elements of the screening and examination, including prioritization of levels, oral health condition, and diagnostic bite wing x-rays.  Parent institution will develop an individualized treatment plan for each youth.

164. **Primary Prevention**:  DYS may provide sealant placement on pits and fissures of non-carious permanent teeth if indicated.  DYS shall provide topical fluoride treatment as recommended by the American Academy of Pediatric Dentistry (AADP) as part of primary prevention of dental caries during the teenage years through early adulthood.

165. **Patient Education**:  DYS shall develop a meaningful oral hygiene education program structured to train youth being mindful of the youth's educational reading level and/or other learning deficits.

166. **Dental Caries Stabilization**:  DYS shall ensure that a system is developed to prioritize dental caries that have progressed beyond demineralization into categories consistent with DYS 403.13 and AAPD guidelines.  Caries placed in high priority categories will be stabilized at or prior to the annual recall examination and dental prophylaxis, and a tracking system will be developed by the Health Services

Administrator and the dentist to ensure the annual follow up dental examination is completed.

167. **Removable Partial Dentures, Crowns, and Fixed Partial Dentures**: DYS shall ensure that removable partial dentures continue to be provided to the patients for whom the dentist determines they are needed. Carious lesions will be restored and the supporting structures stabilized prior to fabrication of removable partial dentures. Mandibular acrylic partial dentures will no longer be fabricated without rests, in order to avoid damage to tissues and abutment teeth.

168. **Oral Surgery**: DYS shall ensure that no dental surgical procedure, including extractions, is performed without adequate dental radiographs and no extensive dental surgical procedure is performed in the absence of a dental assistant (which may be a nurse).

169. **Availability of Specialists**: DYS shall continue to ensure that treatment by dental specialists is available when needed.

170. **Special Needs Patients**: DYS shall monitor dental treatment of special needs patients, including those with mental health and mental disability issues.

171. **Quality Management**: DYS shall develop, implement, and monitor a clinically-oriented quality assurance and peer review system with thresholds by which deficiencies in procedure, quality, or appropriateness can be corrected.

172. **Dental Record Documentation**: DYS shall ensure that the medical information available to the dentist during treatment is adequate to identify conditions where precautions should be taken, or physician consultations are needed.

173. DYS shall revise policy and ensure compliance with the provision of a detailed

dental treatment plan for each youth, which documents and prioritizes dental levels of care and addresses components such as examination, prophylaxis and oral hygiene education, and diagnostic radiographs. The severity of dental caries should be indicated so the parent institution can more effectively triage teeth that are a priority for stabilization to prevent tooth loss.

174. DYS shall ensure compliance with Policy 403.05.01 and the use of the SOAP format in filling out the dental record progress notes, particularly in non-routine appointments, *i.e.,* those generated by a complaint from youth, in order to fully document dental care and to promote the pursuit of a logical process in diagnosis and treatment.

### E. Physical Resources

175. **Equipment Condition**: DYS shall ensure appropriate space, equipment and supplies are available to provide safe dental care.

### F. Human Resources

176. **Dental Clinic Staffing**: DYS shall provide an adequate number of dentists, dental hygienists or assistants for each facility dentist to perform the ancillary work of sterilization, record keeping, appointments, and tracking of patients; to ensure that dentists perform duties commensurate with their professional competence; to ensure that infection controls are not compromised; and to prevent delays in providing care, including the removal of infected teeth or other oral surgery procedures. The number of licensed dentists, hygienists and dental assistants shall be the subject of further study by DYS, class counsel and the Monitor leading to an agreement within 90 days of the effective date of this Stipulation.

177. **Licensure and Required Certificates**:  DYS shall ensure that all clinics comply with the Ohio Administrative Code requirement that licensure of dentists and hygienists must be available for review.

178. **Quality of Providers**:  DYS shall ensure that DYS dental care providers are adequate in number and quality.

    a. **Dentists**: DYS shall adopt policy and procedures to ensure that all dentists provide adequate patient treatment, follow up, annual examinations, dental prophylaxis; proper care, cleaning, and sterilization of instruments; and documentation of dental care, including prioritization of dental care issues and documentation on the category of severity of dental caries.

    b. **Nurses**:  DYS shall adopt policy and procedures to ensure that nurses are trained to recognize dental problems on intake screening and nurse health call triage, and that adequate training is provided and documented to justify the granting of any dental privileges to any nurse.

    c. **Dental Assistants**: DYS shall provide dental assistants or a nurse to maximize the safe, efficient use of dental care resources.

    d. **Dental Hygienists**: DYS shall provide dental hygienists in adequate numbers to improve the quality of the dental cleanings, fluoride treatments, and oral hygiene instruction/education, with an initial staffing level of eight dental hygienist hours per week per facility in addition to the current dentist hours.  DYS shall monitor this addition of staff for effectiveness.

179. **Infection Control**:  DYS shall adopt policy and procedures to ensure full

compliance with infection control procedures, including those mandated by the CDC Bloodborne Pathogens Standard.  DYS shall ensure that there is adequate biohazard labeling in all locations, including on ultrasonic cleaners and day light loaders.  DYS shall monitor compliance with all sterilization and infection control procedures and take steps to ensure compliance with applicable policies and regulations.

## XIII. EDUCATION

### A.  Leadership and Organizational Structure

180.  DYS acknowledges the importance of education to the students and to the safety and security of the facilities' staff and students.

181.  DYS shall adopt an inclusive management model, based on a protocol that seeks input from school staff whenever possible. DYS shall initiate structured, ongoing efforts to improve communication between facility superintendents, program deputies and administrators of the DYS Bureau of Education ("the Bureau").

182.  DYS shall ensure that JCOs are available to curtail violence and maintain order in the schools.  Consistent staffing and a consistent management approach will be established within each school to achieve a positive atmosphere that is conducive to learning.  JCOs and education staff shall receive training in classroom management techniques, including clarification of the appropriate roles and allocation of responsibility between education staff and JCOs.

183.  DYS shall maintain a system to comply with statutory and regulatory requirements for the school superintendent to supervise educational service delivery and evaluate principals and for the assignment of school employees, while ensuring

that facility administrators retain their ownership interest in the schools and share responsibility for the performance of the principals and the schools.

184.  Within 60 days of the effective date of this Stipulation, and subject to consultation with class counsel and the Monitor.  DYS shall develop a plan to ensure that the instructional leadership duties of educational staff are not hampered by competing institutional responsibilities.  In establishing the plan DYS shall consider limiting educational staff responsibilities for Interdisciplinary Committee hearings to those initiated by school staff; limiting their investigative responsibilities to incidents involving school staff; and eliminating their administrative duty officer responsibilities.  The plan shall also ensure that the assignment of institutional duties to principals or assistant principals not detract from instructional leadership.

## B. Physical Plant

185.  DYS shall review current facility usage in light of the classification system to maximize usage of existing school space, and shall take all necessary action to ensure sufficient space to appropriately meet the educational needs of its students.

186.  DYS shall review all of its school facilities to ensure that adequate safety features are in place.  Cameras should be installed to record images in common areas and classrooms in those facilities where assaults occur. Where individual alert systems such as radios are used, DYS shall ensure an adequate supply of such devices for school staff, including contract service providers.

187.  DYS shall ensure that furniture purchased for educational purposes is appropriate in relation to safety and classroom size.

188.  **Site-specific Physical Plant Requirements**:  DYS shall complete necessary

repairs at Luther E. Ball High School at Cuyahoga Hills Juvenile Correctional

Facility ("Cuyahoga"), including the bathrooms, ceiling tiles, gym doors and the

hard-wired security system.  DYS shall ensure that there is sufficient classroom

space at Cuyahoga. DYS shall ensure that a functioning air conditioning and

heating system is installed at Tecumseh High School at Ohio River Valley Juvenile

Correctional Facility ("ORV").

### C. Full School Day & Staffing

189.  DYS, in consultation with the Ohio Department of Education,  shall provide all

youth with a full school day as defined by Ohio law, including but not limited to

Ohio Administrative Code ("OAC") 3301-35-06(E-F), which requires at least 5.5

hours of scheduled classes, supervised activities, or approved educational options

excluding the lunch period and interscholastic athletics.  Within 60 days of the

effective date of this agreement DYS shall establish a plan to adapt any education

that is provided to reception center youth in a manner that is appropriate under

federal and state law.

190.  As needed to meet the full day school, schools shall endeavor to fill every

available school room with a class to allow more scheduling options and additional

electives.  Schools should increase scheduling flexibility by considering the

addition of evening classes, and the use of available additional space such as

physical education facilities, to ensure that no student sits on the unit until a seat is

available in school.

191.  DYS shall increase efforts to recruit and retain competent DYS school district

employees.  DYS shall promote cultural and ethnic diversity among school staff and

administrators by enhancing efforts at minority recruiting.

192. DYS shall establish a centralized hiring process for education staff by assigning retention and recruitment responsibilities to a Bureau administrator while allowing for facility participation and input. The hiring process shall effectuate the statutory responsibility of the superintendent for the assignment of teachers and school staff. The hiring process shall reflect strategic planning for the allocation of manpower, including consideration of the relative strength of the teacher preparation programs from which the applicants come, and the need for compliance with requirements for certification, for placement of highly qualified teachers ("HQT"), and for procedures and outcomes defined by state and federal statutes and regulations, including requirements of the No Child Left Behind Act of 2001 ("NCLB"), 20 U.S.C. § 6301 *et seq.,* and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

193. DYS should consider giving academic credit, including elective credit, for certain group programs, such as the three month course for youth incarcerated due to sex offenses, which can be aligned with class content requirements and placement of an appropriately credentialed teacher with the social workers who currently conduct the group treatment.

194. DYS shall analyze the pattern of vacancies and teacher absences at each facility over a period of time, and staff according to these data. DYS shall maintain acceptable staffing ratios as required by state or federal law for regular and special education students. Within 60 days of the effective date of this Stipulation a plan for meeting the education staffing needs shall be developed by DYS and reviewed

by class counsel and the Monitor.

195. DYS shall increase the budget for substitute teachers and provide for more substitutes at the larger schools.  DYS shall also hire and train permanent substitutes.  These substitutes shall include teachers who can move between schools that are relatively close to each other.  During the rare times when these teachers are not required to staff a classroom, they should be assigned other tasks, including serving as collaborating teachers in other classrooms.

196. DYS officials must be involved in facility decisions to create or discontinue specialty units.  The ability of the school to provide educational services for these units should be a factor in determinations about creating the units.   All youth in specialty units shall be provided the opportunity for education services as required by federal and state law.  DYS must ensure that the individual education plans for youth who are identified as needing specially designed instruction are fully implemented in any specialty unit.

197. DYS shall maintain a system by which the facilities provide the Bureau with information regarding which students are in specialty units so that education services can follow the youth without interruption.

198. DYS should consider expanding the Table of Organization ("TO") to include a highly qualified special education teacher for each specialty unit that contains students requiring highly restrictive educational placements, in order to provide each specialty unit with a self-contained special education classroom for students needing such a restrictive setting and to facilitate students moving to a less restrictive school setting as quickly as possible.

199.  DYS shall revise its policies to provide professional development until such time as the school district has achieved minimal compliance with state and federal education law.

200.  DYS shall continue to require three weeks of pre-service training for teachers and appropriately adapt pre-service training for substitute teachers.  DYS shall provide ongoing site-specific training for education staff in a manner that is flexible and minimizes disruption to schedules, including the use of training videotapes available during duty periods, delayed start times, and early releases.  DYS also should consider allowing teachers to begin work and complete the training modules during school intercessions.

201.  DYS shall provide professional development to guidance counselors, transition staff, and teachers working with transition and reentry issues on the legal implications of students' juvenile records, in order to ensure that students receive accurate information about issues such as the collateral consequences of an arrest, crime, adjudication, or incarceration for employment, military, education, or housing opportunities.

202.  DYS should consider the use of educational aides in selected classrooms.  DYS shall continue to negotiate for contract clauses requiring teachers to sign yearly contracts with the intent of decreasing the number of teachers who resign without notice in the middle of the school year.

### D.  Instructional Practices & Discipline

203.  DYS shall continue to improve communications between facility and school staff. Principals should invite the facility superintendent or designee to all faculty

67

meetings. The facility superintendent should invite the principal or designee to facility staff briefings and to relevant leadership meetings.

204.  DYS shall continue to increase cooperative efforts to reduce violence and its interference with students' education. The Bureau and school administrators should increase the amount of Professional Development related to classroom management and differentiated instruction.

205.  Principals and assistant principals shall intensify efforts to identify teachers who are ineffective classroom managers, and assist these teachers in developing goals and objectives to improve their classroom performance. Bureau and school administrators shall provide continuing education opportunities, mentorship and other resources to assist challenged teachers in progressing toward educational goals.

206.  DYS will contract with an education consultant skilled in instructional practices and classroom management in juvenile correctional settings to improve classroom management techniques, and learning opportunities for youth in DYS.

207.  DYS shall strive to increase compliance with the progressive discipline policy, such as Saturday school as a discipline step preceding exclusion from school. The Bureau should carefully monitor schools' implementation of character education and other positive behavior management strategies to ensure that the schools' efforts are directed toward creating a positive culture.

### E.  Educational Assessment, Guidance Counseling & Reentry

208.  DYS shall strive to maximize the accuracy of educational assessments by evaluating the scope and reliability of current assessment procedures and

instruments.

209.  DYS shall provide clerical support to guidance counselors to provide additional time for counseling for youth on career and transition issues and postsecondary options.

210.  DYS shall designate transition specialist(s) who will assist youth toward successful reentry into the community. The specialist(s) will explore bringing postsecondary options into the schools and promote system-wide expansion of opportunities for students to earn college credit and gain business and other skills through work with nearby colleges. The transition specialist(s) will also develop and maintain community linkages, and provide reentry follow-up in home schools for students.

211.  DYS should continue to explore options for post-secondary education for students and allow selected students off facility grounds to explore postsecondary options through work opportunities, apprenticeships, college visits, and other community-based activities as permitted by law.

212.  DYS shall expand job training opportunities, systematic career assessment and counseling, and vocational education or career technology ("career tech") classes for students.  DYS should move career tech from finance to curriculum on the TO to facilitate an enhanced curricular focus on the program.  DYS shall develop a cogent career-tech plan in order to maximize the availability of career tech options at each school and to ensure that eligible students have career tech choices.  DYS should consider the availability of career tech offerings as one factor in assigning eligible youth to particular facilities.

213. DYS should continue to negotiate with the Ohio Department of Education ("ODE") to obtain waivers or explore alternate sources of funding to address conditions that impair student access to career tech programs in the DYS school system. The Bureau shall explore other funding opportunities to supplement the currently available career tech offerings, including funding for aptitude and career interest inventory counseling, even if adult education funding is used and must be supplemented from other monies.

214. DYS shall explore collaborative arrangements with public schools or adult education providers to provide satellite career tech programs on DYS school campuses, as well as new career tech options that tap into the service industry and non-traditional careers and possibilities for educational options such as independent study as a way for graduates or GED completers to meet one or two of the academic requirements for career tech. Staff should continuously seek collaboration with local businesses. DYS also shall explore options for transporting selected students to existing community career tech or adult education programs.

215. DYS should ensure that all students, including judicially released students, receive a certificate of hours completed and competencies mastered upon leaving career tech classes, in order to facilitate the transfer to career tech classes outside of DYS. The Bureau should make all certification tests immediately available to students eligible to take them.

216. **Site-specific Career & Job Training Requirements**: As part of the development of the education plan at the reception center, the Bureau should consider options to allow males to begin Administrative Office Technology (AOT) classes at William

K. Willis High School, which they could continue at their next placement, and which would bolster enrollment in order to save the class from elimination.  DYS shall promptly provide space for additional school programs at Tecumseh High School at Ohio River Valley Juvenile Correctional Facility.  If there is no other way to provide all students with a full school day, DYS should build the new career tech building at Tecumseh.

### F.  Educational Programs & Support

217.  DYS should ensure that all classroom space on units be wired for Customized Student Learning System (CSLS). DYS shall provide sufficient professional development to enable teachers to implement CSLS successfully and to prevent the degradation of the system into high-tech worksheets unlikely to improve student achievement or behavior.

218.  DYS shall provide school staff with internet access on request.  DYS shall consider allowing student access to InfoOhio as a helpful resource for hometown newspapers and other items of interest.  DYS shall provide all libraries with technology that is functional enough to permit the loading and use of current versions of software.

219.  DYS shall continue to encourage speech therapists to work with students most at risk in reading. Contract time for speech therapists shall be increased if they are working with literacy in this underserved group. DYS shall provide access to computer software package and computer skills training designed to teach reading to students with pre-literacy skills.  DYS shall reinstate the Title I reading teachers since Read 180 does not meet the needs of students most in need of reading

services.

220.  DYS shall develop a program within six months of the effective date of this Agreement for delivering educational services to 12- and 13-year-old students in an age appropriate and developmentally appropriate manner.

### G.  Special Education

221.  Provision of Special Education:  The State shall, at all times, provide all youth confined at the Facilities with adequate special education in compliance with the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. section 1400-1482 (West 2000 & Supp. 2006), and regulations promulgated thereunder, and this Agreement.

222.  Oversight:  The Bureau shall provide oversight of special education at the Facilities including:

   a.  Development and implementation of policies, procedural manuals, and training programs including:  a quality assurance program for special education services, an adequate vocational education program for youth with disabilities, and a curriculum for special education instruction at the Facilities.

   b.  Ensuring that special education teachers are appropriately licensed to teach assigned courses and monitoring whether special education staffing and resources are sufficient to provide adequate special education services to youth at facilities and to ensure compliance with this Agreement.

223.  Special Education upon Intake:  The Bureau shall ensure that all students who qualify for special education services receive such services within a reasonable time

following intake at the facilities.

224.  Screening for Special Education Needs:

    a.  Consistent with federal regulations, the Bureau shall provide prompt and adequate screening of youth for special education needs and shall identify youth who are receiving special education in their home school districts or who may be eligible to receive special education services but have not been so identified in the past.

    b.  The Bureau shall ensure that those staff conducting the screening, assessment and evaluation processes are qualified to do so.

225.  Individual Education Plans:

    a.  DYS shall develop an IEP as defined in 34 C.F.R. section 300.320 for each youth who qualifies for an IEP.  Following development of the IEP, DYS shall implement the IEP as soon as possible.  As part of satisfying this requirement, DYS shall conduct required annual reviews of IEPs, adequately document the provision of special education services and comply with requirements regarding participation by the professional staff, parents, surrogate, and student in the IEP process.  DYS shall ensure that IEP team meetings are held as necessary to develop, review or revise IEPs for qualified special education students in accordance with federal regulations.

    b.  In developing or modifying the IEP, DYS shall ensure that:  the IEP reflects the individualized educational needs of the youth and that services are provided accordingly;  each IEP includes documentation of the team's

consideration of the youth's need for related services and transition

planning, and identifies the party responsible for providing training on

how to monitor progress toward IEP goals and objectives; and teachers

understand and use functional behavioral assessment and behavior

intervention programs in IEP planning and implementation.

226.  DYS shall ensure that fully functional Intervention Assistance Teams ("IATs")

are established system-wide, and will closely monitor IATs to ensure that they meet

regularly for sufficient periods of time and engage in Child Find activities.

227.  DYS officials shall provide continuous professional development (P.D.) in

numerous areas, including but not limited to the following:

    a.  P. D. on collaborative teaching is required for general and special

education teachers, with follow-through to ensure that the precepts of

effective collaboration are embedded.

    b.  All teachers need P. D. on the writing of Individualized Education Plan

("IEP") goals; on the variety of modifications, special education services

and supplementary aids and services available to assist in implementing

IEP goals; and on appropriate progress data collection strategies.

Teachers, principals, and appropriate facility staff should receive training

on the purposes of Functional Behavioral Assessments (FBAs) and

Behavioral Intervention Plans ("BIPs") and training on how to conduct

FBAs and write and monitor BIPs, including monitoring strategies.

    c.  School staff members should receive information on the range of related

services available for special education students, with examples of those

related services that might be particularly appropriate for DYS students. IEP team members also must be advised of their obligation to include all needed related services on students' IEPs, without regard to whether the services are immediately available at the school.

d. Facility administrators, psychologists, school administrators and IEP team members should receive training on change of placement requirements.

e. IEP team members should receive P. D. on how to conduct manifestation determinations. Because most DYS students' disabilities are inextricably intertwined with their behavior, the P. D. must provide guidance on the appropriate factors to consider in conducting manifestation determinations.

f. IEP team members should receive structured P. D. on the importance of transition planning, integration of transition goals with reentry efforts, and the drafting of appropriate transition plans.

g. DYS will require appropriate IEP team membership at IEP team meeting. The practice of case managers fully drafting IEPs should be abandoned and all IEP team members should collaboratively draft IEPs.

228. Guidance counselors shall be provided with electronic access to students' full IEPs at all schools, rather than the IEPs-at-a-Glance, in order to facilitate appropriate scheduling. IEPs-at-a-Glance will be made electronically available to teachers requesting them.

229. DYS shall provide teachers with a form to assist in progress data monitoring, and teachers shall be required to monitor progress toward IEP goals. Monitoring of IEP

goals, as well as effective co-teaching and familiarity with, and teaching to, IEP goals shall be considered in the evaluation process for all teachers.

230. DYS shall create a method of monitoring the implementation of transition goals for students. Transition plans should be included on the IEPs-at-a-Glance so that general education teachers are made aware of them. All DYS schools shall use appropriate placement procedures when moving students to more restrictive educational settings for school-related behavior. Students whose behavior is a manifestation of their disability shall not be excluded from their current school settings without following special education due process procedures. DYS officials shall monitor change of placement practices to ensure that appropriate procedures are being followed, and that IEP teams are not inappropriately excluding students for whom the school building is the least restrictive environment and are not using the process to exclude students whose behaviors are manifestations of their disabilities.

231. DYS shall ensure that school psychologists are available to support the learning needs of youth within the Buckeye United School District. This would include conducting behavior, aptitude and achievement evaluations for identification of student disabilities and the development of individualized education plans, Functional Behavior Assessments (FBA), and Behavior Intervention Plans.

## XIV. GRIEVANCE SYSTEM AND YOUTH ADVOCATE

232. **Generally.** Within 90 days of the effective date of this Stipulation, DYS shall implement a grievance system that has been reviewed by class counsel and the Monitor. The grievance system shall clearly state the purpose and scope of the

76

grievance system.   The grievance system shall be easily accessible to youth, shall ensure the right to meaningful assistance for youth in preparing and appealing grievances, and should empower those staff involved in the system to resolve issues at the local level as expeditiously as possible.   Youth shall easily be able to obtain grievance forms without staff involvement.   The objective of the grievance system shall be to achieve, among the youth who participate, a reasonable level of satisfaction and a sense of fair treatment.   DYS shall establish grievance response deadlines, provide staffing sufficient to meet those deadlines, and enforce the response deadlines.   DYS shall collect appropriate grievance data, which shall be analyzed on a regular basis to determine problem trends.   The grievance system shall include written notification to the youth of the final resolution of the grievance.

233. **Clinical Grievances.**  The grievance system shall include review by an appropriate clinician not involved in the care under review in those cases where the underlying grievance involves medical, mental health or dental clinical issues.

234. **Grievance Orientation.**  A clear explanation of the grievance process shall be provided to each youth upon admission to the facilities during orientation, and to their parent(s) or guardian(s), and the youth's understanding of the process shall be at least verbally verified.

235. **Youth Advocate.**  The position of youth advocate shall be reviewed and redefined and, if continued, shall operate consistently with the counsel access system, grievance system and unit management.

## XV. DISCIPLINE

236.  **Generally.**  Within 90 days of the effective date of this Stipulation, DYS shall

implement a discipline system that has been reviewed by class counsel and the

Monitor.  A staff member shall be offered to the youth to assist the youth in the

hearing.  The parties, in consultation with the Monitor shall agree to participate in a

pilot program designed to determine any expansion to the role of the staff member

at a disciplinary hearing that is deemed to be appropriate.  This pilot program shall

also help determine the scope of any appropriate training for the staff member and

help determine whether the hearing should be recorded.  Neutral fact finders shall

preside at the hearing.

237.  **Disciplinary Dispositions.**  The disciplinary system shall include a range of

consequences consistent with the treatment goals of the youth.  Within 90 days of

the effective date of the Agreement DYS in consultation with the plaintiffs and the

Monitor will develop expanded disciplinary dispositions to be utilized with youth

convicted of institutional violations.  Disciplinary time shall not be added to the

youth's DYS stay or sentence by the hearing panel.  As part of the effort to expand

disciplinary dispositions the parties will determine whether to allow hearing panels

to make a recommendation on whether disciplinary time should be added to a

youth's DYS stay.  This shall be done in conjunction with the plan for reforming

release.  Isolation as a disciplinary measure shall only be utilized in accordance

with the plan to be developed pursuant to paragraph 76.

238.  **Discipline of Youth on Mental Health Caseload.**  When a youth is on the

mental health caseload, the Institutional Disciplinary Committee (IDC) Capacity

Review form shall be used to determine hearing capacity, i.e., whether the youth understands the charges, is able to assist an advocate, and understands the potential consequences of a finding of guilt. The record of the proceeding shall include any facts as to capacity and awareness of consequences. The treatment team should carefully consider the negative consequences of any potential disposition, and suggest a disposition when possible consistent with the treatment plan. When a youth begins to deteriorate during a hearing, the hearing officer shall suspend the hearing, noting the reason why, and indicating when it might be continued (i.e when the appropriate clinician determines that the youth is sufficiently stable to proceed). The hearing will be recorded. The record should reflect the extent to which the youth's illness or condition contributed to the violation that is the subject of the hearing in order to put the behavior in context.

## XVI. DOCUMENTATION AND DATA ACCESS

239. **Generally**. Within 180 days of the effective date of this Stipulation, DYS shall implement a documentation and data access system that has been reviewed by class counsel and the Monitor. DYS shall develop and implement policies, procedures, and practices setting forth clear standards regarding the content, integration, and timeliness of progress notes, transfer notes, school progress notes, discipline, discharge notes, and other records, including, but not limited to, an expectation that such records include meaningful, accurate, and coherent assessments of the individual's progress relating to treatment plans, goals and objectives, and that clinically relevant information remains readily accessible.

240. **Progress Notes**: The documentation policy shall require that all qualified health

professionals create and use progress notes to document, on a regular basis, interactions and each assessment of youth with mental/behavioral health or substance abuse needs. In particular, progress notes shall:

    a.  In the assessment, address the efficacy of interventions, currently presenting problems, and the available options to address those problems; and

    b.  Provide thorough documentation of all crisis interventions.

241. **Accessibility of Relevant Information**: DYS shall ensure that youth records are organized in a manner providing treatment teams prompt access to relevant, complete, and accurate documentation regarding the youth's status.

## XVII. MONITORING

242. Fred Cohen is hereby appointed Monitor. He will be assisted by subject matter experts in the areas of mental health, use of force/investigation, medical, education, and rehabilitation programming. The Monitor shall appoint specific persons to serve as subject matter experts no later than the date of the fairness hearing. The parties must agree to the appointment of any person to these positions. In addition to the subject matter experts described above, the Core Monitoring Team shall initially include Shay Bilchik[*]. The Monitor may retain additional expert consultants for narrowly construed purposes in such areas as dental care, the structuring and implementation of community-based programs, and such additional areas as the Monitor in consultation with the parties deems necessary.

---

[*] Mr. Bilchik shall deal primarily with assisting the parties in the transition to a more regional and community-based juvenile system.

243.  The Defendants agree to pay for all costs associated with all phases of the monitoring process as described herein.

244.  The Monitor agrees to submit to counsel for review the curriculum vitae of any person proposed and for any person to be retained as an expert consultant.  The Monitor shall seek the advice and consultation of counsel for the parties prior to the retention of such substitutes or consultants.

245.  Should the Defendants at any time during the life of this Stipulation deny any request by the Monitor relating to the budget or staff required to perform the monitoring duties, the Defendants shall notify Plaintiffs' counsel in writing of such denial and provide a brief written explanation for the denial.  In the event that counsel cannot expeditiously resolve any dispute in this area the Monitor may then ask the Court to resolve such dispute by any process deemed appropriate by the Court.

246.  The Monitor, members of the Monitoring Team, expert consultants, and staff, full-or part-time, who are retained hereunder in connection with the monitoring function shall contract for their services directly with DYS and shall in all relevant respects be governed by existing DYS rules and regulations regarding such employment; and especially relating to documentation, compensation, and expenses.

247.  The general goal of such monitoring and oversight shall be to promote and assist the parties in achieving compliance rather simply find noncompliance.  The Monitor is a coach and partner in achieving success.  The Monitor must also report

on the compliance of the terms of this Stipulation. Monitoring principles shall include:

a. The reporting and on-site aspects of the monitoring shall be more intensive at the outset and likely decrease as compliance is neared and achieved;

b. Monitoring shall consist of a combination of empirical data, written reports from the Defendants, on-site inspections, oral and written reports from the Monitor, and appropriate consultation with the parties in aid of compliance;

c. The Monitor's role shall include the gathering of appropriate data and statistics and on-site inspections as well as the general duty of assuring that required policy and procedures are prepared in a timely fashion and meet the objectives of this Stipulation; and where disputes between the parties occur or where there appears to be non-compliance, the Monitor shall attempt to resolve such matters in the most expeditious and non-adversarial fashion possible; and

d. The Monitor will seek to minimize interference with the mission of DYS. Defendants will provide timely and complete access to all relevant files, reports, memoranda, or other relevant documents within the control of the Defendants or subject to access by the Defendants; unobstructed access during announced and unannounced on-site tours and inspections to the institutions encompassed by this Stipulation, to include any administrative offices; and unobstructed access to staff and youth and other persons

having information relevant to the implementation of this Stipulation.  The Monitor has the authority to engage in private conversation with any party hereto and their counsel.

248.  A review of records by any member of the Monitoring Team shall not constitute a waiver of DYS or any other agency's quality assurance privilege. Moreover, any such disclosures shall not constitute a waiver or serve as precedent for other legal proceedings with respect to the aforementioned quality assurance privilege. In addition, the Monitoring Team agrees to keep said documentation confidential and not to disclose, publish or use for public consumption any of the records reviewed by the Monitoring Team.

249.  In addition to the quality assurance privileges described above, other records or information whose disclosure is objected to by either party based on a claim of privilege, confidentiality, or relevance to the implementation of this Stipulation shall not be disclosed by the Monitor. Such material shall be made available for inspection by the Court, along with a precise statement of the objection or objections to disclosure prepared by the objecting party, and the Court shall render a decision on the matter.

250.  In conjunction with the overall revision of the policy and procedures, the Monitor, in consultation with Central Office staff, will prepare an audit instrument to be used as a guide during site visits.  Counsel for the parties will be asked to review and comment on the instrument, whose primary objective is to achieve consistency during the site visits.  The Monitor also will prepare data request forms for Central

Office and the various facilities that will be required to submit pre-site visit data to the Monitor.

251. The Monitor shall submit an annual comprehensive report on overall compliance to the parties as well as other regular interim reports noting the areas of progress or lack thereof. The annual comprehensive report shall include data on population demographics, length of stay, discipline, use of force, isolation, programming, education, medical and mental health care, hospitalization rates, inmate complaints, and other indicia of quality of care.

252. The Monitor shall include in his review a longitudinal study of randomly selected youth who shall be followed from commitment through reentry to the community as one tool to use in assessing the impact of this Stipulation.

253. In the event that Fred Cohen is unable or unwilling to serve as the Monitor, the parties shall each nominate two candidates as a Monitor and, with or without the parties' agreement, the Court will appoint another Monitor from those persons nominated. If the Court does not find any of the nominated persons to be acceptable, the Court shall ask the parties for additional nominations.

254. The Monitor shall not be subject to dismissal except upon good cause and the agreement of both parties or by the Court upon motion of one of the parties and a showing of good cause.

255. The person serving as Monitor in this Agreement shall also serve as Monitor should there be an agreement between the United States of America and the State of Ohio resolving the findings by the United States Department of Justice regarding

the conditions of confinement at Marion Juvenile Correctional Facility and Scioto Juvenile Correctional Facility.

## XVIII. DISPUTE RESOLUTION

256.  In the event a dispute arises as to whether Defendants have failed to substantially comply with any term of this Stipulation, counsel for the parties shall proceed as follows:

    a.  Counsel for the parties shall make a good faith effort to resolve any difference that may arise between them over matters of compliance, utilizing the Monitor initially in an effort to resolve such dispute. Prior to the initiation of any proceeding to enforce the provisions of this Stipulation, Plaintiffs' counsel shall notify Defendants' counsel in writing of any claim that Defendants are in violation of any provision of this Stipulation.

    b.  Within thirty (30) business days of the receipt of this notice, counsel for Plaintiffs and Defendants shall meet in an attempt to arrive at an amicable resolution of the claim. Either party may request the attendance and involvement of the Monitor at such meeting. If, after twenty (20) business days following such meeting, the matter has not been resolved, Defendants' counsel and the Monitor shall be so informed by Plaintiffs' counsel, in writing, and Plaintiffs may then have due recourse to any appropriate legal proceeding or agree that the Monitor may render a final and binding decision.  The time frames set out in this paragraph will not prevent the parties from seeking prompt judicial relief in the event of an

emergency posing an immediate systemic threat to the health or safety of youth.

    c.   The parties anticipate that there will be a consent decree in the case of *USA v. Strickland*, USDC SD OH 2:08-cv-00475-ALM-MRA.  The terms of that decree will require that the DOJ consult with class counsel in this case and that DOJ and Class Counsel jointly utilize this dispute resolution process with respect to any claim by the DOJ that the defendant has failed to substantially comply with any term of the decree in *USA v. Strickland*, USDC SD OH 2:08-cv-00475-ALM-MRA.

257.  Any complaints by youth objecting to any conditions of confinement encompassed by this Stipulation shall be addressed through DYS grievance procedures.  Exhaustion of such institutional grievance procedures through appeal to the Chief Inspector shall be a condition precedent to any legal action by a youth. During the pendency of this Stipulation, copies of any such complaints resulting in decisions by the Chief Inspector and related documents shall be provided to the Monitor as requested.

258.  No legal action seeking equitable relief relating to the issues resolved herein, including a motion to enforce the terms of this Stipulation, shall be filed on behalf of the Plaintiff class or by a member of the Plaintiff class without first resorting to the dispute resolution mechanisms set out in this Stipulation, i.e., advising the Defendants of the issue and making a good faith effort to resolve said issue extrajudicially.

259.  The Plaintiffs shall not seek an order of contempt unless and until (1) the

Plaintiffs have sought to enforce this Stipulation by filing an appropriate motion with the Court and (2) the Court has issued a clear and unambiguous order of specific performance to the Defendants.

### XIX. COMPLIANCE AND TERMINATION

260.  The parties agree that a five (5) year period is presumptively required to retain, train and oversee the additional staff and implement the terms agreed upon in this Stipulation.  The parties acknowledge the provision of the Prison Litigation Reform Act ( P.L.R.A.), 18 U.S.C.A. § 3626 (F)(b)(1), making prospective relief terminable two (2) years after a court has approved such prospective relief and fully expect that the status of reforms and timetable for actions under this Stipulation will require continued jurisdiction of the court for the entire period set out in this Stipulated Judgment.

261.  Oversight by the Monitor shall continue for five (5) years following the entry of this Stipulation unless sooner terminated on motion to the Court by the Defendants, and a finding is made by the Court following a determination on that issue by the Monitor, that substantial compliance has been achieved on all terms and been maintained for a period of two years in all areas.

262.  Notwithstanding the P.L.R.A. or any other law, Defendants may move to terminate this Stipulation and dismiss the case on the ground that all of the institutions subject to this Stipulation have been found to be in substantial compliance for at least two years.

263.  The court shall find that this Stipulation satisfies the requirements of 18 U.S.C.A. § 3626 (a)(1)(A) and shall retain jurisdiction to enforce its terms.  The court shall

have the power to enforce the Stipulation through specific performance and all
other remedies permitted by law.

## XX. ATTORNEYS' FEES AND COSTS

264.  DYS shall pay Plaintiffs' reasonable attorneys fees and costs.  Plaintiffs and
Defendants shall seek to stipulate the fair and reasonable amount of attorneys' fees
and costs as of the fairness hearing in this action.  If a stipulation is not achieved,
Plaintiffs shall apply to the Court for an award of fees and costs.  In no event shall
Defendants contest the fact that Plaintiffs are the prevailing party.  Plaintiffs shall
receive fair and adequate fees and costs for representation of the class during
monitoring of the Stipulation.

## XXI. MISCELLANEOUS PROVISIONS

265.  **Youth with Criminal Charges based on Conduct within DYS Facilities**.  The
parties shall work together with the Ohio Attorney General (OAG), local courts and
local law enforcement to expedite disposition of all criminal cases involving DYS
youth based on conduct of the youth in DYS facilities.

266.  In entering this Stipulation, the parties agree and represent that this Stipulation is
fair, reasonable, and adequate to protect the interests of the class of Ohio juveniles
incarcerated within DYS facilities and all parties.

267.  This Stipulation is binding upon the Defendants named in this lawsuit, the
Defendants' successors in office, employees and agents, and the Plaintiffs.

268.  Except where otherwise provided, the Defendants shall be obligated to perform
their obligations under this Stipulation upon the date of the filing of the Court's
approval of the Order for Injunctive Relief in this matter.

269. Only the Plaintiffs named in this Stipulation shall have standing to file a motion seeking enforcement of any of the terms and conditions of this Stipulation. As class representatives, Plaintiffs can adequately represent the interest of the class of Ohio juveniles in the custody of DYS. The fact that Plaintiffs have been released from custody will not interfere with their ability to serve as class representatives. Plaintiffs may replace class representatives from time to time as needed upon notice to Defendants and approval of the Court. This Stipulation does not confer, and is not intended to confer, any rights upon any other party.

270. This Stipulation in no way waives or otherwise affects, limits, or modifies the obligations of youth to comply with the exhaustion requirements of the P.L.R.A., any current or future state or federal law governing the rights and obligations of incarcerated persons, and the Ohio Administrative Code and other applicable policies, procedures, or regulations.

271. The Defendants agree that at the present time they are not aware of any conflict between this Stipulation and the Laws of the State of Ohio or any presently existing collective bargaining agreements to which the State is a party. The Defendant DYS Officials further agree that they will not seek any new laws or the execution of new collective bargaining agreements, or any changes or amendments to existing laws or collective bargaining agreements that would undermine the obligations taken in this Stipulation.

272. This Stipulation reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. No extrinsic evidence whatsoever may be introduced in any judicial proceeding to provide the meaning or

construction of this Stipulation.

273.  The language of this Stipulation shall be construed as a whole and in accordance with its fair meaning.

274.  The obligations governed by this Stipulation are severable and, if for any reason any part of this Stipulation is determined to be invalid or unenforceable, such a determination shall not affect the remainder.

IT IS SO STIPULATED AND AGREED

**_s/Algenon L. Marbley_**

**Algenon L. Marbley**
**United States District Court Judge**