**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **S. H., a minor child, and all others similarly situated, et al.,** : : : **Plaintiffs,** : v. : : **TOM STICKRATH, et. al.** : : **Defendants** : | Case No. 2:04-cv-1206 **JUDGE ALGENON L. MARBLEY** Mag. Judge Terence P. Kemp |

**OPINION & ORDER**

**I.  INTRODUCTION**

This matter is before the Court on the Ohio Civil Service Employees Association's (OCSEA) Motion to Intervene.  Plaintiffs brought a class action on behalf of all juvenile detainees incarcerated at Ohio Department of Youth Services ("ODYS") facilities, alleging a myriad of unconstitutional conditions.  OCSEA, a labor union representing over 1,000 ODYS employees, moves to intervene pursuant to Federal Rule of Civil Procedure 24(a) and (b).  For the reasons set forth below, the Court **DENIES** this motion.

**II.  BACKGROUND**

This litigation arose amid a maelstrom of national media attention surrounding allegations of violence and sexual abuse at Scioto Juvenile Correctional Facility ("Scioto").  Beginning in 2003, prosecutors indicted fourteen Scioto Juvenile Corrections Officers (JCOs) for abusing incarcerated minors.

> One officer was convicted of attempted sexual battery as a result of allegations that he ordered a female youth to undress while he watched and engaged in inappropriate sexual touching.  Another officer pled guilty to misdemeanor assault for slapping and punching a youth, and then kicking the youth after she fell to the floor.  A female

> officer pled guilty to dereliction of duty as a result of allegations that she ordered a male youth to expose himself and engage in inappropriate sexual touching. Another officer tendered an Alford plea to misdemeanor assault and falsification charges for striking a youth during an altercation, puncturing her eardrum. Finally, an officer was convicted of sexual battery and attempted sexual battery for forcing one youth to perform sex acts on him and for inappropriately sexually touching another female youth.[1]

(United States Dep. of Justice, Civil Rights Div., Rep. on the Investigation of Scioto Juvenile Correctional Facility, Delaware, Ohio, May 9, 2007, at 5) ("DOJ Report"). These convictions, coupled with allegations of systemic violence, brought considerable attention to the intolerable conditions of juvenile corrections facilities in Ohio.

In December 2004, Plaintiffs, then incarcerated minors, sued ODYS on behalf of all girls imprisoned at Scioto. The complaint alleged that Scioto's female inmates were subject to grossly unconstitutional conditions of confinement ranging from inadequate mental health care to endemic violence. The complaint alleged that Scioto staff physically and sexually abused incarcerated minors and arbitrarily placed them in isolation as a form of punishment. Plaintiffs demanded comprehensive declaratory and injunctive relief. Plaintiffs petitioned the Court to close the prison until ODYS implemented a host of reforms, including an overhaul of the hiring, training, and supervision of prison staff.

Three months later, the Civil Rights Division of the Department of Justice (DOJ) opened an investigation of Scioto prison. Soon thereafter, the parties to this litigation jointly moved to stay proceedings, including discovery, pending settlement negotiations. Although the parties negotiated for two years without reaching an agreement, in the spring of 2007, a confluence of events reinvigorated the settlement process. First, in April 2007, allegations of violence and

---

[1] One defendant was acquitted and the charges against seven others were dismissed.

abuse at other ODYS facilities prompted Plaintiffs to move to lift the stay and expand the class to include all ODYS detainees. Second, on May 9, 2007, the DOJ published its findings, in which it concluded that Scioto's juvenile inmates suffered "significant constitutional deficiencies regarding use of physical force, grievance investigation, processing, and use of seclusion." (DOJ Report, 4). The DOJ also found that incarcerated minors suffered "harm or the risk of harm from constitutional deficiencies as to: [safety]; certain discrete elements of medical care; grievances; and special education services." *Id*.

These developments breathed fresh life into settlement negotiations. ODYS consented to lift the stay, amend the complaint to include all ODYS detainees, and certify the class. In May 2007, the parties jointly proposed a Case Management Plan ("CMP") in which they agreed to commission an independent fact-finding team led by Fred Cohen to conduct a comprehensive investigation of all ODYS facilities. The CMP directed the Cohen Team to "take special note of staffing levels, staff credentialing, and staff training." (CMP, 3). The CMP declared that the Cohen Report would serve as the basis for negotiating a final settlement.

On December 31, 2007, after almost a six-month investigation, the Cohen Team submitted a 214-page report. It was nothing short of damning. As a preamble, the Cohen Report lamented that ODYS facilities are "overcrowded, understaffed, and underserved in such vital areas as safety, education, mental health treatment, and rehabilitative programing." (Exec Summ., i). The Report went on, in detail, to "sustain[] each area of the complaint, in varying degrees of intensity." *Id*.

First, the Cohen Report noted that "excessive force and the excessive use of isolation, some it extraordinarily prolonged, is *endemic to the ODYS system*." *Id.* (emphasis added). The

3

cause of this systemic violence, according to the Report, is that JCOs are poorly trained, psychologically ill-equipped for their job, and lack effective oversight. *Id*. As a result, ODYS staff function "more like prison guards (or police officers) than trained partners in a shared rehabilitative effort." *Id*. The Report found that this culture of violence has a devastating impact on the mental health of incarcerated youth, to say nothing of their physical suffering. The Report concluded that "a dramatic reduction in staff violence should be the first order of business." *Id*. at 8.

Yet the Cohen Report also detailed a multitude of other unconstitutional conditions, including inadequate mental health care, dental care, and educational opportunities. Addressing potential remedies, the Report directed ODYS to: (1) down-size existing facilities in favor of smaller Community Correctional Facilities ("CCFs"), which are geared towards rehabilitation and permit minors to remain geographically closer to their communities and families; (2) overhaul the training, responsibilities, and supervision of JCOs (i.e. replace "cops" with "counselors"); and (3) implement sweeping structural reforms in view of providing health care, education, access to the courts, and above all a safe environment for the state's juvenile detainees.

On January 9, 2008, the parties began intensive settlement negotiations, mediated by Magistrate Judge Terence P. Kemp, to fashion a remedy to the catastrophic conditions of confinement identified in the Cohen and DOJ Reports. On April 4, 2008, the parties agreed to an 89-page stipulated injunction. The agreement is both a comprehensive and detailed remedy, carefully crafted to redress the unconstitutional conditions at ODYS facilities. Notably, the agreement adopts Cohen's recommendation to down-size its centralized and overcrowded

prisons in order to divert juveniles to smaller regional facilities. The stipulated injunction also contemplates changes in the responsibilities, training, and supervision of the ODYS staff in an effort to reduce physical and sexual abuse.

On March 19, 2008, two weeks before the parties agreed on a final draft of the stipulated injunction, OCSEA moved to intervene. OCSEA, a labor union, represents roughly 36,000 public employees in the state of Ohio—over a 1,000 of whom serve ODYS as JCOs, teachers, therapists, and staff. OSCEA negotiated a Collective Bargaining Agreements ("CBA") with the state that governs these employees' wages, hours, and terms and conditions of employment. The CBA runs from March 1, 2006, to February 28, 2009. OSCEA moves to intervene to block the approval of the stipulated injunction, which it argues jeopardizes the rights of its members under the CBA. Both the class and ODYS object.

### III. INTERVENTION AS OF RIGHT

OCSEA moves to intervene as a defendant in this class action. Pursuant to Federal Rule of Civil Procedure 24(a):

> [o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To prevail on a Rule 24(a) motion for intervention, a prospective intervenor must show that: (1) it moved in a timely manner; (2) it maintains a substantial legal interest in the disposition of the case; (3) its interest will be impaired in its absence; and (4) the parties already before the court cannot adequately protect its interest. *Coal. to Def. Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007); *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th

5

Cir. 1999). Judicial economy favors the disposition of related issues and claims in a single suit. *See Jansen v. City of Cincinnati*, 904 F.2d 336, 339-40 (6th Cir. 1990). As such, Rule 24 should be construed in favor of intervention. *See Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 315 (6th Cir. 2005) (noting that the Sixth Circuit subscribes to "a rather expansive notion of the interest sufficient to invoke intervention as of right"). But the Court must balance these considerations against the public's and the litigants' interest in the expedient resolution of claims. *See Jansen*, 904 F.2d at 339-40. Accordingly, the Court should be wary of intervenors that delay proceedings or unnecessarily increase the complexity and cost of a suit. *Id.*

### A. TIMELINESS

The purpose of the "timeliness inquiry is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *United States v. BASF-Inmont Corp.*, No. 93-1807, 1995 WL 234648, at *2 (6th Cir. 1995) (quoting *United States v. S. Bend Comty. Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983). There is no bright-line rule to determine the timeliness of a motion to intervene. Rather, the Court must take into account the context of all relevant circumstances, including:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000).

### 1. Progress of the Suit

A motion "to intervene filed during the final stages of a proceeding is not favorably viewed." *BASF*, 1995 WL 234648, at *2. Although the timeliness inquiry cannot be reduced to merely "counting days," *In re S. Oh. Corr. Facility*, 24 Fed. App'x. 520, 532 (6th Cir. 2001), if "the litigation has made extensive progress in the district court before the [intervenor] moved to intervene then [the advanced nature of the proceedings] weighs against intervention." *United States v. Tennessee*, 260 F.3d 587, 592 (6th Cir. 2001).

In this case, OCSEA knocks at the eleventh hour. Consider the progress of the litigation: OCSEA's motion comes three and a half years after Plaintiffs filed the complaint, almost three years after the parties first moved to stay adversarial proceedings pending settlement negotiations, ten months after the parties agreed to a Case Management Plan that established a timetable for fact-finding and settlement, nine months after class-certification, 79 days after the conclusion of discovery (joint fact-finding), and 63 days after the parties began drafting the stipulated injunction. Two weeks after OSCEA moved to intervene the parties finalized the settlement agreement, which the Court approved pending a fairness hearing.

By Sixth Circuit standards, this is very late in the proceedings to intervene. *See*, *e.g.*, *Johnson v. City of Memphis*, 73 Fed. App'x. 123, 132 (6th Cir. 2003) (affirming the denial of a motion to intervene because it came a year after the complaint, by which time the parties had designated witnesses, completed discovery, and filed dispositive motions); *Creusere v. Bd. of Ed. of City Sch. Dist. of City of Cincinnati*, 88 Fed. App'x. 813, 825 (6th Cir. 2003) (affirming the denial of a motion to intervene "because the case was over three years old, discovery was long over, the deadline for dispositive motions had passed months before, and trial was scheduled in about a month"); *Stupak-Thrall*, 226 F.3d at 474 (intervention was untimely

because the motion came seven months into the case, ten weeks after the close of discovery, and seven weeks *before* the dispositive motion deadline) (emphasis added).

OCSEA counters that it is not too late to intervene because the Court has not approved the final settlement. The Sixth Circuit has rejected just this argument in a similar case. In *United States v. Tennessee*, 260 F.3d at 592, a class action brought on behalf of Tennessee's developmentally disabled citizens, plaintiffs alleged that the conditions of state institutions violated the class members' constitutional rights. The state agreed to a Community Development Plan ("CDP"), a detailed and comprehensive remedial scheme to overhaul the state's mental health facilities. *Id*. When a non-profit group moved to intervene, the parties had consented to the CDP and the district court had conditionally approved the stipulated injunction.[2] *Id*. All that remained was for the district court to conduct a fairness hearing and approve the final settlement. *Id*. As such, the district court held that the motion to intervene was untimely. The Sixth Circuit affirmed on the grounds that the proposed intervention came after all the substantive issues had been resolved short of a fairness hearing to approve the final judgment. *Id*.

This case is almost identical. OSCEA moved to intervene three years into settlement negotiations, by which time discovery was over and the parties were two and a half months into drafting the stipulated injunction. Like *Tennessee*, this was no ordinary settlement. In both cases, the parties negotiated a comprehensive and detailed scheme to remedy systemic constitutional violations at a number of state facilities. Admittedly, OSCEA moved two weeks

---

[2]Two related cases were consolidated for appellate review. *Tennessee*, 260 F.3d at 590. Both district courts denied the non-profit group's motion to intervene. *Id*. The Sixth Circuit affirmed. *Id*.

before the parties finalized the stipulated injunction, whereas the prospective intervenors in *Tennessee* moved after the district court had conditionally approved the settlement. But the distinction between the cases is only a matter of days.³ In each case, the lawsuit was approaching the terminus thanks to a settlement that was the culmination of years of fact-finding and painstaking negotiations. That OSCEA moves on the cusp of this resolution militates against intervention.

*United States v. BASF-Inmont Corp.*, 1995 WL 234648, at *2, also undermines OCSEA's contention that a litigation on the brink of settlement is not sufficiently mature to bar intervention. The federal government sued BASF and other multinationals under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9606(a) (CERCLA), for dumping hazardous waste. *United States v. BASF-Inmont Corp.,*819 F.Supp. 601, 604 (E.D. Mich. 1993). After the defendants agreed to clean up the environmental disaster, but before the district court approved the settlement, a citizens' group moved to intervene. *Id.* Like OCSEA, the *BASF* intervenor argued that its petition was timely because it came before the court's approval of the settlement. *Id.*

The Sixth Circuit held otherwise, noting that "[a]t the time [the intervenor] filed its motion to intervene, only one step in the litigation remained: the district court's approval of the

---

³Pursuant to Local Rule 7.2(a)(2), opposing parties have 21 days to respond to motions. A reply memorandum may be filed within 11 days of this response. Only then does a motion become ripe for review. When OCSEA's motion to intervene became ripe on April 18, 2008, the parties had reached a settlement and docketed a proposed stipulated injunction with the Court. By this time, the Court had conditionally approved the settlement and set a fairness hearing for May 21, 2008.

9

proposed consent decree. This is *the* final stage of the proceeding." *BASF*, 1995 WL 234648, at *3. OCSEA's motion is similarly tardy. *See also In re S. Oh. Corr. Facility*, 24 Fed. App'x. at 532 (affirming the denial of a motion to intervene because it was filed "after the parties had agreed upon a settlement, had created a complicated administrative scheme through which to carry it out, and either had reached the payment phase or were about to do so"). This lawsuit is nearly over. The fact that OCSEA knocks at the eleventh hour weighs against opening the door.

### 2. Diligence of the Intervenor

The Court must next consider "the length of time the proposed intervenors knew or should have known of their interest in the case before they finally moved to intervene." *Midwest Realty Mgmt. Co. v. City of Beavercreek*, 93 Fed. App'x. 782, 786 (6th Cir. 2004). OCSEA admits to knowing about this case from the beginning, but contends that it had no interest in the litigation until recently when, according to the union: (1) the gravamen of the class action, which had previously centered on health care and education, shifted to allegations of violence and misconduct by union members; (2) the litigation changed from an adversarial to a remedial posture; and (3) the proposed stipulated injunction dramatically expanded the scope of the litigation such that the settlement undermined the CBA. The Court finds that each contention is baseless.

#### i. The Gravamen of the Lawsuit

First, OCSEA argues that it did not intervene sooner because it had no interest in the underlying subject matter of Plaintiffs' case, which OCSEA characterized to be educational programming and health care for incarcerated youth. According to OCSEA, the Cohen Report

recently took the case in a new direction by alleging violent and abusive conduct by JCOs and other union members. OSCEA now demands intervention to rebut these charges. The union argues that only Plaintiffs' recent allegations trigger its interest in this suit, as any remedy would alter the training, duties, and supervision of union members in violation of the CBA. The union's characterization of the purported shift in the gravamen of this case could not be more wrong.

From the very first pleading, the thrust of Plaintiffs' claims has been accusations of violence, physical and sexual abuse, and the excessive and arbitrary use of isolation as a form of punishment. Start with the complaint, filed on December 20, 2004, and of which OSCEA was aware. The introduction states that the girls incarcerated at Scioto are subject to "abusive and inhumane conditions, policies, and practices." In the second paragraph, the complaint alleges that "a culture of violence among the uniformed staff persists at Scioto, verbal and physical abuse are common, sexual misconduct by the staff occurs . . . ." The complaint's proposal for injunctive relief contained fourteen specific requests. *Ten* of these provisions aim to remedy violent or abusive conduct by Scioto staff. Compl § XI(5). Only the final four remedial provisions relate to the education and health care of incarcerated youth. *Id*. The amended complaint, expanding the class to all youth incarcerated at ODYS facilities, was similarly focused on the violence and abuse that Plaintiffs alleged were endemic throughout ODYS institutions. This case was never just about health care and education.

Further, the May 2007, Case Management Plan reiterated Plaintiffs' assertion of "system-wide failure regarding the conditions of confinement within facilities under the control of ODYS that endanger Plaintiffs' physical health and safety . . . ." (CMP, 1). The CMP

commissioned the Cohen Team to investigate the conditions of confinement at ODYS facilities, including: "Plaintiffs allegations of excessive use of force; arbitrary and excessive use of isolation and seclusion; arbitrary and excessive discipline; abusive violation of privacy . . . ." *Id.* at 3. To this end, the CMP directed Cohen to "take special note of staffing levels, staff credentialing, and staff training." *Id.*

OCSEA's contention that until recently, this class action was about health care and education, is obviously incorrect. If OSCEA had a legitimate legal interest in defending union members from accusations of abuse or violence, it should have intervened at the beginning of this suit. Further, OSCEA may not feign ignorance that the class action only recently threatened to alter the duties, training, and supervision of union members. Given the accusations of systemic violence that Plaintiffs leveled at the outset of this case, any remedy required ODYS to alter the duties, training, and supervision of staff accused of such gross misconduct. The gravamen of the class action has not changed. As such, OSCEA knew, or should have known that this case implicated its interests long ago.

### ii. Posture of Proceedings

OSCEA further insists that it did not intervene sooner because proceedings only just shifted from the "liability-phase" to the "remedial-phase." Only then, according to the union, did the possibility of a stipulated injunction violating the CBA trigger its interests in shaping a remedy. Again, OSCEA's characterization of the progression of this suit is skewed. From almost the beginning, this litigation has not been an adversarial proceeding. Although ODYS initially filed a motion to dismiss suggesting that it would contest Plaintiffs' allegations on the merits, in July 2005, the parties jointly petitioned the Court to stay proceedings pending

12

settlement negotiations. If the prospect of a settlement triggered OSCEA's interest in the class action, it should have intervened when the parties first decided to abandon the adversarial process in July 2005.

Two years later the litigation traveled further down the path to a settlement. In May 2007, the DOJ Report exposed a myriad of unconstitutional conditions at ODYS, notably violence and abuse by staff. Whether this caused ODYS to abandon any hope of contesting the class action on the merits is unclear. But around this time, ODYS consented to expand the class to include all incarcerated minors, agreed to lift the stay, and jointly proposed the Case Management Plan commissioning the Cohen Report. The CMP is particularly indicative that ODYS was not litigating the case but cooperating with Plaintiffs in view of a stipulated injunction. The stated purpose of the CMP was to appoint a neutral fact-finder to investigate ODYS, such that the "matter can be resolved through a collaborative process." *Id*. Accordingly, in the summer of 2007, OSCEA knew or should have known that the case had long ceased to be an adversarial proceeding. If it sought to join the parties in crafting a remedy, as it asks now, it should have intervened then.

### iii. Scope of the Remedy

Finally, OSCEA contends that the breadth of the stipulated injunction has taken it by surprise. OCSEA likens this case to *Grubbs v. Norris*, 870 F.2d 343 (6th Cir. 1989) and *Linton v. Comm'r of Health & Env.*, 973 F.2d 1311 (6th Cir. 1992), in which the Sixth Circuit reversed district courts for concluding an intervention was untimely. In *Grubbs*, a class of Tennessee prisoners sued the state for unconstitutional conditions of confinement. 870 F.2d at 344. The district court found for plaintiffs and as a remedy restricted the admission of prisoners to state

13

facilities in order to prevent overcrowding.  This had the effect of diverting state prisoners to local jails, prompting the city of Nashville and Davidson County to intervene.  *Id*.  But the district court held that the proposed intervention was untimely because it came after it had entered a final judgment.  *Id.*

The Sixth Circuit reversed on the grounds that "[i]t was precisely the district court's *remedy* . . . that triggered [the intervenors'] clear interest in the action."  *Id*. at 346.  Before the district court restricted the intake at state prisons, the city and the county had no interest in a state conditions case.  But the district court's order triggered such an interest because it diverted state prisoners to the already overcrowded city and county jails.  As such, the Sixth Circuit held that intervention was not untimely.  *Id.*  OSCEA argues that its plight is similar: like the city and county, it could not anticipate that the stipulated injunction would undermine its contractual interests in negotiating the terms and conditions of its members' employment.  But *Grubbs* is easily distinguishable from this case.

In *Grubbs*, the appellate court held that neither the city nor the county could have known that the district court would fashion a remedy that would affect their institutions.  *Id*.  Here, from the outset of this litigation, Plaintiffs have demanded comprehensive injunctive relief, including a dramatic overhaul of the hiring, training, conduct, and oversight of union members.  The stipulated injunction, which does exactly that, should therefore come as no surprise to OSCEA.  OSCEA also knew that rather than litigating the case, ODYS has been negotiating a settlement since 2005.  Accordingly, OSCEA knew or should have known that *any* remedy would change the terms and conditions of union members' employment, to which the union now belatedly objects.  In *Grubbs*, the city and county were blind-sided by a remedy that they had no reason to

anticipate in a case in which they were not involved. *Id*. Here, the stipulated injunction to which the union professes surprise is almost exactly what Plaintiffs demanded in the initial complaint, filed in 2005, and the amended complaint, filed in 2007.

*Linton* is similarly inapplicable to this case. In *Linton*, nursing-home residents sued the Tennessee Department of Health and Environment ("TDHE") seeking injunctive relief to remedy Medicaid Act violations. 973 F.2d at 1311. The district court found for plaintiffs and adopted a remedial scheme, proposed by TDHE, which required Medicaid providers to change their patient admission and discharge procedures. Immediately thereafter, six nursing homes moved to intervene. The district court held that these petitions were untimely but the Sixth Circuit reversed. *Id*. at 1318. The appellate court so held because the district court's remedy dramatically expanded the scope of the litigation and the attendant duties on Medicaid providers. *Id*. But this is not OSCEA's lot.

In *Linton*, plaintiffs alleged the illegality of a policy that implicated only one of the six intervenors. *Id*. As such, the intervenors had no reason to know that the remedy would dramatically alter their responsibilities with respect to the Medicaid program. Unlike the movants in *Linton*, OCSEA was on notice from the beginning of this litigation that a settlement would affect its interests. Further, the *Linton* court's remedy dramatically expanded the scope of the case, forcing many previously uninterested parties to intervene to protect their statutory and contractual rights. Here, there was no such expansion. The nature and breadth of this case has been obvious for quite some time. OCSEA knew or should have known, arguably since 2005 but at the very least since the summer of 2007, that joint fact-finding, negotiations, and the

collobrative drafting of a comprehensive administrative remedy would affect its interests. If it wanted to influence the outcome of these processes, it should have intervened then.

Finally, OCSEA claims that it moved with diligence upon learning of the Cohen Report and the remedies proposed therein. But Cohen filed his report on December 31, 2007. Immediately thereafter, the parties entered into intensive settlement negotiations to draft a stipulated injunction remedying the constitutional violations highlighted in the report. OCSEA did not move until March 19, 2008, two and a half months later. By this time, the parties were on the cusp of agreeing to a complex administrative scheme. Even if the Court credits OCSEA's assertion, which it does not, that it had no interest in the litigation until the Cohen Report proposed sweeping administrative remedies that implicated the rights and responsibilities of union members under the CBA, OCSEA offers nothing to explain why it waited ten weeks to intervene. Ultimately, OSCEA should have known that this litigation affected its interests for some time.

### 3. Purpose of Intervention

OSCEA demands to be admitted to this case to block the pending settlement because it contends that the stipulated injunction violates the union's contractual rights. But according to § 4117.10 of the Ohio Revised Code, "[l]aws pertaining to civil rights . . . prevail over conflicting provisions of agreements between employee organizations and public employers." Because the stipulated injunction remedies a host of unconstitutional conditions of confinement at ODYS facilities, by Ohio law its implementation prevails over competing statutory or contractual obligations to OSCEA. The rational is simple: the constitutional rights of incarcerated youth to adequate health care and education, saying nothing of their right to be free from violence and

16

abuse, trump the statutory and contractual rights of the prison staff to determine the terms and conditions of their employment.

Even if this were not so, the Court does not have jurisdiction to resolve the union's grievances. OSCEA moves to block the settlement on the grounds that the stipulated injunction violates the CBA. Pursuant to § 4117 of the Ohio Revised Code, the State Employment Relations Board (SERB) has exclusive jurisdiction to adjudicate claims that arise from or are dependent on the collective bargaining rights of public employees. *Franklin Cty. Law Enforcement Assn. v. Fraternal Order of Police, Capital City Lodge No. 9*, 572 N.E.2d 87, 88 (Ohio 1991)("FCLEA"). OSCEA's objections to the stipulated injunction, by the union's own admission, arise from its rights under the CBA. SERB therefore has exclusive jurisdiction to hear such claims. *See Rootstown Local Sch. Dist. Bd. of Ed. v. Portage County Ct. of Common Pleas*, 678 N.E.2d 1365, 1367 (Ohio 1997); *Frat. Order of Police, Oh. Labor Council, Inc. v. Ct. Common Pleas of Franklin County*, 667 N.E.2d 929, 931 (Ohio 1996).

OSCEA counters that SERB is not an adequate forum: even if SERB concludes that ODYS violated the CBA in negotiating a stipulated injunction without the union's input, it may not collaterally attack a federal court injunction and thus may not grant OSCEA prospective relief. True, but if SERB determines that ODYS committed an unfair labor practice in negotiating a settlement to this lawsuit, it may award OSCEA money damages. O.R.C. § 4117.11(C). As such, the settlement does not preclude OSCEA from vindicating its contractual rights before SERB. In fact, it is the proper forum for the union's claims.

### 4. Prejudice to the Existing Parties

OSCEA demands to be admitted to this case in order to block the settlement, assert a cross-claim for injunctive relief against ODYS to prohibit the state from consenting to a stipulated injunction without the union's approval, and contest Plaintiffs' allegations on the merits. OSCEA's intervention is plainly prejudicial to the parties. First, OSCEA would destroy the settlement. The union argues that the stipulated injunction violates the CBA and otherwise extends "way beyond what is reasonably necessary to correct any proven federal violations." The stipulated injunction is the fruit of considerable labor. The parties have invested years of work into settlement negotiations, joint-fact-finding, and collaborative drafting. Rather than intervene at the beginning and participate in this process, OSCEA attempts to halt its consummation at the last minute. The prejudice to the parties is therefore grave.

Moreover, OSCEA is not merely interested in the scope of the remedy. Rather, OSCEA's proposed answer and cross-claim shows that the union seeks to contest liability. Notably, OSCEA denies that any union member, including JCOs, inflicted any unjustified or unlawful harm on incarcerated minors.[4] Not only does this ignore the catalogue of violence and abuse amassed first by the DOJ and second by the Cohen investigation, but by denying the allegations at the very heart of Plaintiffs' suit it shows OSCEA's intention to contest this action on the merits. In addition, OSCEA raises a number of affirmative defenses such as qualified immunity, sovereign immunity, Plaintiffs' failure to exhaust administrative remedies, and

---

[4]In fact, OSCEA goes so far as to chastise ODYS for not rebutting Plaintiffs' accusations. OSCEA laments: "[t]o its shame, [O]DYS consented to an entry which makes findings that [O]DYS employees used excessive force and/or violated policies regarding isolation and punishmentof juveniles and violated the juveniles' rights to due process of law." (OSCEA's Rpl. Mem., 14). OSCEA's position is surprising given the voluminous evidence supporting those allegations.

applicable statutes of limitations.  OSCEA, ignoring this Court's order to the contrary, also disputes whether a class action is an appropriate mechanism to litigate Plaintiffs' claims. OSCEA's intervention would in effect, return the litigation to square one, circa 2005, before the parties embarked on a settlement process.  OSCEA would thus derail a painstakingly negotiated agreement at the last minute, thereby undoing three years of work.  This is so plainly prejudicial to the parties that it weighs strongly against intervention.

### 5.  Unusual Circumstances

Nor do the unusual circumstances of this case favor OSCEA's admission.  This case, at its core, is about fixing a social catastrophe.  The parties have agreed that juveniles are currently incarcerated in grossly unconstitutional conditions at a number of ODYS facilities.  These children are subject to physical and sexual abuse by their would-be guardians, who have inculcated the state institutions with a culture of violence.  These children lack adequate health care and education.  ODYS staff lack adequate training and supervision.  In some cases they are unqualified.  The parties, the DOJ, and independent investigators have concluded that the state has failed its incarcerated minors, a failure which the state has now duly sought to remedy.  The dire conditions weigh against delay and against an intervention that would obstruct a solution to the systemic deprivation of constitutional rights.

Ultimately, all five factors for determining the timeliness of intervention align against OSCEA.  OSCEA moved to intervene in the final stage of the lawsuit yet offers no excuse for its tardiness.  It admits that it knew about the lawsuit from the beginning.  Rather than take an unexpected twist, the stipulated injunction is the logical and foreseeable resolution of three years of negotiation and fact-finding.  Nor does intervention serve OSCEA's purpose.  The stipulated

injunction, with its constitutional pedigree, takes precedence over the CBA.  Even if it did not, this Court does not have jurisdiction to resolve the union's grievances.  The consequence of the union's intervention would be to delay relief to a vulnerable class of plaintiffs who have suffered unconscionable and unconstitutional conditions of confinement.  OSCEA's motion to intervene is untimely, and the Court need not reach the other factors in adjudicating the union's motion to intervene as of right.[5]  *See Johnson*, 73 Fed. App'x. at 134.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** OSCEA's motion to intervene.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY, JUDGE**
**United States District Court**

**DATED:  May 22, 2008**

---

[5]OSCEA's application for permissive intervention is similarly untimely.  *See* Fed. R. Civ. P. 24(b) ("On timely motion, the court may permit anyone to intervene who . . .").