# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| S.H., a minor child and all others<br>similarly situated, et al., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | Case No. 2:04-CV-1206 |
| | : | |
| | : | |
| v. | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | |
| | : | |
| TOM STICKRATH, et al., | : | |
| | : | <u>**SCIOTO JCF  REPORT:**</u> |
| | : | |
| | : | Report to the Court in Compliance with |
| | : | Order of June 24, 2009 |
| Defendants. | : | |

1

SCIOTO JUVENILE CORRECTIONAL FACILITY REPORT:
REPORT TO THE COURT IN COMPLIANCE WITH ODER OF JUNE 24, 2009

## TABLE OF CONTENTS

A.  Introduction ................................................................................................ 3

B.  Introductory Narrative ................................................................................ 5

C.  The Facility ................................................................................................ 12

D.  The Methods Employed ............................................................................ 15

E.  DYS Assessment Activities: Self and External ...................................... 19

F.  Reception and Classification .................................................................... 23

G.  Programming: Leisure and Recreation .................................................... 35

H.  Use of Force, Seclusion, Restraints & Investigations: Protection from Harm ....... 39

I.  Education .................................................................................................... 46

J.  Mental Health and Medical Care: Documentation .................................. 61

K.  Grievance Process ..................................................................................... 76

L.  Proposed Findings by the Court ............................................................... 86

    Appendix A

    Appendix B

    Appendix C

    Appendix D

*There is a 12-minute video enhancement to this Report available at http://www.ohiojjp.com. A hard copy of this 12-minute DVD will be sent to the Court, the DOJ, Class Counsel, Director Tom Stickrath, and Superintendent Gwen Randle.*

*I respectfully request that the aforementioned DVD become a part of the record along with this Report.*

### SCIOTO JUVENILE CORRECTIONAL FACILITY REPORT
### FRED COHEN, MONITOR

**August 11, 2009**

### A. INTRODUCTION

In compliance with the Court's Order of June 24, 2009, I hereby submit my Report on Scioto Juvenile Correctional Facility (Scioto). I wish to recognize the significant contributions to this Report by *S.H.* team members Steve Martin, David Roush, Ava Crow, and Barbara Peterson and my assistant, Linda Mitchell. I thank the Court for this opportunity to present this Report and move forward with the unified monitoring and reporting of all DYS as described in the Court's Order.

The Court's June 24 Order was issued at a time when regularly scheduled site visits were in place for the entire Summer of 2009. Participating team members were required to cancel or change vacations plans and other professional commitments in order to assist me with this Report. I am extremely grateful to my team members for their commitment to this undertaking and I applaud the quality of their work as well.

We have made every effort to prepare this Report in accordance with the substantive areas and our understanding of the measurement and evaluative components of *U.S.A. v Ohio*. The Report actually goes beyond the seven remedial areas identified by Department of Justice (DOJ) Counsel Vinnie Herman in a letter to me dated June 25, 2009 (See Appendix D). In so doing it is my desire to provide the broadest, yet manageable, framework for understanding the *U.S.A.*-related remedial activities at Scioto.

The evaluative measures or components sought by DOJ in relation to the *U.S.A.* Stipulation are: (1) Steps taken by the Monitor to assess compliance, (2) self-assessment steps

3

by the facility, (3) level of compliance in the language of "non-compliance" v. "substantial compliance," and (4) the Monitor's recommendations, if any, with regard to compliance.

At the outset, I should state that in the Report I have frequently used the evaluative term "progress toward compliance;" primarily because we are only now leaving the start-up/consultative stage of implementation.  The phrase "substantial compliance," for example, is more descriptive of substantive achievements than putting in place the structure, process, and people needed to achieve such ends as timely and appropriate mental health care, an increasingly safe environment, appropriate special education, and so on.

## B.  INTRODUCTORY NARRATIVE

Before turning to the substantive areas encompassed by *U.S.A.* and the required evaluative measures, I wish to provide the Court and the parties with a somewhat less rigid narrative and thereby add a more human dimension to what ultimately is an intensely human undertaking: the protection and rehabilitation of a group of youth who have violated the law, some having committed very serious felonies, and who invariably have been young victims themselves.

Interaction with a group of girls placed at Scioto will produce more truth on their current status than any set of cold numbers.  Talking with Scioto staff will produce more material on what is working, and what is not, than any survey.  This Report, then, flows from multiple interviews with Scioto girls, the boys in reception, and the revocation unit (to be described).  We have interviewed numerous Youth Specialists (YS: formerly JCOs)[1] and other DYS staff and officials.  We have, of course, studied relevant records, walked the walk, and just observed.

I am entirely confident about what we know, what we need to know more about; what is working , and what is not.  And, a great deal is working at Scioto with more to do.  At this time and in this space the **overall assessment** of Scioto has to be **significant progress toward substantial compliance with the *U.S.A.* Stipulation and anticipated compliance with *U.S.A.* within three years of its effective date.**

The Court and readers will detect distinctions as to style and length in the various sections of this Report.  That is because I have served more as a producer-editor than as the principal author.  Thus, the Section on Education, for example, while edited by me closely

---

[1] The formal change in nomenclature has not yet occurred but we are participating in the verbal and conceptual shift early to ease the transition.

parallels our expert's style and terminology.  It also hews more closely to the *U.S.A.* Stipulation

in its detailed references thereto as opposed to a congruent narrative. The Mental Health and

Medical Section is not as lengthy as the significance of the areas suggest but I believe the

coverage to be more than adequate. Ultimately, this is a Report from the Monitor but the Court

and interested readers should understand that it is more collage than a single landscape.[2]

The overall picture at Scioto, as noted, is extremely positive.  There is no question in any

of our minds that Scioto is making significant progress toward substantial compliance in each of

the seven substantive areas encompassed by *U.S.A.*  It has been just over a year since the *S.H.*

and *U.S.A.* Stipulations were agreed to and, as I have repeatedly stated, the first year in an

undertaking of this magnitude is essentially organizational and consultative regarding our

monitoring and implementation by DYS.

**There has been significant progress in enhancing youth and staff safety; in**

**providing appropriate medical, mental health, and dental care; in grievance reform;**

**special education, programming, and documentation.**  This conclusion rests on the anecdotal

and empirical data described herein and it ultimately flows from the expertise and experience of

*S.H.* Team members.

Perhaps the most important progress is in the area of a safe environment, although the

available PbS data may not always reflect this.  Gains in special education are palpable and are

significant "game changers." Obviously, problems remain: integration of mental health care and

programming, finalizing a revised grievance and disciplinary policy, improving staff training,

and the like.  These are among the problems we are collaborating on with DYS and some

---

[2] My other choice would have been to present five or six separate Reports, bound as one, to the Court and counsel.  I believe that would have been far less acceptable.

solutions are for the near term (e.g., grievance procedures), while enhanced training will take more time.

Given the slow and somewhat tedious first few months of implementation, I believe the demonstrable gains made illustrate the hard work of DYS staff and the Monitoring Team. The bona fides of DYS is beyond question.

I have been visiting the Scioto facility since 1998 as a retained observer and analyst, focusing on conditions of confinement. When I first visited there were 100-plus girls in essentially the same living units that now house 51. Clinical staff then totaled 16 with a staff to youth ratio of 1 : 7.93, and now totals 16.5 with a staff to youth ratio of 1 : 3.31.

During my earlier visits, youth were either in school or idle. Group punishment was the norm. The dereliction of a single girl would lead to an entire cottage being required to sit in silence without even a pencil ("too dangerous") or any reading material ("not available").

The JCOs, however, often could be found nose-to-nose with an errant youth screaming invectives and unintelligible commands. This was role modeling. There was visual dry rot to this potentially enveloping campus and a hollow interior where even a pretense of treatment or rehabilitation appeared to require too much energy. The Scioto ambiance of today is worlds apart. The campus is aglow with the lushness of a rainy Spring and the attention of an involved staff.

Just as there is no metric that can be applied to happiness, there is none to measure ambiance. Those of us who have walked through dozens, if not hundreds, of juvenile and adult facilities however, will detect the prevailing ambiance almost immediately. Staff, for example, may force residents to clean, to say "yes sir, no sir," and to police the grounds. These youth,

7

however, cannot be forced to convey a sense of safety, of freedom of movement and expression — of relative satisfaction with their circumstances.

There are programs, but more are needed; the school is humming, YSs are often positively involved and now rarely physically or verbally aggressive.  The sought after culture change is emerging. Indeed, on June 29, 2009, I met at Scioto with two union representatives for an hour and they spoke of their interest in enhanced training and a perceived need for a few more YSs.  More importantly , they expressed their desire to see Scioto continue to accelerate on the affirmative path it is now on.  There were no complaints about "being soft on youth," "we're in danger," "can't use any force," or the like

In three separate meetings on June 29 and 30, 2009, with a total of 16 girls, I asked if they felt safe at Scioto  Almost all, unhesitatingly, said yes.  For those who said no, I asked if they felt unsafe from staff or other girls.  The unanimous answer was: other girls.  I asked, "And, what could we do to help with that?"  "I don't know.  Maybe that's just how it is with girls living together."  Maybe so.

This is a sea change from recent years when, inter alia, I uncovered the sexual abuse of some girls by male officers, leading to the prosecution of such officers.  Asked, at that time, if they felt safe, the virtually unanimous answer was no.  Staff?  "Yes."  Other girls?  "Yes."

Without a safe environment — a fundamental requirement of both Stipulations — treatment, rehabilitation, and education simply will not occur.  It is the building block upon which rests everything else we want to accomplish.  Again, in my judgment, the perception and honest reporting of the girls themselves is the most significant data I might present.  There is powerful support for this at Section H of this Report.

While the overall picture of Scioto should be regarded as positive, as making significant progress toward substantial compliance, there are problems that must be addressed in the upcoming year.  It was disturbing, for example, to learn that the swimming pool had not been in use for over four months because a maintenance contract fell victim to budget cuts.

On July 30, I learned that the maintenance contract had been revived and a pool filter repaired.  Scioto is awaiting the recertification of its lifeguards and that will be done very soon.

I observed a large muscle exercise-recreation period in the gym involving some 35 reception boys where the boys were led through a few calisthenics and then offered "open basketball."  Perhaps three-fourths of the boys elected to merely sit in the bleachers and just watch.  The new Recreation Administrator had only recently arrived from Marion and told me that his staff was too thin to enhance the recreation-exercise time.  While the staff may be below what is desirable, I believe a number of positive, competitive-type inducements could be employed to significantly improve this situation.  We will continue to monitor in this area and with the complete support of Superintendent Randle on this issue.

At another level — and again to be discussed infra in some detail — there is authentic mental health treatment occurring; there are regularly offered, well attended structured programs (although I am quite concerned by the high number of religiously-oriented programs on the agenda).

One example of this concern, quoted from DYS handouts, will illustrate this point:

"**Celebrate Recovery** — Volunteer lead [sic] recovery group that helps girls deal with any issues in their lives.  *The purpose of Celebrate Recovery is to fellowship and experience God's healing power in our lives through working the <u>12 Steps and 8 Recovery Principles</u>*.  The purposes of the Celebrate Recovery Ministry are

9

to fellowship and celebrate God's healing power in our lives. This experience allows us to be changed. By working and applying these principles, we begin to grow spiritually. We become free from our addictive, compulsive and dysfunctional behavior. This freedom creates peace, serenity, and joy and most importantly a stronger personal relationship with God and others. As we progress through the program we discover our personal, loving, and forgiving Higher Power — Jesus Christ, the one and only true higher power."

I was unable to locate anything other than Christian, particularly Protestant, religiously infused programs or services. I found no alternative secular program available for "recovery" efforts.

With regard to treatment and rehabilitation efforts, the team was unable to locate connectors (or a unified approach) to mental health care, substance abuse programs, and structured programs generally. As with the religious influence questions, I am confident that we will resolve those problems in the coming year. With regard to a unified case plan and management, I would say that progress toward compliance to date has been minimal. Team member Barbara Peterson is working diligently with DYS staff on this issue, as well as a comprehensive continuum of care plan. As I noted in my First Annual Report, progress on these issues has been unacceptably slow but DYS appears fully committed to creating unified treatment/rehabilitation plans and records. I will give extremely high priority to monitoring and consultation in this area. DYS officials do not disagree with my assessment and are extremely cooperative with me and team members.

Central Office needs a psychiatrist, if only part time, to provide leadership and peer review-type undertakings. To fill that void, the Agency just entered into a contract with a board-

10

certified adolescent and child psychiatrist who is also a pediatrician.  I will meet with Dr. Brandon Strange, the new hire, on August 20, 2009.

I turn now to the more detailed aspect of this Report beginning with a description of the facility itself.

## C.  THE FACILITY

Scioto is located on the Scioto River about 10 miles north of Columbus and, with the closing of the Freedom Center, is the only female facility operated by DYS.  Scioto also serves as the male reception center.  The American Correctional Association accredited Scioto in May of 2006.

Rated as a maximum-security facility, Scioto provides intake and reception services to males and females between the ages of ten (10) and 21 who are committed to the Ohio DYS or whose parole has been revoked.  The facility provides female offender treatment services for the Department.  The male units are Woodson (Intake), Boone (Orientation), Jefferson/Carver/Sycamore (Reception), and Cedar (Parole Revocation Pilot Program).  The female living units are Buckeye, Allman, and Davey, which is the mental health unit.

Each living unit has a Unit Manager assigned the responsibility for the operation of the unit including the supervision of  YS's.  They report to the Deputy Superintendent for Direct Services.  Social Services, Psychology, Religious Services, Education, Medical, and Recreation report to the Deputy Superintendent of Program Services.  Youth Specialists in the unit are responsible for security while other staff assigned to program services are responsible for treatment.  According to some staff this causes some problems with communicating treatment and security issues between the two staffs.

The female living units provide treatment and rehabilitation services to girls who have been committed to ODYS from throughout the state.  The mental health unit has been refined to deal effectively with those girls who have significant mental health disorders and who cannot function in the regular living units.

With the exception of Cedar Unit, male units provide housing for youth awaiting placement following the intake and reception process. Cedar Unit houses the revocation Cognitive Behavioral Treatment (CBT) pilot program developed in partnership with the University of Cincinnati (UC). It is designed to serve as a demonstration program for the testing of a new departmental treatment approach. The CBT program is intended to provide a model of treatment based on best practices and research, staff training on the new model, ongoing consultation by the UC, and the creation of a structure for quality assurance in the development of the model.

Scioto reports an average length of stay for intake youth at 25 days. This is a decrease from 34 days in 2008. Staff reported the length of stay for May, 2009, was 40 days and in June it was 36 days. In the wake of the Marion closing, the average length of stay for youth awaiting placement has, we trust temporarily, increased. This must be closely managed since Intake and Reception provide diagnostic and basic services as opposed to long-term treatment services. Management of those cottages housing youth awaiting placement more nearly resemble juvenile detention centers than treatment facilities: brief terms, information gathering, and distribution. Operational practices should include even more behavioral observation to determine the youth's adjustment to congregate living, interactions with peers and staff, and so on. Documentation for the transfer of this information to the receiving placement or "home" institution is vital.

Scioto's youth population on June 15, 2009, was 146 Males and 58 Females. The capacity of this facility is reported as follows: Rated Capacity (ACA Definition) is 125 Males and 69 Females; Maximum Capacity (Double Bunked) is 241 Males and 133 Females; and Number of Physical Beds is 203 Males and 131 Females.

In 2008 there were 1,723 youth received by Intake and Reception.  Non-white youth comprised 63.9% and White youth comprised 36.1%.  Of the 1,519 youth who received the LSI (Level Service Inventory) at Intake and Reception, 72.9% scored as high risk; 25.7% moderate risk; and 1.4% low risk.  Six counties accounted for 76.6% of youth — Cuyahoga, Franklin, Hamilton, Lucas, Montgomery, and Summit.

Since May 2008, team members have visited Scioto 11 times, which is far more than our visits to any other juvenile facility.  Table 1 illustrates those visits.

Table 1

| Date of Visit | Team Member(s) | Mission |
|---|---|---|
| May 2008 | Barb Peterson | Initial overview visit |
| June 2008 | Ava Crow | Initial overview visit |
| August 2008 | Fred Cohen | Overview visit |
| November 2008 | Orlando Martinez | New Directions Program |
| December 2008 | Shay Bilchik | New Directions Program, attended 1st graduation, met with staff regarding programming. |
| January 2009 | Ava Crow | Baseline monitoring |
| February 2009 | Fred Cohen | Overview visit, interviewed staff and youth |
| June 15-16,  2009<br>June 29-30,  2009 | "Roush" team<br>Cohen, Roush, & Peterson | Official site visit<br>Site visit re: Report due to the Court |
| July 2009<br>July 2009 | Ava Crow<br>Steve Martin | Site visit re: Report due to the Court<br>Site visit re: Report due to the Court |

This Report derives primarily from the various June 2009 visits, although some data and expert judgments are an amalgam derived from earlier visits.

14

## D.  THE METHODS EMPLOYED

All of our formal site visits, certainly all of those in June 2009, used the following site visit assessment format:

1. **Stipulation Review**:  Enhanced study and familiarity with the *S.H.* and *U.S.A.* Stipulations, with the latter being particularly significant for this Report.  Discussions between the Monitor and Team members on technique.

2. **Pre-Visit Document Review**:  In advance of the site visits, the Monitor's office requested that DYS provide us with a list of materials and documents for review.  The time specific documents and materials, such as special incident reports, child abuse investigations, and population data, were from January 1 through June 30, 2009. DYS distributed the documents electronically by (a) scanning hard copies into PDF format, (b) using existing electronic documents as much as possible, and (c) transferring data into Excel worksheets.  Some problems associated with Central Office schedules delayed the receipt of usable documents in the electronic format.

3. **Use of Data**:  DYS has an excellent management information system with access to a wide range of data.  Regarding the nature and extent of special incidents, DYS has sufficient data to permit an analysis of frequencies and rates for all facilities involved in the monitoring process.  Data, of course, are important because they provide a place to begin the discussions about progress.  When multiple definitions and perspectives exist about what constitutes progress, frequencies and rates provide empirical starting points for these discussions.  The same applies to portions of the Stipulations that have no formal professional standards.

4. **Entrance Interview — Executive Staff**:  The typical entrance interviews include introductions, informal discussion of institutional goals and objectives, an overview of the assessment process, a review and discussion of assessment instruments, and the scheduling of the remaining assessment activities.  DYS staff members in attendance included: Gwen Randle, Superintendent; Nan Hoff, Deputy Superintendent of Programs; Vinson Spurlock, Deputy Superintendent – Indirect Services; Chris Baker, Deputy Superintendent – Direct Services; Larry L. Blake, Labor Relations Officer; E. Earl Myles, Unit Manager Administrator.  Central Office officials were present, particularly Chris Money, more than occasionally.

5. **Facility Tour**:  Earlier visits included a brief, get-acquainted walk through the facility. The Scioto facility tour included a general inspection of all selected spaces and used copies of construction documents or fire evacuation floor plans on an 8 ½" x 11" format.

6. **Staff Interviews**:  The assessment incorporated confidential, individual and group interviews with at least 40 direct care, supervisory, and administrative staff members. The interviews and discussions asked about supervision, job satisfaction, staff morale, safety, and admissions, among other topics.  A partial list of individuals who contributed information and perspectives to this assessment include:

Gwen Randle, Superintendent
Chris Baker, Deputy Superintendent – Direct Services
Nan Hoff, Deputy Superintendent of Programs
Vinson Spurlock, Deputy Superintendent – Indirect Services
E. Earl Myles, Unit Manager Administrator
Kerry Baker, Program Administrator
Rebecca Bateman, Training Coordinator
Larry L. Blake, Labor Relations Officer
Michael Blevins, Unit Manager
Dr. Joshua Childers, Psychology Supervisor
Byran Conrad, PbS Coordinator

16

Marquetta Dudley, YS
Yolanda Frierson, YS
Karen Goggins, Reception Coordinator
Patrick Holt, YS
Stephen Hughes, YS
Wilson Humphrey, YS, 2nd Vice President of the Local Chapter of OCSEA
Marius Igwe, Social Worker
William E. Isaman, YS, Vice President of the Local Chapter of OCSEA
Dana Jackson, Social Worker
Jessica Jefferson, Social Worker
Dr. Irvin Jones, Psychology Assistant
Scharron Kane, Director of Reception
Jenni Longo, Social Worker
Brett Miller, YS
Tami Null, YS
Michael Otis, YS, Davey Cottage
Shawn Overstreet, YS
Bobby Perkins, Social Worker Supervisor
Dr. Jason Randle, Psychology Assistant
John Rafferty, YS
Robert Reynolds, YS
Matt Russell, YS
Gary Scruggs, YS
Tanya Serrell, YS, Sec/Treasurer of the Local Chapter of OCSEA
Dr. Pamela Thies, Psychology Assistant
Kimberley Times, Cosmetologist
Velma Valentine, Social Worker
Ricardo Volley, YS, President of the Local Chapter of OCSEA
Karl Wilkins Jr., YS, Chief Steward of the Local Chapter of OCSEA
Becki Williams, Social Work Supervisor

7. **Resident (Youth) Interviews**: The assessment by Dave Roush included interviews with

20 residents in four groups, eight (8) female residents in two groups from Buckeye,

Allman, and Davey Cottages and 12 male residents in two groups from Cedar and

Jefferson Cottages. Institutional staff selected the youth to participate, eliminating any

youth on disciplinary action, room confinement, or who had been in the facility fewer

than 3 days. Interviews took about 45 minutes to complete, and they occurred in the unit

group room with reasonable privacy from staff. Fred Cohen interviewed, for an hour

17

each, three groups of girls totaling 17 interviewees.  Two of the groups were varied as to length of time at Scioto without regard to their living unit.  Six girls were interviewed on the Davey unit.

## E.  DYS ASSESSMENT ACTIVITIES: SELF AND EXTERNAL[3]

**Performance-based Standards**

**Facility Improvement Plan.**  Following each reporting period for the Performance-based Standards Project, the PbS staff, consultants, and coaches assigned to DYS work in concert with facility staff to develop a Facility Improvement Plan (FIP) that outlines a strategy to address scores that are below the Field Average.  FIPs are specific to a particular problem that contributes to a specific PbS outcome.

The FIP is a short, straightforward, and often behaviorally specific plan.  In situations where intractable external realities inhibit the likelihood of critical change occurring, the FIP sometimes reads like an overly simplistic statement of the obvious.  Nonetheless, it has the effect of placing on the record important issues for staff consideration.  An FIP can remain "open" meaning that staff have not fully resolved all of the issues.  Each FIP has a list of tasks and responsibilities assigned to various individuals, so that anyone with access to the PbS data, particularly the Superintendent, will have an on-going accounting of the status of the activities designed to fulfill the FIP.

**DOJ Letter.**  The July 1, 2009 letter from DOJ attorney Benjamin Tayloe to me reviews PbS data extracted from the youth and staff climate surveys administered before the April 2009 data collection.[4]  A review of the letter and the original data confirm the fidelity of the summary statements with regard to reflecting the above data.  I do not, however, find that this data itself, particularly with only some 30% of the youth responding, is particularly accurate.

---

[3] I have relied heavily on the excellent work of Team Member David Roush for the material in Sections E through G.  Dr. Roush is the ultimate juvenile justice professional and of incalculable value to our work.
[4] Attached as Appendix A.

**Correctional Institution Inspection Committee Report[5]**

The Correctional Institution Inspection Committee (CIIC) Report , dated January 11, 2007, reflects the findings of a series of visits that took place between August 9, 2005 and May 25, 2006.  Most of the visits were unannounced and coordinated with the Department of Youth Services following the new CIIC statutory authority to inspect and evaluate juvenile correctional facilities.  The new statutory language became effective in April 2005 and is contained in Ohio Revised Code Sections 103.75 – 103.79 providing the following:

- The CIIC may make an inspection of any youth services facility at such times as it determines;

- The CIIC, for purposes of making inspections of youth services facilities, shall have access to any youth services facility, or to any part of the facility, and shall not be required to give advance notice of, or to make prior arrangements before conducting an inspection;

- The CIIC may establish and maintain a continuing program of inspection of youth services facilities; and

- The CIIC may evaluate and assist in the development of programs to improve the conditions or operations of youth services facilities.

The CIIC Report contains data comparisons for the individual facility versus the other DYS juvenile correctional facilities.  These thorough data permit staff to assess their numbers in relation to other facilities.

---

[5] The CIIC, headed by Shirley Pope, is widely respected for its independence and expertise.  These are not in-house, back-slapping studies and deserve to be accepted as reliable reviews.

The 2007 CIIC Report on Scioto is thorough, detailed, and impressive in the scope of its findings. It addresses almost all of the substantive issues identified in the Stipulations.

Several points should be made about the CIIC Report. First, the issues in the findings are three years old. Second, the time span between the last on-site (May 25, 2006) and the issuing of the report in January 2007 represents a delay of approximately eight (8) months. Third, despite statutory authority to be prescriptive in the improvement of conditions of confinement and operations, the Report is mostly descriptive and lacks substantive recommendations.

**Mock Audit Report**

As a part of the ACA accreditation process, DYS assembles an audit team of Central Office and other JCF employees to conduct a mock audit several months in advance of the actual ACA audit. The mock audit of Scioto occurred on February 23-24, 2009. Twelve DYS employees participated in the two-day event. This represents a substantially greater investment in manpower than virtually all other assessment activities, including the DOJ monitoring, but excluding the monitoring conducted through my office.

The mock audit covers the ACA Standards and the PbS on health care. ACA Standards are very focused on life safety issues, and the mock audit is a decent measure of the status of such issues. However, like the CIIC Report, the mock audit is largely descriptive. It identifies those things that Scioto does well, i.e., those things that are in compliance with ACA Standards, and those things that it does not do well or that need improvement, i.e., those issues that are in non-compliance with ACA Standards. The mock audit does not provide detailed information about plans of improvement, nor does it directly address the relationship between ACA accreditation and the Stipulations.

21

**Internal Management Audit**

The Internal Management Audit is the Department's annual self-inspection process. This is another essentially descriptive report for administration regarding operations. It is the precursor of an internal quality assurance process, even though there is no plan generated by the report for remediation or improvement.

Thus, DYS has four substantial self-assessment processes. For the most part, these resources provide a litany of things that are problematic or need improvement. While the reports also identify those things that Scioto does well, they provide one measure of progress over time. Other than the PbS, FIP, which forces the development of a corrective action, these resources do not fare well in providing institutional staff with effective pathways for improvement. This area needs strengthening and I view it as a vital aspect of our monitoring that we make certain that DYS continues to develop and refine internal review and remediation processes.

At the end of the oversight day, whether that "day" is three or five years, our monitoring success should be measured, in part, by the existence and functioning of DYS quality assurance, peer review, and internal audits. I believe the DOJ Stipulation is more explicitly demanding in this area than the *S.H.* Stipulation, and I believe further that the *S.H.* monitoring will be enriched by this additional emphasis on self-scrutiny, which we take very seriously.

Again, I find that DYS has made substantial progress in the area of self-assessment while needing to improve on prescriptive measures and more clearly announced processes and goals for staff.

## F.  RECEPTION AND CLASSIFICATION[6]

Put most simply:  A youth's experience with DYS begins with the Reception and

Classification process.  In the not too remote past (1998 for example), the boy's reception process

could take months; idleness was the norm; education was deficient or non-existent; and

classification as to risk and program/treatment needs was crude, certainly when compared to

present methods.

Our most current review of the Reception and Classification process included interviews

with staff, interviews with youth, reviews of classification documents, and direct observations.

The process moves through two stages that parallel the youth's housing assignments.  The first is

the Woodson-Boone stage where intake and initial assessments occur, and the second is the

assignment to Sycamore or Jefferson or Carver where the assessment process is completed and a

determination is made about the "home" institution (the JCF where the youth will be placed or

transferred).

The Woodson-Boone experience includes the admission to the facility, including the

search, shower, confiscation, and storage of personal items, delousing, issuing DYS clothing,

medical screening, fingerprinting, picture, and a DNA swab.  Basic information acquired at

intake goes into a form called the AWOL flyer.  This document follows the youth and is part of

the security alert log wherever the youth is housed.  (An inspection of the security alert logs in

Boone, Carver, and Jefferson, revealed that they were current with the census on each cottage.)

Mental health, education, and substance abuse assessments begin.  One important

assessment relates to the PREA (Prison Rape Elimination Act) form.  This designates which

---

[6] Readers with limited time and concerned primarily with the U.S.A. parameters for monitoring could skip to page 28 and the Revocation Unit.

youth are eligible for multiple occupancy room assignments and which youth must have a single occupancy room.  The decisions about PREA status appear a bit vague when the decision about multiple occupancy status can be mitigated by age, size, and type of offense.  In some instances, sexually aggressive or sexually vulnerable youth could be paired with a similar youth of a similar age and size with similar characteristics.  One area for improvement would be a change in policy and practice that required single room occupancy for youth who are sexually vulnerable or who have been sexually victimized and single room occupancy for sexually aggressive youth whose victim was the same sex.

By the completion of the Woodson-Boone experience, a youth will have completed the Juvenile Automated Substance Abuse Evaluation (JASAE), and his scores will become a factor in determining the home institution.  Likewise, youth will complete the MAYSI-2, thus providing initial indicators of possible suicide, substance abuse, and other mental health issues.

Assignment to Sycamore, Jefferson, or Carver is a function of age.  Youth 15 years of age or younger go to Sycamore, and those 18 years of age and older go to Carver.  The remainder goes to Jefferson.  The Sycamore–Jefferson-Carver stage of reception and classification completes the assessment process, administers the Security Classification Inventory (SCI), and develops the Reception Assessment Summary (RAS).  This information informs the decision-making regarding home institutions.

The first assessment instrument is the Level of Service Inventory (LSI).  The LSI has eight domains and provides a score for each along with a total score.  The LSI is a needs assessment instrument, and it identifies the important program needs for youth during the DYS placement.

24

The SCI, the more important of the two major classification assessments, assesses risk, specifically risk of institutional misbehavior. The SCI consists of factors that predict institutional misbehavior, and the assessment of these predictors provides an estimate of the level of supervision required at the youth's home facility. These supervision levels are minimum, medium, and close.

**Youth Services Classification Instrument (YSCI)**

Some confusion about how the classification system works begins with staff efforts to explain the "classification tool" or the YSCI. Developed through a contract with the University of Cincinnati (UC), the explanation of the program is derived from training handouts provided by UC representative Brian Lovins, dated June 10, 2008. The explanation is fairly straightforward: Using data provided by AMS, a logistic regression provides predictors of institutional misbehavior. The YSCI assesses risk of misbehavior in twelve areas, six of which are used to establish a threshold for the use of the remaining six areas.

The integrity of the initial classification information remains questionable. For example, access to current information about important static classification factors as offense history and aggravating issues such as seriousness (violence or injury to the victim) is not always or uniformly available at the time of classification, according to Reception and Central Office staff. Subsequently, this information is often supplied by the youth through self-report.

Reception staffers enter information into a computerized system using UC established criteria. Reception does not make the computations regarding the YSCI. Instead, Reception receives a one-page report called the "Security Classification Instrument." It contains the classification along with a printout of the questions and answers contributing to the classification

decision.  Scores or weighted scores (if there is a weighting of scores) are not included, so Reception staff cannot explain the inner workings of the process.

The YSCI training materials clearly state that intake staff shall have the ability to override the youth's classification level.  Overrides are submitted to the Division of Facility and Program Operations for final approval.  Reception staff indicate that an override is justified when it is based on clinical judgment; however, staff could not recall a time when an override was submitted.  An interview with Dr. Jones, psychology assistant, revealed that he had not submitted an override based on issues pertaining to psychological services for girls.  The incident regarding the death of a YS at Cuyahoga Hills has prompted an enhanced interest in the use of a security override.

Two factors warrant greater investigation.  First, in discussions with the YSs on the Reception cottages, they indicated that there are times when youth classification records are incomplete due to the inability to get certain information from other agencies or organizations.  Delay in receiving information was not seen as a problem.  Any failure to include important information, particularly information that could change a predictor score for violence on the YSCI, could substantially alter a classification decision.  Again, the YS death at Cuyahoga Hills underscores this concern.

The second issue is the Event-Based Reclassification (EBR).  According to Reception staff, any youth can be reclassified at any time following a significant incident regarding aggression, violence, or assault.  The unit social worker supplies information to Central Office; and if Central Office agrees, a reclassification can be done.  This would have the potential of changing the classification security level and altering the option for the home institution.

26

The Monitor's office remains concerned about the efficacy of the Reception and Classification process.  Team members Roush and Martin, with Martin lately assuming the lead here, will continue to closely study the security override process working with national expert Dr. James Austin[7] to further refine this vital process.

**Reception Staff Interviews**

Seven (7) total YSs on reception units participated in two recent group interviews.  They indicate that they have no input regarding the classification process.  Furthermore, no one could even recall an EBR.

YSs indicted that youth act differently with different staff members.  They act-out with some and not with others, with some staff members apparently afraid of the youth.  In addition, there are significant differences between working with boys than with girls, and this becomes apparent when someone from one of the gender-based units is mandated to work on a different unit.

All staff agreed that mandations (non-discretionary overtime) remain a significant problem, primarily on the weekend.  One YS indicated that it was not uncommon to be mandated four or more times a week.  As a result, some YSs believe morale is declining.  This is aggravated by the perception of staff that they are the last to know what is going on and their input is not valued.

Some of this negativity is attributable to the recent closing of the Marion facility and the very real prospect of yet another facility closing.  Jobs are in jeopardy; where one might work is problematic given the employees' right to "bump" on a seniority basis; and fundamental change is in the air, even without reference to the closings, due to the *S.H.* and *U.S.A.* Stipulations.

---

[7] Dr. Austin is a consultant to DYS and is a nationally recognized expert in the area under discussion.

All staff agreed that mandation of overtime is at least partly a function of the abuse of leave time; and all acknowledged that some of this is a problem of staffs' own doing.  Staff scheduling was described as a "monster," forcing YSs to plan their lives six months in advance.

When asked what is needed to make Scioto a better facility, staff had some very interesting responses:

1.      YSs requested more incentives for well-behaved youth.  Their concern was that all their attention goes to the misbehaviors of a few youth, and those who behave appropriately end up in their rooms while staff are dealing with problem behaviors. As a result, YSs believe that it is very difficult to increase appropriate behaviors.

2.      There was a sense among YSs that youth have a pretty good idea about what programs will help them.  Hence, one YS recommendation was that DYS should implement more programs that youth think they need.

3.      Staff were concerned about consequences, but not in the way the Monitoring Team has become accustomed to hearing.  The Scioto YSs were not asking for more consequences or more severe consequences, instead they were more concerned about the certainty of consequences.  This is a subtle but important distinction consistent with the long-standing, classical criminology axiom that the swiftness and certainty of punishment may be more crucial to its effectiveness than its intensity or duration.  Staff complained that there are too many protocols for implementing consequences resulting in too much delay between the event and the consequence.  Staff believe that disciplinary effectiveness is lost in the delay.

4.      Administration, particularly supervision at the unit level, is said to be too indecisive and hedges or changes decisions too often.

28

5.      Maintaining structure is important but there are a number of YSs that try to derail

structure.  Some are not properly trained.  Indeed, in separate interviews I

conducted with staff, they were most concerned about the timing of training

(conflicts with holidays and vacations) and the quality of the training/trainer.  The

training curriculum, trainers, and Training Academy leadership are very much

unresolved issues for us.  The Director is aware of this conclusion and appears open

to working collaboratively to resolve these vital issues.

The Reception and Classification process shows progress toward achieving compliance but there must be a solution to the security override matter.  The increased time spent awaiting transfer to the home facility must be reduced.  The disruption caused by the Marion closing seems closely associated with the delays.  This will be monitored closely.

DYS is aware of my conclusion in this area and we will work together in the next few months to speed placements, enrich the time youth spend awaiting placement, and work with expert James Austin and our team member Steve Martin to refine the security classification process.

**Revocation Unit (Cedar Cottage)[8]**

Interviews and direct observation of the Revocation Unit, at times referred to as the CBT Unit, support my previously expressed view that this Unit is the star at Scioto and may well be the most successful program in all of DYS.  The University of Cincinnati developed the program strategy utilizing cognitive behavioral therapy.  All staff went through a minimum of three weeks of training on the CBT concepts and principles.  The staff is informed, enthusiastic, and caring.

---

[8] We need more information on the process of selection for this Unit.  That will be acquired as we move forward.

The Revocation Unit appears to have attained the often elusive factor of consistency in its approach to youth and daily problem solving.  YSs were clear about their role and responsibilities and able to describe program components and how these components apply to youth.  Staff indicated that their primary objective was to successfully resolve problems as they occurred during the shift and help rehabilitate these youth.

YSs and residents indicated that there actually were very few problems that occur during the shift.  Several factors likely contribute to this.  First, there are fewer youth on Cedar than in the general population cottages.  On the day of the most recent assessment, there were only 17 youth on the unit.  Second, youth have their own rooms.  There are no double occupancy housing assignments on this unit.  Third, the daily schedule is filled with events and activities, allowing limited opportunities for idle time or boredom.  The focus is clear that this is a treatment program, and at least seven groups (group counseling) occur weekly.

The daily schedule supplies structure.  According to residents and staff there is only about 60 minutes of free time available during the day.  The remainder of the time is distributed between school, recreation, group, and program related homework assignments.  Youth are immersed in a program concept that involves them in program activities most of the day.  Within the daily program structure are program expectations that set behavioral goals and expectations at a very high level.

The staff appear to work together as a team.  YSs understand the program and provide group sessions on the weekends.  Social workers run groups during the weekdays.  Their schedule is staggered so that there is a social worker present for Sunday visitations and to conduct an evening group two days per week.

The therapeutic emphasis sends a clear message to youth that the purposes of staff interventions and program involvement are to help the youth change his behaviors so that he can succeed after returning to the community. The numerous groups and individual counseling sessions provided by social workers amplify this. This level of program intensity creates a cooperative environment with positive, helpful behavior as the norm. Subsequently, youth become more inclined to assist other youth in the problem solving process. The result is the creation of a positive peer culture.

There was little need to discuss discipline problems. There are virtually no fights and very few room confinements. While youth help one another in the application of program concepts, youth do not play any role in disciplining or correction of other youth.

This model shows every sign of being replicable throughout DYS and, indeed, even community based centers. The program is not complex, easily absorbed, and easily emulated.

Replication within DYS does present one major hurdle: The Unit's stance on fighting is "one and out." Youth do not want to go elsewhere and diminish their prospects for early release. Thus, DYS must be prepared to do something in the same "swiftness and certitude" design. This threat of removal appears to have an effect on suppressing fights, a very destructive phenomenon in DYS.

The Revocation Unit strategy is to teach alternative, pro-social behaviors in the interim so that aggressive behaviors do not reoccur. As a result, the behavior management approach in the Revocation Unit is elementary. While there is a point system and coupon-based token economy, there is very little clear specification of target behaviors. A portion of the point system allows youth to earn points for the absence of negative behaviors. This concept is problematic from a reinforcement theory approach. Explanations of its use parallel the definition of response-cost

systems, which have their own set of problems.  The nature of the token economy or behavior management element of the Revocation Unit is sufficient to address the general, but non-specific, reinforcement of positive behaviors.  It appears to be sufficient for the youth assigned to the Revocation Unit, and through extrapolation, should be sufficient to address the needs of youth in the community based treatment centers.  There will likely need to be a strengthening of the behavior management elements of any token economy that is applied to general population youth or youth in special management units at other DYS facilities.

The cognitive component of the UC, CBT model seems to work very effectively with the Revocation Unit youth.  Everyone talks about "Stop and Think."  I observed two youth enthusiastically explain this to my 15 year old son when we informally visited months earlier.  The intervention intentionally (a) slows down or disrupts what the program would refer to as the ABC sequence and (b) forces youth, through program components and activities to address the link between inappropriate behaviors and undesired consequences.

Application of the UC model will require a strengthening of the cognitive component and a rethinking of its application to youth with greater emotional and mental health problems.  The present level of cognitive skill interventions on the Revocation Unit appears to be appropriate for this population, but it does not adequately address how the change of inappropriate behavior to pro-social behavior results in the generation of pro-social thought.  This is a challenge for a cognitive behavioral strategy applied to group living situations with high concentrations of security threat group youth or gangs.

The Revocation Unit is an exciting program for DYS.  The program consistently engages youth at levels not previously seen as a part of our consultative or oversight monitoring process.  As noted earlier, an opportunity exists to expand and improve program concepts so that they are

applicable to a wide range of DYS populations.  In order to do that, two strategies are recommended.  First, the range of knowledge about cognitive behavioral principles among the social work staff on the Revocation Unit appears limited to the information provided through the University of Cincinnati.  The program is limited by the parameters of the Prepare Curriculum regarding cognitive intervention.  Fidelity to the model is one thing if the model is totally comprehensive but the "fighting clause" — one and out — means that the model may not be as relevant to other units within DYS.

Second, the Revocation Unit seems somewhat isolated from other portions of Scioto and that may well be a function of its youth and experimental nature.  The concepts and principles that work in the Revocation Unit do not interface with other program elements of Scioto. Much can be learned through the interaction and sharing of ideas.  It likely would benefit DYS if there were a systematic effort to coordinate the various behavior management and cognitive interventions, starting first at the institutional level.  Mohican Juvenile Correctional Facility's reliance on the Therapeutic Community, for example, is a candidate for such coordination.

This unit should be viewed as an experiment that deserves serious consideration for replication.  We do not have all the data one would like for a more empirically grounded assessment but as professionals in this business it is our collective judgment that this unit is very close to achieving its objectives and that the model deserves serious consideration for replication within DYS.

Deputy Director Chris Money recently told me that she hopes that the Cedar Unit will soon be the model for all DYS facilities. We support that objective and find substantial compliance as to the modeling of a new approach to dealing with youth and staff.  Our efforts

now will be to follow any proposed expansion and make certain evaluative data is compiled and

analyzed.

## G.  PROGRAMMING: LEISURE AND RECREATION

The *U.S.A.* Stipulation, Section III (F) calls for structured programming including physical, recreational, or leisure activities during non-school hours.  Concern for youth in lockdown situations is expressed as well.

The integration of structured programs and physical activities with individual treatment or behavior plans is emphasized in the *U.S.A.* Stipulation and has been a central part of my work with DYS in this area.  That is, DYS officials enthusiastically accept this principle of integration and even at this early stage of implementation the commitment is evident.  Recreation staff, mental health staff, and teachers are viable components of the treatment team (TT) and participate in TT meetings.

A youth who is excelling at or simply "sitting out" recreational and sports activities obviously is conveying important information relevant to treatment or behavioral change needs.  And that information is dealt with at the TT meetings.

Extended seclusion is not the norm at Scioto  (see Section H of this report).  However, when any youth is on any type of room/unit  confinement, recreation staff are instructed to go to the youth's living quarters and make certain that there is at least one hour of recreation — large muscle activity when feasible — provided.  In the great majority of such cases, the youth will be provided with much more "rec" after school and prior to "lights out."

The staff at Scioto, most certainly including Superintendent Gwen Randle and Deputy Nan Hoff are wholeheartedly committed both to the integration norm and the recreation/leisure activities being available to all the girls and boys on campus regardless of any room restrictions.

There has been an expansion of programming availability for girls.  The treatment staff appears highly knowledgeable and competent.  The range of programs appears to meet the needs

35

of female offenders.  Of particular interest is the trauma-informed programming linked to Dr. Julian Ford of Yale University.  Also, the use of Dialectical Behavior Therapy (DBT) should be explored and expanded.

The Girls' IDT consists of the youth's social worker, juvenile correctional officers, unit administrator and representatives from education, recreation and mental health.  Youth may be involved in Alcoholics Anonymous Meetings, alcohol and drug treatment, anger management, domestic violence and monthly behavior improvement celebrations.  Additional female programs and activities, which are impressive, include, but are not limited to the following:

a.  Target — trauma affect regulation:  guidelines for education and therapy for adolescents/pre-adolescents.

b.  Girls Circle — increase girls' self-efficacy, body image, and social support that is a strength based skill building approach to create a safe space for girls to address risky behaviors, build on protective factors, and improve relationships.

c.  Conflict Management

d.  PROOF — a positive reinforcement behavior management to include daily goals group and a monthly behavior incentive party.

e.  Victim Awareness

f.  Sensory Connection — "comfort rooms" and "comfort bags" to help self-regulate emotions.

g.  Educational book clubs

h.  Intensive mental health unit

i.    Domestic Violence — Choices — girls lean about the cycle of domestic violence and how to identify early warning signs.

j.    Hopes - a psycho-educational parenting group.

k.    Art for Child Safe America- a creative program providing the opportunity for female youth to express themselves by exploring their feelings regarding incarceration, victim awareness, choices/consequences.

l.    University of Olive — a 5-month life-skills program established by Helping Our Lost Youth (HOLY).

m.    Opening Doors — helping to promote the successful development of interpersonal skills.

n.    Heart to Heat — a sex session program involving adult volunteer women designed to allow girls to reflect on themselves and connect with positive, caring adult women.

o.    Book Club/Read and Watch — youth read a novel, have group discussions about the book, and close with watching the movie adaptation.

p.    Cooking — a professional chef allows female youth to assist in preparing meals.  Bracelet making, ultimate makeover; quilting club; tutoring; silent choir, puppet ministries, birthday parties, game night, New Life; Girl Scouts, breaking fee, black history month Olympics, family day, holiday tea, special monthly activity, etc.

In the context of what was, this is quite impressive.  The next step is to more fully evaluate these programs and determine the interplay between such programs and what goes by

37

the name of treatment.  The Monitoring Team will need to array this list of programs against the inactivity Team members observed during visits when the school intercession was in effect.

Attached as Appendix B is a further listing of these programs, as well as others, with data regarding the number of living units involved in each program; the average number of youth who participate. and the frequency of each program.  There is no suggestion made here that these programs have been evaluated except for their existence, attendance, and frequency.[9]

---

[9] My special thanks to Shelly Fitzhugh, DYS, Central Office and the staff at Scioto for compiling this data.

## H.  USE OF FORCE, SECULSION, RESTRAINTS, AND INVESTIGATION OF SERIOUS INCIDENTS: PROTECTION FROM HARM

**Introduction**

Team expert Steve Martin was asked to make an unscheduled visit to Scioto to obtain additional information on the areas listed in the above title.  Mr. Martin, of course, was already reasonably well-versed in those areas but we both thought that a special visit in mid-July would be productive.  And it was.

What follows, then, is primarily in the words of expert Steve Martin, but presented as the Monitor's Report in these areas.  The following reflects Mr. Martin's observations and recommendations to me on Scioto's level of compliance with the following provisions of the *U.S.A.* Stipulation: Section III.A.2. Use of Force; A.3. Seclusion; A.4. Restraint; A.5. Investigation of Serious Incidents.

There has been significant progress in the use of force, seclusion, restraints, and investigations.  Mr. Martin's independent findings buttress my conclusions on feelings of safety as expressed in interviews with the Scioto female population.  I want to applaud the efforts of Central Office officials, Scioto staff, and expert Steve Martin on their shared efforts to bring us this far.  With Scioto serving as the test pilot for the new use of force policies and training, I am more hopeful than ever before that a decade of a DYS culture of violence will begin to evaporate.

**Methodology**

In preparation for Mr. Martin's site inspection of Scioto on July 14-16, 2009, he reviewed the following documents: 1) use of force investigations conducted by the Chief Inspector's Office for Scioto, January 1, 2009 thru May 31, 2009; 2) use of force investigations conducted

39

by Scioto facility personnel, January 1, 2009 thru May 31, 2009; 3) Scioto use of force incident reports, February 2009 and June 2009; 4) Scioto Mechanical Restraint Detail Reports for precautionary restraints, January 1, 2009 thru May 31, 2009; 5) Mechanical Restraint Detail Reports for protective restraints, January 1, 2009 thru May 31, 2009; 6) Scioto Seclusion Summary Reports, January 1, 2009 thru May 31, 2009; 7) Scioto select AMS Incident Reports for seclusion, January 1, 2009 thru May 31, 2009; 8) Scioto Superintendent Monthly Reports, January 1, 2009 thru May 31, 2009; 9) ODYS AMS Physical Response Summary, April 2008 thru March 2009; 10) PBS Data, Scioto, April 2009.

On July 14, 2009 expert Martin met with the Scioto Superintendent and her executive staff to discuss particular compliance issues related to use of force, seclusion, restraints, and investigations. They reviewed in detail a number of use of force incidents selected from the pre-site document review. This review included viewing a number of video tapes related to these incidents. In reviewing Scioto's experience with the new use of force policy (Scioto Pilot Project), they discussed training issues, possible revisions to the policy, and development of self-auditing tools. Mr. Martin also requested follow-up documents related to seclusion, restraints, and facility investigations. During the course of the July 14-16 site work, he met with YS's from all three shifts to elicit their comments on the new use of force policy. During the course of the three days, there were three separate meetings with personnel at the DYS Training Academy to discuss enhancements to system-wide use of force training set to begin August 1, 2009.

**Observations and Recommendations**

**Use of Force**. On June 1, 2009 Scioto officials implemented the new use of force policies approved by the parties in March 2009. Scioto had been selected by DYS officials, in consultation with the Monitor's office and expert Martin, to pilot test the new Use of Force (uof)

40

policies. Preceding the implementation, all Scioto staff underwent training on the new policies. Careful review of every use of force incident for June 2009 allows Mr. Martin to make the following observations:

1. Staff (Unit Managers (UM), Operations Managers (OM) and YS's) were very consistent in exhausting verbal strategies, often times eliminating the need for force.

2. UM's and OM's have begun to supervise YS's during applications of force rather than directly participating in the application force.

3. Staff are less frequently using dangerous leverage/pain compliance tactics during applications of force.

4. Staff are utilizing standing escort tactics more and full-blown hard takedown tactics less during applications of force.

5. Both staff and youth injuries were infrequent and minor for the 87 incidents reviewed.

6. Facility staff thoroughly reviewed each incident (including video reviews) and appropriately referred incidents for investigation.

7. Supervisory staff are consistently providing immediate feedback to UM's, OM's and YS's in after-action reviews of incidents. Moreover, the Direct Deputy Superintendent is conducting monthly meetings with the UM's and OM's to review use of force incidents.

8. Use of force was generally utilized as a last resort and limited to that force necessary to immobilize/neutralize aggressive behavior by youth.

9. Staff are generally documenting use of force when appropriate and with sufficient detail to allow administrative review and/or investigation.

10. None of the June incidents reflected use of prohibited tactics (see SOP 301.05.01, IV.C.).

Having continuously and periodically reviewed literally hundreds of Scioto use of force incidents from 2004 to present, Mr. Martin represents that each of the foregoing observations reflect significant improvements by staff.   In discussing implementation issues with both supervisory staff and YS's, it became evident that further refinement of the training curriculum was necessary as it relates to when force may be used to intervene with youth engaged in non-targeted property destruction.  Moreover, it became evident a number of revisions were necessary to the new policy to further clarify certain provisions as follows: 1) revised definition of "Enforcement Necessity," (see 301.05.01, III.); 2) added definition for "Supervisory Staff," (see 301.05.01, III.); 3) deleted  phrase "in the area," (see 301.05.01, IV.A.3.c.); 4) changed the name of the "Youth Intervention Witness Report," to "Responder Report."

Finally, there was discussion on the development of a facility, self-audit tool for use by facility administrators that will include, among other things, cumulative monthly reports utilizing "pin-mapping" strategies (frequency of incidents by gender, location, personnel, shift, injuries, etc.).  This will allow supervisory staff to immediately identify strategies to advance compliance.

For example, female youth at the facility are involved in a disproportionate number of use of force incidents (see ODYS AMS, Physical Response Summary, Scioto, April 2008 thru March 2009 and PBS Data, April 2009).   Facility administrators explained that a significant number of female youths at the facility have mental health diagnoses (82%) and are generally more difficult to manage.  It is just such a finding that may require development of specific strategies targeted for this population that could even further reduce the incidents of force. Facility management was very receptive to utilizing such data to reduce incidents of force at the facility.

In summary, Scioto staff have done a very commendable job in implementing the new use of force policies. The June pilot project, as expected, yielded vital information that will clearly enhance the forthcoming system-wide implementation of the policy.

We therefore find significant progress toward achieving substantial compliance for use of force.

**Seclusion.** A review of the AMS Scioto "Seclusion Summary Reports" for January 2009 thru May 2009 indicate that the large majority (approximately 80%) of seclusion events are less than four hours. The majority of these events are incidental to youth-on-youth altercations and use of force incidents. The events in which youths were secluded in excess of twenty-four hours are isolated. Of the 858 seclusion events for the period, only 59 exceeded twenty-four hours. Twelve of these 59 events were related to a single incident in March involving multiple youths engaged in fighting and verbally threatening other youths as they left the cafeteria for the noon meal. According to the Direct Deputy, these youth were held in seclusion pending an investigation of the incident. In addition to reviewing this single incident, Mr. Martin took a random sample of incidents (every 10th event) from the five summary reports and reviewed the incident reports for those events. In each instance, the decision to seclude the youth met the provisions of SOP 301.05.03, "Seclusion Reporting, Monitoring and Documentation Requirements."

We therefore find significant progress toward achieving substantial compliance in the area of seclusion.

**Restraints.** For January-May 2009 there were no reported instances in which Scioto staff used immobilization restraints (four-point). There were seven incidents in which restraints were used as a protective device (protection from self-inflicted injury). In reviewing these seven

incidents, the restraints were used no longer than necessary, and in each instance the youth remained subject to direct supervision during the restraint period.  For the January-May 2009 period there were 181 incidents in which precautionary restraints (used to manage combative or destructive resistant youth behavior) were applied.  A significant portion of these restraint events were incidental to use of force incidents.  A random sample of these events (every 10th event) were selected from the AMS "Mechanical Restraint Detail Report" for January-May 2009 and the incidents reports reviewed.    In eight of the 18 incidents, restraints were applied for less than 30 minutes.  There was a single instance in which the restraints were used in excess of approximately three hours.  In each instance, the application of restraints met the provisions of SOP 301.05.02, "Mechanical Restraints."

In reviewing the videos for the June 2009 use of force incidents, an overall improvement in restraint practices was noted.  This is due in part to the Director's Memorandum of January 29, 2009 in which guidance was provided on the risks of prone restraints and positional asphyxia.

During the course of meeting with Scioto executive staff, a variety of means were discussed to improve restraint techniques.  Moreover, the importance of continued in-service training on restraint techniques was emphasized.  It should be noted that Pat Hurley, a retired DRC (prison) administrator, has been retained by Central Office to assist in monitoring use of force and restraints.  He was in attendance during our meetings with the Scioto officials and will work with them and the training academy on improving restraint techniques.  While the current SOP 301.05.02 provides the necessary safeguards for the use of restraints, the Director's January 2009 Memorandum should be incorporated into a revised SOP (with other minor revisions).

We therefore find significant progress toward achieving substantial compliance in the area of restraints.

**Investigation of Serious Incidents.** For the period January-May 2009, there were 13 Scioto use of force investigations initiated. Three of these 12 were referred to the Chief Inspector's Office (CIO) for investigation with the remaining nine investigated by facility staff. It is evident that facility staff, without hesitation, initiate referrals to the CIO for use of force incidents of a critical or serious nature. The three CIO investigations that were reviewed were found to be properly and thoroughly investigated. Five of the nine investigations conducted by facility personnel also were reviewed and likewise found them to have been properly and thoroughly investigated. Six of these investigations resulted in substantiated findings with sanctions imposed that included suspension, fine, removal, reprimand, and two supervisory conferences.

It is clear that facility managers are aggressively reviewing, and where appropriate investigating, possible use of force violations. It should be noted that expert Martin reviewed all CIO investigations conducted system-wide for January-May 2009 and attests to an overall, very commendable effort by their personnel to conduct thorough and timely investigations.

We therefore find significant progress toward achieving substantial compliance in the area of investigations of serious incidents.

# I.  EDUCATION

This section is essentially a product of education expert Ava Crow and her associate Anne Flynn.  Ms. Crow and Ms. Flynn have spent considerable time with DYS education officials, visiting all DYS facilities as well as Scioto on two occasions.  While the text that follows often appears to speak of  the July 17-18, 2009 visits as a voyage of discovery, those visits were simply the latest and driven by the necessity of the Court-Ordered Report.

Ms. Crow and Ms. Flynn have been extraordinarily diligent and painstaking in their work.  They have been consultants, gadflies, and critics, and have been of enormous assistance to DYS in an area where progress is palpable and youth are benefitting.

**Preliminary Information**

To assess compliance related to the Ohio Department of Youth Services' (DYS) education program, 2009 visits were made on January 29-30 and July 17-18.  During the January visit, 20 staff members were interviewed, including the facility superintendent and deputy, the school principal and assistant principal, 14 teachers, the guidance counselor, and the special education secretary.  In addition, several students were interviewed, and nine student records were reviewed.  Teacher evaluations were reviewed on four teachers, and the monitoring team members observed several classrooms.  Additionally, they accompanied and observed teachers serving students outside the school building.

The July visit was explicitly conducted to comply with the Court's Order of June 24, 2009.  Twenty-five staff members were interviewed, including the facility superintendent and deputy; the school principal; the administrator for intake; a guidance counselor assigned to intake assessment and an intake counselor; a central office administrator filling in for the absent assistant principal; the school psychologist; the special education administrative assistant; and 13

teachers, 10 of whom teach the boys and 9 of whom teach the girls (many teach in both parts of the school). In addition, two boys and two girls were individually interviewed, three of the girls and four of the boys records were reviewed, seven classrooms were observed (five girls classes and two boys classes), the delivery of educational services on the girls intensive mental health unit was observed, and there was email communication with central office. Additional documents reviewed include the Ohio Department of Education's (ODE) letter releasing Scioto from Focused Monitoring after verifying the school's compliance in previously identified areas of noncompliance; the school's Master Schedules; the school's listings of special education students with Individualized Education Plans (IEP) and evaluation expiration dates; the 2008-09 list of Scioto Professional Development (P.D.), supplemented with additional information about the 2009-10 P.D. offerings; the DYS internal school monitoring report completed in December 2008 related to Scioto; Intervention Assistance Team (IAT) meeting minutes for the school for 2008-09; the Student Locator Reports for July 16, 2009; and the Transcript Logs for 2008-09.

For purposes of this report, expert Ava Crow considered the following factors in evaluating compliance:

- The P & P that are in place;

- Whether the infrastructure exists to carry out the policies, including training, sufficient teaching and support staff, and internal audit and quality assurance controls such as DYS monitoring and ODE focused monitoring; and

- Whether the policies are being implemented, as evidenced by interviews of teachers and staff about their knowledge of the policies, observations of classrooms, interviews with students and record review.

At the time of the July visit, all existing education policies and procedures, including all Standard Operating Procedures (SOPs) related to DOJ Stipulation E.,  had been reviewed and revised, with the exceptions of discipline, special education behavioral changes of placement, records, and granting academic credit.  The discipline and behavioral change of placement SOPs have been reviewed, but DYS is developing a facility-wide SOP on discipline that will encompass the schools.  Thus, the discipline-related general and special education SOPs have not yet been finalized, although drafts exist.  It is expected that these policies will be finalized in the very near future.

This area is proving to be complex and there are widely varying opinions on point.  Thus, any delay here is not related to desuetude.  Rather, delay is related to hard work on "getting it right."

During the July 2009 visit, there were 118 male students and 52 female students in the facility.  Of these, 41 of the males and 22 of the females were identified as special education students.  Nineteen of these male students were identified as emotionally disturbed (ED) and all but four of the girls were so identified.

**Provision of Special Education**

DOJ Stipulation E.1. requires DYS to provide all youth with adequate special education in compliance with federal law and the Stipulation.  Following the January 2009 Scioto visit, it was determined that the facility was, in effect, making substantial progress toward substantial compliance.  The education report filed as an Appendix to the Cohen Court Report in March 2008 noted, "…DYS has treated education as a priority area, and results can already be seen.  Major strides have been made in…improving special education… ."  *Id.* at p.4.  This progress continues at Scioto.

As discussed more fully *infra*, DYS is providing substantial oversight of the special education program at Scioto.  Sufficient staff members are present to provide general and special education services during the full school day to all identified students, with the exception of those receiving "home instruction" (discussed more fully *infra*).  One of the girls on the intensive mental health unit has recently earned her high school diploma through the DYS school system, and all girls on this unit are receiving a full school day on the unit from a special education teacher.  This is quite an achievement.

Related services providers are available either on staff or through contract, to meet all identified related service needs of students.  Interviews establish that general education teachers, with limited exceptions, are aware of their students' special education needs and modifications and implement those.  Progress data on IEP academic goals is maintained largely through the school's computerized education program.  Specific data on behavior goals is not being maintained, but the principal described a system he intends to implement in the upcoming quarter, after training, that will chart compliance with specific behavioral goals.  Teachers' caseload and class size numbers are all at or below state- established limits.

**Oversight**

DOJ Stipulation E.2. requires DYS to provide adequate oversight of special education at its facilities.  Since the signing of the Stipulation, a new special education administrator has been named at Central Office, and she has been active with Scioto.  In addition, the DYS Bureau of Education has revised its internal monitoring procedures to provide for a three-year monitoring cycle in which each facility self-evaluates, is evaluated by a sister facility education program and is then evaluated by the DYS central office.  Scioto has self-assessed and been assessed by its

sister facility, Indian River.  The DYS monitoring tool includes a Special Education Checklist that addresses such items as:

- Whether evaluations are completed in a timely manner;

- Whether appropriate parental consent forms exist;

- Whether the parent or student was provided a copy of the parental rights handbook;

- Whether appropriate persons are present at IEP team meetings; and

- Whether students requiring speech services are actually receiving them.

As an additional quality check, DYS invited ODE to complete Focused Monitoring at each of its facilities, and the Scioto schools were placed in the first cycle.  By all reports, the ODE monitoring process is rigorous, and the Scioto schools were released by ODE on June 9, 2009.

The central office special education administrator has provided a list of visits she has made to the Scioto schools since January 2009, and there are ten visits from January 1 through mid-July.  Additionally, she has met twice (in January and June) with the special education secretaries who handle most of the special education paperwork, including the majority of parental contacts, and has met three times with special education supervisors from each school.  Further, in private interviews with special education staff members in the schools, they praise the central office administrator for her prompt and helpful responses to telephone calls and email.

**Special Education Upon Intake**

The Bureau of Education, facility superintendent, deputy and school principal have all set high expectations in this area.  Interviews establish that girls are placed in school within one day of arrival at Scioto, with some placed on the day of arrival.  Boys are placed in school for testing on the third day after arrival, and begin receiving a full school day on the fourth day after

arriving at the Reception Center.  Interviews and record review establish that placements
(general education or special education classroom) are immediately based upon the student's
current education records when they are received.  There are no waiting lists for classroom
placement or for special education services.  Interviews and record review establish that efforts
to obtain students' public school records begin almost immediately upon arrival of the students.
Students are asked about their special education status, and assessors indicate that if the students
deny having special education status but test low, a telephone call is then made to the local
district to confirm the student's report.  Faxed records requests are sent to all school districts
identified through records or by the student.

**Parent or Guardian Involvement**

DOJ Stipulation E.4. requires development and implementation of policies and practices
to appropriately notify and involve parents or guardians in the provision of special education
services.  As noted *supra*, DYS has reviewed and revised its special education policies, including
those policies related to parent or guardian involvement in the special education process.   The
revised policies related to parent involvement currently fully comply with the Individuals with
Disabilities Education Act (IDEA).

The infrastructure exists at Scioto to ensure appropriate efforts to involve parents and
guardians in the provision of special education services and to invite the participation of
surrogate parents at appropriate times.  The school's special education administrative assistant is
responsible for making parent or guardian contacts to obtain their attendance at IEP team
meetings.  She makes extra efforts to reach parents, including staying late and working on
Sundays to telephone them.  The principal allows her to flex her time to accomplish this.  When
mailing information to parents, she makes the envelopes distinctive and attractive, to distinguish

them from other court- or facility-related documents that court-weary parents might be hesitant

to open.  She prepares them for the packet by calling first, and she makes a reminder call to

parents a few days before the meeting date.  She includes information about Scioto in the packet,

driving directions, and contact information.

In addition to the efforts of this administrative assistant, interviews establish that the

school psychologist makes repeated efforts to contact parents to involve them in evaluations.

Record review establishes that parents attend or participate in IEP team meetings by telephone

conference call and that surrogate parents are used at Scioto when appropriate.

**Staffing**

Stipulation E.5. requires that the State develop and implement an education staffing plan

to ensure adequate education staff.  A written staffing plan is near completion, although it is

anticipated that the staffing needs at the facility may change as the type of students and the

mission of the Scioto facility continue to evolve.  Despite the absence of a finalized staffing plan,

DYS has aggressively sought to increase it education staff.  The Bureau of Education has

assigned two full-time senior employees to the tasks of recruitment and retention of diverse staff.

These staff members have attended job fairs that reach students in at least 29 colleges and

universities.

In addition, DYS has substantially increased education staffing at Scioto, while the

population has decreased.  In July 2009, there were sufficient teachers to provide educational

services to the students in the school building and the girls' intensive mental health unit.  One

vacancy exists, and that is in math.  There are two vacancies for assistant principal positions, but

central office is assisting in providing temporary assistance until the positions can be filled.  In

addition, YSs were observed throughout the school during the July 2009 visit, adding an

enhanced level of safety.  The program deputy reports that plans are underway to increase the presence of social workers in the school to work with students.

The school's short-term behavioral classrooms (somewhat comparable to traditional in-school suspension or time-out rooms) are jointly staffed by YSs and teachers each period.  The hours for the part-time school psychologist have been increased since the signing of the Stipulations, and the position is now posted as a full-time position.   The principal is currently reviewing applications for classroom assistants, and anticipates hiring two such persons to work in the classrooms.

Creative scheduling by Scioto, substantial additions to the teaching staff, and the reduction in population since the initial DOJ visit have resulted in virtually all Scioto students receiving the requisite 5.5 hour school day, in contrast to the two or three-hour school day provided to the boys in the past.

The sole area that remains problematic is staffing for students receiving unit instruction, also referred to as "home instruction."  Interviews establish that the goal is to provide all home instruction students, including those that are special education students, with at least one hour of direct contact time with a teacher each day.  The goal is to increase this to two hours per day by next year.  However, interviews further establish that the amount of contact time with a teacher is not based on the special education student's individualized educational needs.  Rather, it is based on available resources.  Increased attention needs to be given to identifying strategies for providing a full school day to all of these students, unless their individualized educational needs dictate less.

**Screening for Special Education Needs**

DOJ Stipulation E.6. requires identification of those youth who have been previously identified through their local school districts, as well as prompt and adequate screening of unidentified youth for special education services.  It also requires that staff conducting screening, assessment and evaluation be qualified to do so.

As discussed *supra*, systems are in place to identify those students who were receiving special education services in their local schools.  Further, the DYS policies related to IATs have been reviewed and revised, as have the SOPs related to screening, assessment and evaluation.

IAT teams are used by DYS schools for Child Find.  Although the policies have been on the books for a number of years, effective implementation of the teams has been slow and spotty. During the past year, DYS has provided training on the teams and has emphasized their importance.  IAT meeting minutes for one year were reviewed during the July 2009 visit, and the chair of the girls' team and a participant on the boys' team were interviewed.  The minutes reflect that several girls have been identified for special education evaluation through the IAT, and interviews establish that at least one boy was identified for evaluation.  IAT meetings are on the girls Master Schedule for a set time and day each week, and are flexed on the Master Schedule for the boys, with a daily 25-minute period identified for possible meeting times.

Because of the low number of boys identified through the process, additional interviews were conducted.   Boys coming to Scioto through the Reception Center typically stay less than three weeks. (The Marion closing, as noted earlier, has caused what we view as a temporary lengthening of the stay in reception.)  Absent extreme learning difficulties, this is a brief period of time to identify a Reception Center student for consideration as a likely special education candidate.  Boys assigned to the short-term, successful  revocator program often come in already

identified because they have previously been through both the DYS and the public school systems. Additionally, because behavior is a critical part of successfully completing the short-term revocator program, the boys make extra efforts to manage their own behavior. Thus, few male special education referrals would be expected to occur at Scioto.

Immediate screening of students is conducted by the Reception intake assessors who are teachers under the direction of a licensed guidance counselor. Record review and interviews establish that all subsequent assessments and evaluations of special education students are accomplished by persons appropriately qualified under state law.

**Individual Education Plans**

DOJ Stipulation E.7 contains a number of requirements related to IEPs. Record review and interviews of staff, students, teachers and administrators establish that IEPs are drafted with consideration of individualized student need. Transition planning was an area addressed by ODE in its focused monitoring. Record review of IEP documents reflect that transition planning occurs for eligible students, and the implementers of transition services are identified.

Record review and interviews establish that students' need for related services is considered and these areas are screened during multidisciplinary assessments. Students were identified who receive speech therapy and interviews establish that occupational therapy is also available for identified students through the IEP process. Interviews further establish that additional and different related services will be made available for students as needed, through a telephone call to the central office special education administrator.

Interviews and record review establish that parents, students, administrators, and general and special education teachers participate in each IEP team meeting. The school psychologist and guidance counselor often sit in, and very often there are two or more general education

55

teachers present for the meeting.  Students who were interviewed indicate they are receiving the special education services they need, and no concerns in this area were heard from the students.

Record review and interviews establish that IEPs are implemented promptly after being finalized.  Record review, interviews and compilations provided to and monitored by the DYS central office related to IEP annual reviews establish that annual reviews occurred in a timely fashion.  With one exception, all female students have current IEPs.  This meeting will be scheduled for this student within a reasonable time, considering summer school breaks.

Of the 41 male students with disabilities at Scioto on July 16, 2009, fourteen arrived with expired IEPs and two expired while at Scioto.  Because of the brief average stay for all but the boys on the revocator unit, the practice is to permit these boys to pass through and have their new IEPs written by teachers who will know them at their receiving schools.  This appears to be a reasonable process, so long as the Scioto stay remains brief.  One student on the revocator unit arrived with an expired IEP and an expired multifactored evaluation.  The evaluation process has been initiated for this student.

Progress data is maintained on IEP goals, other than behavioral goals, and as noted *supra*, the principal plans on implementing a monitoring process for behavioral goals in the upcoming quarter.  Interviews establish that with an isolated exception, general education teachers have knowledge of the special education students in their classrooms and the modifications these students need.  An electronic system is in place to communicate this information to the general education teachers.  Additionally, some interviewed special education teachers provide specific hard-copy information to their students' general education teachers.  Teachers have been trained on monitoring goals and additional training for monitoring behavioral goals is planned for the upcoming quarter.  Functional Behavioral Assessment (FBA) and Behavioral Intervention Plan

(BIP) training has been provided to teachers, and interviews establish that the school

psychologist will be providing ongoing assistance to teachers in these areas. Record review and

interviews establish that FBAs and BIPs are currently being written at Scioto. A particularly

strong FBA, prepared by the current school psychologist, was reviewed in a challenging

student's file. Further, interviews of teachers reveal that the school psychologist is considered an

integral part of the IEP teams and is relied upon for insight in the cases of students with

behavioral difficulties.

**Vocational Education**

DOJ Stipulation E.8. requires the provision of appropriate vocational services required by

students' IEPs as transition services. All vocational transition services listed in records reviewed

were services that could be completed by the new Career Based instructor. Because this

instructor was newly assigned to the Scioto girls and revocator boys and had been on duty two

days when the July visit occurred, this Stipulation could not be adequately monitored. However,

interviews establish that other services were implemented by special education and general

education teachers prior to this school year.

**Forwarding Screening and Assessment Information upon Transfer**

DOJ Stipulation E.9. requires that if a student is being evaluated for special education

services upon transfer from DYS facilities, the facilities shall forward to the receiving school

district all information regarding screening and evaluations completed to date. No records of

such a situation could be identified, and interviewees stated that it was an extremely rare

situation. However, during interviews, the school psychologist referenced one young man who

fit into this fact pattern. She explained that she contacted the receiving school's school

psychologist to advise the district about the student's status. The receiving school psychologist

referred the DYS psychologist to a special education administrator in the central office, and the psychologist contacted that administrator to inform that person about the student's status and to follow through with providing information requested by the district. Additionally, collateral interviews confirm that the school psychologist routinely contacts parents to advise that evaluations are being completed and to seek the parents' input.

**Training and Quality Assurance**

DOJ Stipulation E.10. requires DYS to provide adequate annual training requirements for special education. Training is now mandated, rather than discretionary for teachers. Training for Scioto teachers and staff for 2008-09 included "Roles of Staff and Content in Developing IEPs;" "IEPs, Co-Teaching, and Transition;" training on the new computerized curriculum; "Special Education Processes" including manifestation determinations for special education administrators; IEP technical assistance from the ODE Region 11 School Support Team; training on new special education technical assistance software; "IAT Team Function;" "Transition;" "Manifestation Determinations, FBAs and BIPs;" nationally provided manifestation determination training; a train the trainer session on Positive Behavior Supports, FBAs and BIPs with follow-up training for all school staff, and additional IAT training scheduled for the upcoming year. The special education administrative assistant participated in all focused monitoring training, thus making her even more efficient and effective in her contacts with parents and staff. Additional quality assurance measures are discussed *supra*.

**Transition Services**

DOJ Stipulation E.11. requires DYS to provide transition assistance to students by providing counseling and concrete information about appropriate community resources, post-secondary options, re-enrollment in school or completion of the GED. Compliance with this

requirement is in progress.  In the past, much of this work fell to the students' parole officers.

Now, in addition to the work of these officers, DYS is implementing a re-entry/transition

program for its students, and the educational component is to be addressed by new transition

teachers.  The re-entry program has been designed, responsibilities have been assigned, and

teachers are being employed to fill these positions.  A full-time teacher has been assigned to

Scioto to work with the girls and the revocators who will be leaving the facility at the end of

their short-term program.  This teacher was working at her new position for the second day when

the July 2009 visit occurred.  She discussed her plans to attempt to involve parole officers in her

students' work, and she has a curriculum in place for her class.  Because the transition program

for the entire district is in its infancy, this area merits continued careful review.

**Conclusion**

After review at Scioto on July 17-18, 2009, and based on records review; classroom

observations; communications with and documents from central office; and student, teacher,

administrator and other staff interviews, it is concluded that the facility continues to make

significant progress toward substantial compliance with the DOJ Stipulation E.1.-11.  All special

education policies, with exceptions identified *supra*, have been reviewed and revised.  The

infrastructure is supportive of the nascent transition/re-entry program, and implementation with

the newly assigned teacher has begun.  Additionally, the training, oversight, quality assurance

program with self-assessment, and adequate staffing by appropriately certified staff are all in

place at DYS and Scioto to ensure compliance with the special education policies.  Thus,

although challenges remain in the area of implementation, careful review reflects a pattern of

good faith efforts and progress in the implementation of the DOJ Stipulation.

**Recommendations**

DYS should evaluate the service delivery methods being used for students on "home instruction" and revise these methods to ensure that all special education students receive a full school day when their individualized educational needs and abilities permit that.  Under Ohio regulations and IDEA, the starting point for analysis is that all special education students are entitled to a full school day.    Services for these students should be increased to 5.5 hours per day, absent evidence that the students cannot tolerate a full school day.

Training on monitoring of behavioral goals should be completed as quickly as is reasonably possible so that teachers can effectively monitor behavioral goals contained on their students IEPs.  Specific monitoring should begin as soon as the training is complete.  Effective and accurate monitoring is critical to implementing successful behavior management systems.

## J.   MENTAL HEALTH AND MEDICAL CARE[10]

**Introduction**

Barbara Peterson, R.N. abetted by Ron Shansky, M.D. and this writer, was the principal investigator and early Report author for this Section.  Dr. Cheryl Wills is now firmly on board and we expect significant contributions in mental health from her as we go forward. This Section will begin with a synopsis and then move to a more detailed presentation.

It should be remembered that medical care has never been a significant problem area at Scioto.  Problems, yes, but not of the structural , organizational, and process varieties.  On the other hand, mental health care is, and has been, an ongoing issue.  Progress in the mental health area has been unacceptably slow, witness my having to ask for an extension until September 2, 2009 to prepare an Addendum to my First Annual Report.

The good news is that a continuum of care plan is well on the horizon; a well qualified child & adolescent psychiatrist will soon provide leadership in psychiatry from Central Office; and the mental health unit (Davey) at Scioto is functioning better, with fewer girls and more qualified staff, than at any time in the last, say, 10 years.

There is progress here, it is in the right direction, but it will take until the end of the second year of monitoring to be able to present a more detailed evaluation of the program.

**Synopsis: General Medical Care**

There  has been progressive improvement since 2007 in the provision of routine, emergency and specialty care for medical (and dental) needs.  Assessments of individual medical and mental status and individual needs have also substantially improved.  These assessments are completed at admission, upon transfer and whenever a change in health mental health status is

---

[10] The organization of Section J differs from other Sections with a synopsis of medical and mental health care preceding the more detailed sub-sections that follow.

suspected.  Timeliness is more consistent with stated guidelines with 90% of all required assessments being completed within fourteen days of admission.  Policy development, review and revision for all areas of medical practice continue to progress.

**Synopsis: Mental Health Care**

There has been a moderate amount of progress toward strength based treatment which focuses on building skills rather than only extinguishing behaviors.  Treatment teams meet regularly and have multidisciplinary participation including Youth Specialists.  Assessments are completed at the time of admission and repeated with each intrasystem transfer to insure that all needs have been identified and, where required, there is immediate referral to an appropriate mental health care professional.  There has been progress in recruiting qualified mental health professionals to provide required services.  An example of this is the Psychology Director position at Scioto which was filled within two weeks of the departure of the incumbent. Prior to this most recent vacancy, recruitment had taken over twelve months to fill like positions.

Psychotropic medications are used and use is generally consistent with current standards of care.  Individual case reviews are conducted if a medication generally used for adults is being considered.  While there is a policy that describes the steps required for the use of involuntary medications there has been no demand or need for its use in the past three years.  Education regarding all medications is provided for youth and guardians.  The informed consent process is in place for psychotropic medications and is properly used.  There are medication reviews every thirty days or as clinically required with reports of side effects or adverse effects.   Youth may also request a review of medications.

Suicide is among the mental health issues awaiting finalization of P & P on point. Suicide, and serious suicide attempts are not part of the problem package at Scioto and have not been for many years. I could not locate data on the last custodial suicide at the facility.

There has been recent and substantial progress in developing a continuum of care that describes the array of educational, mental health, medical and other services that are available from admission through release. A completed plan is expected to be available by the end of July or early August 2009.

**Synopsis: Documentation**

ODYS policy requires that the S (subjective) O (objective) A (assessment) and P (plan) format be utilized for interdisciplinary progress notes. Progress notes have improved and in the files reviewed nursing staff achieved and maintained a standard of 85% compliance. Continuing work is required with all clinicians and should be completed through quantitative and qualitative reviews. Documentation is now, and will always be, an area that requires continuing improvement. ODYS is moving toward one file that will contain medical, mental health and additional pertinent material with the goal of implementing this change in 2010. This unified file should enhance the clinician's ability to treat the whole person by making pertinent information available to all members of the treatment team.

In each of the areas reviewed we compared practice with current policy and proposed policies for chronic care clinics; completed file reviews for medical and mental health documentation consistent with diagnosis, individual need and treatment plans; and completed interviews with youth and staff. Self assessment steps have been addressed infra and were generally found to be lacking as to prescriptive measures. Suggestions to identify problems/issues; develop a plan and complete implementation plus ongoing assessment and

continuing improvements are included with each section. Also addressed are the references to the requirements of the *U.S.A.* Stipulation in each respective area.

**General Medical Care**

All youth are assessed by a nurse and have a physical performed by a physician within the first five days of admission. If the nurse's assessment completed the day of arrival identifies a need for immediate care it is provided at the facility or at a local hospital if required. Confidential medical information is maintained in medical files that are properly secured. Youth have access to privacy and confidentiality in requesting and receiving care.

The facility does insure and has made substantial progress in the provision of routine medical, mental health and dental care[11]. Preventive and emergency care in all areas is also being provided as required. All care is consistent with the current standards of practice in each area. Needs or problems are identified and addressed by professionally competent practitioners and the response to care is documented in accord with ODYS policy and as required in *U.S.A.*

Essential medications are ordered without interruption and are consistent with the individual's needs and current standards of clinical care. There is an informed consent process for psychotropic medications which is utilized and education is provided regarding all medications prescribed. There is also an involuntary medication policy which could be used if a situation required. However, use has not been required because the informed consent/educational route has been effective for the past three years.

ODYS through psychiatric and nursing staff has made substantial progress in ensuring that youth and the parent or guardians are provided with age appropriate and practical information regarding the use of medications. The anticipated benefits of use of the chosen

---

[11] Dental care coverage was not specifically required of me by DOJ.. However, this Report includes an occasional reference thereto.

medication are explained as well as the risks.  Symptoms that must be reported to medical staff are clearly identified.  Side effects that may be experienced are also explained.

The informed consent process is explained verbally and documented in the medical file. There is also a letter to the parent/guardian with information regarding the medication. There is a place for the adults' signature indicating understanding and instructions to return the signed copy to the facility.  The procedure for involuntary medications, which has not been utilized in the past three years, includes a review by the ODYS Medical Director or designee and ODYS Legal Services as required in *U.S.A.*  There is an orientation for all new admissions and a useful handbook on how to access services and other relevant information.

The *U.S.A.* Stipulation states that policies, procedures and practices to establish a consistent, orderly admissions intake system that gathers information and provides clinical and support staff with information that will guide care and safety is to be established.  ODYS has, indeed, implemented and sustained a system that meets these requirements.   There is also an orientation session that describes facility rules, positive incentives for completion of programs and following the rules and the sanctions for rule violations.  Each youth receives a handbook that describes each of these areas. Handbooks for males and females have been developed and are reviewed at regular intervals for improvements.  Every handbook also includes youth rights and steps to access counsel.  There are also directions for reporting abuse.  Allegations of abuse are investigated and may result in the removal of an employee or reassignment to avoid contact with youth if the allegation is validated.

Employment practices have been altered to recruit individuals who are able to meet the professional and paraprofessional requirements now in place for all classifications of clinical and support staff.  Orientation and educational offerings for employees have been redesigned and

field testing has resulted in additional changes to curriculums.  While there has been progress in this area there is much that remains to be done.  There must be a more direct relationship between the offerings of those who provide training and education and the actual work that is required in the individual facilities.  Educational offerings should be consistent with the mission, vision and values of ODYS and the special mission(s) of each facility.

**Chronic Medical Care**

Ten chronic care files were reviewed for this Report.  In each of the ten cases the chronic disease was identified during the initial assessment which was completed on the day of arrival. The nurse sees each youth enrolled in chronic care clinics a minimum of once every 30 days or more frequently based upon need/request.  The physician completes an initial review, orders necessary medications and then follows the youth at intervals (30, 60 or 90 days) dependent upon the youth's health status and the status or control of the disease.  Notes were in the SOAP format and chronic care forms which are being evaluated were completed as required in 100% of the cases.

Each youth identified with chronic disease was subsequently seen by the chronic care nurse and the physician according to proposed ODYS guidelines.  Medications, if required, were found to be consistent with need.  The relevant youth were interviewed and found to be familiar with their diagnosis, the disease process and the medications that had been ordered.  This, indeed, is an uncommon finding in adult facilities and, in our experience, even more so in juvenile facilities.  I should add that in some of the interviews I conducted, the girls did express concern about their knowledge of their medical care.  The Section on grievances discusses this matter as well.

There has been substantial progress in the development of policies to govern the provision of medical care for youth with chronic disease. Work on the procedures and forms to be utilized continues as of this writing. The initial forms have been field tested and nursing and medical staff have completed revisions to those forms based on feedback from the field. This process will continue to be monitored by us and likely improved. Specialty care is provided as needed. The policies and procedures for all aspects of medical care have been recently revised and the majority have been submitted for final approval.

Immunizations continue to be a focus throughout the youth's stay and consistent with current community standards immunizations have been added as indicated or required (Hepatitis vaccines are one example.)

**Medical Care Summary**

There has been significant and sustained progress in meeting the requirements of *U.S.A.* in the area of General Medicine. There is also a quality improvement program being developed to insure stability in levels of performance and continuing growth of the programs/services.

**Medical Care Recommendations**

- All essential medications should be monitored for compliance, as is the case with psychotropic medications.

- Qualitative and quantitative reviews of clinical records for both medical and mental health (while files remain separate) should be completed monthly. Information should be shared and if required corrective action (education, for example) should be documented and then reassessed. Employee performance goals should be consistent with the requirements of clinical care and documentation and data may also be used for performance evaluations.

- Youth with chronic disease are now being monitored throughout their stay to insure that care is consistent with need and this should be continued.

- Clinical practice for all levels of clinicians should be assessed quarterly and included in annual performance evaluations. All reviews should be discussed with the employee in a timely manner and jointly identified improvement goals should be documented.

- Hospitalizations should be reviewed from the initial phase of the illness/injury through the hospitalization and recovery. Reviews should be documented and utilized to identify trends in accidents/injuries or levels of care that could have been provided at the facility if the problem had been accurately diagnosed. Data can also be used to conduct morbidity reviews with clinical staff.

- Quality improvement projects should be identified at all levels of the organization and all employees should be educated in quality improvement techniques.

**Mental Health Care**

Screening for mental illness and substance abuse is completed on the day of admission and every time the youth is transferred to another facility to insure that mental health needs are identified and met. If there is an emergency or immediate need the youth is seen by a qualified mental health professional well within the 12 hour window required by the DOJ Stipulation. Changes in behavior or medical status are evaluated by clinical staff as the changes are noted by any member of the multidisciplinary team.

ODYS is currently completing program descriptions that describe the continuum of care that is available and the criteria for enrollment and completion of the identified programs. There is a progressive element to program offerings so that if a program has been successfully completed the next segment offers new material. The development or adoption of new programs

or approaches to mental health care will continue to be developed, implemented and evaluated for effectiveness with the population served.

Treatment teams either include representatives or relevant information from all areas in which the youth is involved. The treatment team meets weekly and individual case reviews are completed at designated intervals (not less than once every 30 days). Reviews may occur more frequently if there has been a behavioral change. Staff members are working on developing strength based plans of care which aid in building desired skills rather than emphasizing extinguishing behaviors. The psychiatrist serves as a member of the team and each youth participates in his/her treatment planning. Family members are informed of the plan of care and can comment or offer suggestions. Family members are also included in the informed consent process for use of psychotropic medications as is the individual youth.

ODYS has promulgated policies and procedures that include initial and ongoing clinical assessments, development and review of an individualized treatment plan by a multidisciplinary treatment team that includes the youth and encourages families to participate and to define the primary role of each clinician. There is a consistent core of members of the treatment team that includes the youth, social worker, youth specialist, recreation worker, an educator, psychiatry, occupational therapist and a nurse. Others may join the team as well to insure that all needs are being addressed consistently.

The psychiatrist assesses the need for medication and completes regular medication reviews with the youth. At these 1:1 meetings the effectiveness or desired outcomes of medication use are assessed as are any reports of adverse or side effects documented by other members of the team. There has been reasonable improvement in the communication of

information regarding all medications between youth and clinical staff and families and in the treatment planning process.

Documentation by mental health staff is completed on an electronic record. ODYS is currently working on an automated record for all services and the development of one medical record that will contain all relevant information and notes by all staff providing services. This will continue to be monitored as content is developed with implementation currently being targeted for 2010. Documentation of individual and group sessions may be in separate files as well a synopsis of participation, goals and progress must be included in progress notes that are available to the treatment team. Continuing improvements are required in this area while the unified file is being developed.

Housing for youth with a diagnosis of mental illness is consistent with the youth's need for supervision and planned interventions to aid in building skills for functioning effectively in the 'community' which may be general population for some period of time.

The Davey (mental health) Unit housed 10 girls on June 29, 2009 and has housed as many as 20 in the past. Of the 54 females housed at Scioto (on August 19, 2009), some 44 (82%) were on the mental health caseload. Twenty-three, or 61% were on psychotropic medication.

Dr. Julie Niedermeyer, the psychiatrist for the unit, spends two days a week with the girls and is extremely well liked. In addition to medication management, Dr. Niedermeyer provides individual therapy. Dr. Niedermeyer, and the entire mental health staff seek to prepare the girls for discharge and maintenance in the community. That goal is obviously basic for a juvenile facility with a caseload of this magnitude. A youth's transition plan is linked to counseling in the community and appointments are arranged as clinically indicated. DYS encourages counselors

from the community to meet with the Scioto girls prior to release in order to establish a relationship, clarify treatment needs, and establish a relationship.

The Davey staffing includes a psychiatric nurse, a psych assistant, an occupational therapist, and two licensed social workers.

Half of the Davey girls take education classes off the unit, while the other half are schooled on the unit.  Interviews with six girls on the unit were extremely positive and supportive of the program.  One youth whom I have interviewed several times over a three-year period stated that Davey was now the calmest unit at Scioto; an almost shocking development.  This 16 year old was more "together" than at any other time I have seen her.

The new "Consistent Response" program[12] was said to be responsible for bringing "fighting way down."  The Davey girls felt safe and cared about.  Some were supportive of more individual treatment (while noting the availability of Dr. Niedermeyer) and others wanted more group.  There is nothing surprising in this.  One young lady argued that the program — Scioto itself — should be tougher so "kids don't wanna come back."  A consistent complaint involved irregular access to outdoor exercise  I have noted this issue earlier.

Psychotropic medications are used in compliance with community standards for use in children and adolescents.  Compliance data is completed monthly and utilized by the psychiatrist in managing the use of medications.  Medication education is provided by the psychiatrist and nurses and is documented in the medical file.  All required testing is completed and reviewed by the physician with the youth.  All aspects of the medication administration process will continue to be monitored in order to sustain the substantial improvements that have been achieved in the administration of medications.

---

[12] A SOP designed to establish consistency in DYS facilities regarding the six most serious disciplinary infractions. When a girl is charged with such an infraction, seclusion pending a hearing is virtually guaranteed.  While seclusion numbers certainly will go up, early returns suggest fighting and assaults are decreasing.

The effectiveness and use of psycho-stimulants continues to be assessed by the Child and Adolescent Forensic psychiatrist who serves as a member of the *S.H.* monitoring team. Substantial improvements are anticipated in a manner consistent with the needs of youth.

Treatment plans remain focused on the elimination of behaviors and require work to make behavioral goals reasonable in number and attainable by the individual. Treatment plans also need to be expanded to address mental health and medical areas. Individual education plans will eventually be added to the automated medical record and those goals will also be utilized to effectively develop approaches to learning and sustaining new behaviors in the multidisciplinary treatment plan.

**Mental Health Summary**

There has been substantial progress toward achieving substantial compliance in the individual elements of mental health care such as the initial and ongoing assessments, the development of the treatment team, the informed consent process for psychotropic medications, the monitoring of compliance with psycho-tropics and the regular meetings with youth to review the effects of medication. Continuing improvement is required in the areas of the unified medical record, adequate access to information for all members of the multidisciplinary treatment team and the adequacy of special housing units to meet the immediate needs of youth and to develop the skills necessary for community living.

**Mental Health Recommendations**

- Consistent with those made for General Medicine, quantitative and qualitative record reviews should be completed; data should be used to improve clinical performance, identify trends in areas that require attention and the development of new or special programs to better meet youth needs and to conduct morbidity reviews.

- Hospitalizations should be reviewed to assess the level of intervention provided and the adequacy of care and treatment being provided at the institutional level; data should be used to adjust programming as necessary.

- Education for all staff and special programs for those desiring to work on special housing units should be available throughout the year and consistent with the mission of each facility.

**Documentation**

ODYS is in the process of converting to one (unified) file for medical, mental health and treatment planning information.  The intent is to automate the entire medical record.  Systems personnel are currently working with representatives of each clinical division to identify necessary characteristics and the specific requirements of access and confidentiality.  The target date for completion, education and implementation is late 2010.

Treatment plans are developed and reviewed with youth. They are filed in the mental health file maintained by psychology which means there is limited access for other members of the team. The need to share treatment plans must be addressed while awaiting the implementation of the single automated file.

There has been appropriate progress in the use of the SOAP format by nursing and physician staff although continued monitoring of this area continues to be recommended. Policies and procedures for all documentation are in the process of being completed and an annual review of this policy is now required and routine monitoring will be continued.

Documentation of interventions that are utilized is reflected in the progress notes along with the youth's response and any changes in care that are to be made in response to the immediate situation.  There is a need to substantially improve the documentation of the plan for

the entire course of care and the rationale for that care so that members of the team have an understanding of the care to be provided.  Access to relevant information by the treatment team and clinical staff that must have access to all aspects of care and information is being addressed as the automated system is being developed.  This area will continue to be monitored.

**Documentation Summary**

There has been substantial progress toward compliance in the area of documentation and in the techniques and tools used to gather information.  The coordination of information and effective use of information requires continuing improvement.  Monitoring of documentation must be completed regularly and the information shared with responsible staff to make the required improvements.

**Documentation Recommendations**

- Policy development/review/revision should be expedited to allow for education of staff and identification of implementation dates.  Monitoring criteria must also be established to sustain improvements.
- There must be more effective communication within the agency to share the mission, vision and values of the department and to insure that data is effectively and consistently gathered and used.

**Overall Summary**

The *S.H.* Stipulation repeats and expands upon the areas addressed by the *U.S.A.* Stipulation and requires not only sustainable change but continuing improvement in the entire system of care offered by ODYS.  ODYS has completed much of the preliminary work to begin educating staff at all levels in the required techniques and practices as articulated in the *U.S.A.* Stipulation.

As repeatedly noted, progress must be evaluated on a timeline.  After some 15 months, and some early difficulties, DYS is now on track to fully comply (and more) with the *U.S.A.* and *S.H.* Stipulations.  In a time of almost catastrophic fiscal austerity for the State, the gains made are truly remarkable.

In the case of mental health care, one would need to spend just 15 minutes on the Davey Unit to detect the calm, the caring, the progress with these troubled youth.

## K. GRIEVANCE PROCESS

**Introduction**

The *U.S.A.* Stipulation at III (D) succinctly addresses the requirements for the DYS grievance process:

D.  Grievance Process

1.  The State shall develop and implement policies, procedures, and practices to ensure that the Facilities have an adequate grievance system including: no formal or informal preconditions to the completion and submission of a grievance; review of grievances by the chief inspector; timely initiation and resolutions of grievances; appropriate corrective action; and written notification provided to the youth of the final resolution of the grievance.

2.  A clear explanation of the grievance process shall be provided to each youth upon admission to the Facilities during orientation, and to their parent(s) or guardian(s), and the youth's understanding of the process shall be at least verbally verified.

3.  Without any staff involvement, youth shall easily be able to obtain grievance forms and submit grievances.

In addition to serving as Monitor, I have assumed primary, consultative responsibility for helping to revise the DYS grievance process.[13]  We are close to a final, agreed upon, draft but at this writing DYS continues to operate under its existing policy and practices.

As a general observation, I have never studied, observed, or read about any adult or juvenile grievance process that was essentially satisfactory to the intended consumers.  Although DYS youth, certainly including Scioto, invariably are quite informed about the process, know how to access it, believe the multiple secure boxes are adequate, and (with very few exceptions)

---

[13] I served as Reporter to the IJA/ABA Juvenile Justice Standards Project and co-authored the Standards Relating to Corrections.  Part IX, Section 9.2, attached as Appendix C, is our 30-plus-years-old effort at creating a grievance system to be part of a larger concern for Accountability.  I believe this earlier work continues to be relevant and perhaps even progressive.

do not believe retaliation for filing occurs, there is pervasive skepticism about the grievance process.

As I have found elsewhere, distrust for the process is not invariably linked to achieving a desired outcome.  Rather, it is more often a belief that the system, the process itself, is unfair. The distrust expressed to me by the numerous girls I interviewed is much less intense than the distrust expressed, for example, by the adult females imprisoned at the Ohio Reformatory for Women (ORW).

The requisite forms for filing a grievance are readily available, notably on the living units.  At reception orientation, the girls watch a film on "legal rights" and this includes access to the grievance process.  Ms. Eddy, the Grievance Coordinator, follows this up by going on the units and speaking individually with the newly arrived girls.  She also periodically does grievance workshops on the unit, discusses the process, illustrates how to express a grievance, and how to get the problem solved.

The clearly marked and secure grievance drop-boxes (over 20 on the campus) are accessible only by the Grievance Coordinator and she collects the grievances on a daily basis during the regular work week.

The grievance process at Scioto, and all of DYS, is umbilically tied to the PLRA requirement that all administrative remedies be exhausted as a precondition to filing suit in federal court.  A further complication exists related to the case of J.P. v. Taft, also within the jurisdiction of this Court.

*J.P.* is an outgrowth of the unique decision by the Sixth Circuit that the undoubted constitutional right of access to the courts require that juveniles be provided with access to counsel:  See *John L. v. Adams*, 969 F.2d 228 (6th Cir. 1992).

Vincent Nathan succeeded me as Monitor in *J.P.* and reports that a significant number of complaints brought to the lawyer-access program, the Legal Assistance Program (LAP), were not colorable legal claims and were more appropriate for the grievance process.  Some complaints related to early release or disciplinary issues and were beyond the purview of the LAP.  This precisely parallels my own findings.

My primary point here is that Monitor Nathan correctly recommends in his Second Report on the LAP:

> DYS should develop and implement a revised grievance system that accomplishes the following three objectives: (a) provision of a prompt and effective resolution mechanism for complaints by youth; (b) provision of an administrative management tool for identifying emerging problems in DYS institutions; and (c) provision of a simple and direct means for youth to exhaust the grievance system in order to gain access to federal and state courts. (p. 50)

When Sharon Hicks was the LAP provider she was, in effect, a significant, yet unauthorized , part of the grievance process.  If a Scioto youth presented a problem to Ms. Hicks, and without regard to whether it was litigable, she attempted to, and often did, bring about an informal resolution. It is, of course, understandable that Scioto (and other DYS youth) would then attempt problem-solving with the LAP and not even use the grievance system except perhaps to achieve "exhaustion" as a prelude to litigation.

Thus, added to the "usual" distrust for a grievance process, Scioto youth developed an informal, problem-solving process with then LAP Attorney Sharon Hicks.  Now that she is no longer serving as the LAP counsel, the present LAP counsel are devoted to separating the litigable from the non-litigable.  The grievance process is now in the process of morphing into a first resort for youth problem-solving.

**Methodology Employed**

I have interviewed dozens of Scioto girls over the years regarding their knowledge and assessment of the grievance process.  Most recently, I have been involved in numerous meetings with Jennifer Fears, the Chief Inspector, Chris Money, Deputy Director, Rebecca Eddy, Scioto Grievance Coordinator, and Vince Nathan, Monitor in the *J.P.* case.  I have studied incidence and outcome data.

I have also reviewed the existing P & P and SOPs on point and then prepared a number of revision drafts for discussion.  In addition, I have studied the case law on point, particularly as to the PLRA "exhaustion" requirement; studied the two *J.P.* Reports prepared by Vince Nathan; and studied the CIIC Report on the DYS Grievance procedure (August 16, 2006).

Parenthetically, a major complaint in the CIIC Report is that 40% of grievances were reported as not completed.  Table 1, which follows, shows that the Scioto coordinator has virtually a 100% on-time completion rate.  Also, please note that complaints of staff abuse are dramatically lower now (see Tables 2 and 3).

DYS does need to strengthen its use of grievance data as a feedback mechanism; as a way to determine that clusters of certain grievances indicate a set of problems that need a policy or process-oriented solution.

## GRIEVANCE LOG - MONTHLY SUMMARY

### June 2008 through May 2009

| | June | July | August | September | October | November | December | January | February | March | April | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number of Grievances** | 30 | 27 | 41 | 29 | 52 | 35 | 41 | 29 | 40 | 44 | 66 | 57 |
| | | | | | | | | | | | | |
| **Chief Inspector Responses** | 7 | 4 | 2 | 1 | 1 | 1 | 4 | 5 | 5 | 3 | 9 | 11 |
| **Late Chief Inspector Responses** | 6 | 1 | 1 | 0 | 0 | 0 | 1 | 4 | 1 | 2 | 2 | 4 |
| **Chief Inspector % On Time** | 14% | 75% | 50% | 100% | 100% | 100% | 75% | 20% | 80% | 33% | 78% | 64% |
| | | | | | | | | | | | | |
| **Manager Responses** | 10 | 8 | 6 | 4 | 10 | 5 | 5 | 6 | 9 | 12 | 15 | 19 |
| **Late Manager Responses** | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| **Manager % On Time** | 100% | 100% | 100% | 75% | 80% | 100% | 100% | 100% | 100% | 100% | 93% | 100% |
| | | | | | | | | | | | | |
| **Coordinator Responses** | 30 | 27 | 41 | 29 | 52 | 35 | 41 | 29 | 40 | 44 | 66 | 57 |
| **Late Coordinator Responses** | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Coordinator % On Time** | 100% | 96% | 100% | 97% | 100% | 100% | 100% | 100% | 100% | 100% | 98% | 98% |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Table 1

## GRIEVANCE STATISTICS - Females

### June 2008 through May 2009

| | June | July | August | September | October | November | December | January | February | March | April | May | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Concerns | 1 | | 4 | 1 | 4 | 2 | 2 | 1 | 1 | 2 | 4 | 3 | 25 |
| Medical | 3 | 3 | 6 | 3 | 10 | 2 | 3 | 3 | 6 | 4 | 7 | 11 | 61 |
| Institutional Operations | 5 | | 4 | 2 | 4 | 1 | | 3 | 1 | 8 | 6 | 4 | 38 |
| Complaints against Staff | 4 | 8 | 8 | 11 | 8 | 3 | 10 | 8 | 4 | 9 | 11 | 4 | 88 |
| Recreation | 1 | | | | 1 | | | | | 2 | | | 4 |
| Education | | | | | 1 | | | | 1 | 2 | 1 | 3 | 8 |
| Mental Health | 1 | | | | | | | | 1 | | | 3 | 5 |
| Phys. Abuse from Youth | | 1 | | | 2 | | 2 | | 2 | | | | 7 |
| Phys. Abuse from Staff | | 1 | 4 | 1 | 1 | 1 | | | | | 1 | 1 | 10 |
| Communication | | | 1 | | 2 | | 1 | 1 | 6 | 2 | | 2 | 15 |
| Religion | | | | | | | | | | | 1 | | 1 |
| Verbal Abuse | | | | 1 | 1 | | | | | | | | 2 |
| Other Issues | | 2 | | 1 | 1 | 3 | 3 | 4 | 5 | 4 | | 3 | 26 |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Totals | 15 | 15 | 27 | 20 | 35 | 12 | 21 | 20 | 27 | 33 | 31 | 34 | 290 |

Table 2

## GRIEVANCE STATISTICS - Males

### June 2008 through May 2009

| | June | July | August | September | October | November | December | January | February | March | April | May | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Complaints on Staff** | 4 | 3 | 5 | 4 | 6 | 7 | 9 | 5 | 4 | 3 | 13 | 9 | **72** |
| **Institutional Operations** | 6 | 1 | 4 | 1 | 2 | 4 | 3 | | 2 | | | 1 | **24** |
| **Medical** | 3 | | | | | 3 | 3 | | | 1 | | 7 | **17** |
| **Recreation** | 1 | | 1 | | | 1 | | | | | 3 | | **6** |
| **Communication** | 1 | 3 | 1 | | 1 | 1 | 4 | | 3 | 1 | | 3 | **18** |
| **Religion** | | 1 | 1 | | | | | | | | | | **2** |
| **Program Concerns** | | | 1 | | | 2 | | | 1 | 4 | 7 | | **15** |
| **Access to Legal Counsel** | | | 1 | | | | | | | | | 1 | **2** |
| **Education** | | | | | | 1 | | 2 | | | | | **3** |
| **Verbal Abuse from Staff** | | | | | | | 1 | | 3 | 2 | | 1 | **7** |
| **Verbal Abuse from Youth** | | | | | | | 1 | | | | | | **1** |
| **Other Issues** | | | 1 | 4 | 2 | 1 | | 2 | 1 | | 2 | 2 | **15** |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **_Totals_** | **15** | **8** | **15** | **9** | **11** | **20** | **21** | **9** | **14** | **11** | **25** | **24** | **182** |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Table 3

**Grievance Process**

Rebecca Eddy is Scioto's full-time Grievance Coordinator.  Ms. Eddy regularly retrieves the written grievances from the numerous, secure boxes scattered about the campus.  After retrieving the written grievances, it is Ms. Eddy's job to try to resolve the grievances and, failing that, the grievance may go to the facility Superintendent and then on appeal to the Chief Inspector at 51 N. High Street, Columbus, Ohio (Central Office).

I will shortly discuss the available grievance data for Scioto for the period of June 23, 2008 through May 31, 2009.  If one looks to "grievances filed-grievances resolved (or not)" as the significant data on the resolution of problems Scioto youth seek to resolve, that is quite misleading.

A grievance is a written complaint by a youth about life at Scioto.  Disciplinary proceedings (IDC hearing) are exempted from the grievance process.  Any number of complaints by youth are resolved informally by the Unit Manager, Don Reyna (Central Office, Youth Advocate) or, for Scioto only, Ms. Eddy herself.  Thus, where a matter is resolved locally, informally, and often expeditiously there is no data compiled to reflect this.

For example, June 2008 data for Scioto shows 30 grievances received and 20 resolved.  It does not show the numerous complaints settled without resort to a written grievance.  Thus, the grievance system should not be viewed as the exclusive problem-solving mechanism for youth given the statistically unknown, yet believed to be large, number of unwritten, informal resolutions.

At this writing, and as noted earlier, the proposed revision to the grievance P & P have not yet been finalized.  In its present form, however, there is a process that would begin to capture the informal, unwritten complaints and their resolution (e.g., a log-in system).

Part of the reason for the delay in finalizing the P & P on grievances relates to an ongoing concern about the PLRA "exhaustion" requirements as a condition for initiating federal litigation.  Vince Nathan, the Monitor in *J.P.*, has expressed his concerns here and Director Stickrath and I are working toward a solution.

The specific issue is to simplify and clarify exactly what it takes to exhaust administrative remedies.  The federal law on exhaustion is often mindboggling in its complexity and in its make-work requirements, e.g., exhaust even if the agency cannot provide the remedy sought.

**Grievance Data**

Tables 1, 2, and 3, hopefully, are, in the main, self-explanatory.  Worth noting are the low number of female grievances concerning mental health care (five) and the relatively larger number of health care issues (61).  Note that the boys filed about one-fourth the number of medical grievances reflecting a rather frequent occurrence in adult and juvenile facilities: females are much more likely to express and pursue medical issues and also grieve unsatisfactory outcomes.

Ms. Eddy relates that most of the girls with medical grievances are those who are seen repeatedly by the physician or nurse and who simply do not agree with a diagnosis, treatment, or the medication prescribed.  Where we might expect our physician to alter a medication that is not working, the Scioto girls may grieve.  Where a medication is changed, the girls also might grieve.

The important lesson here for Scioto is that clinicians should begin to better explain medical (and mental health) treatment.  The anxiety of the girls would be lessened and the grievance process avoided.

**Grievance Process Recommendations**

- Clearly, the revised P & P must be adopted and implemented in the very near future. The revision should enhance the assistance given youth in the preparation of a grievance; emphasize the desirability of an informal (i.e., unwritten) resolution of a grieveable issue, and use some means to record these efforts at speedy, "local," and informal problem-solving.

- Where a written grievance will be filed, the youth needs assistance especially as to complying with the jurisdictional "exhaustion" requirement.

- The grievance must be answered in a timely fashion. Emergency-type grievances must be accommodated, as they are, indeed, now.

- The Chief Inspector should be encouraged to improve her on-time rate for deciding grievance appeals.

- There should be a separate category for clinical grievances with some input from a neutral, expert in the area that is grieved; that is, a mental health, medical, or dental expert.

- DYS should create an effective means of studying grievance data as a form of internal evaluation. This is not done now.

## L.  PROPOSED FINDINGS BY THE COURT

Fred Cohen, as the Court-appointed Monitor in *S.H. v. Stickrath*, Case No. 2:04-CV-1206 (May 21, 2008) and *United States v. Ohio*, Civil Action No. 2:08-CV-475 (June 4, 2008), hereby respectfully requests that the Court find the attached Report to be timely filed and to be in all respects compliant with this Court's Order of June 24, 2009.

The monitoring and reporting in *S.H. v. Stickrath* will be Ordered to continue without reference to any of the substantive, monitoring, and reporting requirements contained in *United States v. Ohio* except that the Monitor will follow the three-year timeframe stipulated in *United States v. Ohio*.

The substantive, procedural, oversight monitoring, information sharing, and reporting requirements of *S.H. v. Stickrath* shall henceforth be the exclusive monitoring requirements to be followed by Fred Cohen as Monitor and any members of his monitoring team.

Respectfully Submitted by:

Fred Cohen, Monitor
August 11, 2009

* * * * * *

### **Afterword**

I requested and followed guidance from the DOJ on the preparation of this Report and then provided the DOJ with a draft of this Report and requested comments.  I have attached the above noted correspondence, including the DOJ's concerns, as Appendix D.

I have followed the DOJ's instructions to me as contained in correspondence dated June 25, 2009 from DOJ Counsel, Vincent Herman. See Appendix D (2). Some of the DOJ concerns as expressed in their email of August 10, 2009 are simply baffling. For example, they express concern about programming while the Report lists and describes a plethora of programs and provides data on location, frequency, and attendance.

The August 10, 2009 concerns about needing additional support for data-driven conclusions arrived at by our experts finds no support in the *U.S.A.* Stipulation, law, logic, or simply common sense.

I will assert what I believe is obvious: DYS has no doubts about the state of compliance at Scioto; my reasoning, and our collaborative approach to problem identification and resolution; and what it will take to achieve substantial compliance.

The *S.H.* Expert Team works collaboratively with DYS and the Team's expertise in its consultative and oversight roles pervades the substantial progress made to date. We talk  and problem solve with DYS on a daily basis

Finally, I will let the DOJ letter of August 10, 2009  ultimately speak for itself. A fair reading of the Report and the *U.S.A.* Stipulation I believe will satisfy the Court both as to our compliance and the formulaic response of Mr. Tayloe.