IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO: |
| ) | 2:08-cv-475 |
| THE STATE OF OHIO, et al., ) | |
| ) | JUDGE ALGENON L. MARBLEY |
| Defendants. ) | |
| | |
| S.H., and all other similarly situated, ) | |
| et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO: |
| ) | 2:04-cv-1206 |
| TOM STICKRATH, ) | |
| ) | JUDGE ALGENON L. MARBLEY |
| Defendant. ) | |

**ORDER**

On February 24, 2010, this Court held a Status Conference in *S.H. v. Stickrath* (the *S.H.* case) and *U.S. v. Ohio* (the *U.S.* case). The Department of Justice and the Monitor in the S.H. case, Mr. Fred Cohen ("Monitor Cohen"), particpated by telephone. Amy Ast, Christine Money, Barbara Moore, and Marci Sutherland, all with the Ohio Department of Youth Services ("DYS") were also present.

The Stipulation in the *S.H.* case has as a guiding principle that "DYS shall provide youth in its charge with a safe and humane environment." (*S.H.* Stipulation ¶ 10.) It also provides that DYS policies and procedures "will be reviewed and revised as needed." (*S.H.* Stipulation ¶ 35.) These policies and procedures "will be designed to meet or exceed the minimum level of care requried by the relevant statute or constitutional Amendment. *Id*.

Recently the Court was informed that youths at the Ohio River Valley ("ORV") and Circleville DYS facilities were being denied meals when they refused to leave their rooms to eat in the facility dining room or cafeteria. This was allegedly occuring as a result of DYS policy, circulated by Christine Money on August 5, 2009. These youths were allegedly required to remain on their unit when the rest of the youth on their unit went to eat; and as a result there were youths that were not receiving food and not eating. It was reported to the Court was that individuals were refusing to leave their rooms out of fear of being either sexually or physically assaulted.

At the Status Conference the Court had the opportunity to engage with the various stakeholders on this issue. The Court had received a copy of the policy in question from Monitor Cohen. The policy from Christine Money, DYS Deputy Director, addressed to Thomas Teague, Superintendent at Circleville and dated August 5, 2009 states:

> [Circleville] has been approved to implement this PILOT for thirty days. Effective immediately the following protocols must be followed when a youth refuses to attend a meal in the cafeteria.
>
> - A staff member MUST inform the youth that eating in the cafeteria is their only opportunity to receive a meal.
> - Once the youth has been informed of the opportunity and the youth continues to refuse, a staff member is required to document the refusal in the Unit Log Book and notify the on-duty Operations Manager.
> - Any youth who refuses to go to the cafeteria will not receive a carry back

- meal.
- Any youth refusing to go to the cafeteria shall be placed in their rooms or in a dorm setting must sit in an assigned location until the unit returns.
- IF a youth misses two (2) consecutive meals the Unit Manager must complete a face to face interview with the youth to determine the reason for the refusal. If the Unit Manager is not available then the unit Social orker or the Operations Manager must complete the interview.
- If through the interview, the youth continues to refuse to go to the cafeteria, the Unit Staff are required to develop an individual plan to address the needs of the youth.

A weekly report shall be forwarded to Deputy Director Money indicating the number of youth refusing the opportunity to attend a meal in the cafeteria. At the end of the month, the Deputy Director along with the Superintendent will evaluate the PILOT to determine if it will continue.

(August 5, 2009 DYS Memo on Cafeteria Refusals - CJCF Pilot) ("Cafeteria Refusals Policy).

Al Gerhardstein, class counsel, informed the court that he and his co-counsel had been unaware of this new DYS policy until February 2010 when an email received by class counsel alluded to problems with the DYS Cafeteria Refusals Policy.  Mr. Gerhardstein stated:

> [W]hat happened with the August policy was a system change. We didn't know about it, and we didn't find out about it until February, class counsel.  We found out about it at the same time I got an email from class counsel or from defense counsel saying don't worry we're going to feed the kids...If in fact system changes are shared with us, then we could have a better dialogue, becuase we would have been more engaged on this had we seen the policy and asked some questions.

(Tr. of Status Conf. February 24, 2010 p. 33.)

At the Status Conference the Court confirmed that the DYS Cafeteria Refusals Policy was implemented not only at Circleville, but also at the other DYS facilities including ORV. Ms. Moore, Deputy Superintendent at ORV, confirmed the Cour's information that multiple youth at DYS facilities had been denied meals when declining to eat.  She informed the Court that while she only knows of one youth at ORV that had been refusing to eat, she was "sure

there are more" and that "[s]ince February 11th, we've been tracking youth that's been refusing." (Tr. of Status Conf. February 24, 2010 p. 9-10.)

In preparation for the Status Conference, DYS provided this Court with summary data and information about the effect of the DYS Cafeteria Refusals Policy at the Circleville facility. This report is incorporated herein and made a part hereof as Attachment 1. Data was compiled by Mr. Teague and given to Ms. Money. (February 23, 2010 DYS Memo on Meal Refusal Data.) This data shows that between August 2009 and February 2010, 429 meals were refused by the youth at Circleville. (February 23, 2010 Circleville Meal Refusal Statistics.) Of those meals, 386 involved breakfast refusals, 30 involved lunch refusals, and 13 involved dinner refusals. *Id*. DYS submitted that breakfast refusals represent instances where youth wanted to sleep in. (Tr. of Status Conf. February 24, 2010 p. 18.) DYS, however, did not provide data or support that this was necessarily true for all breakfast refusals, or that the same was true for any of the 43 lunch or dinner refusals. *Id*. at 19. And pursuant to the terms of the DYS Cafeteria Refusals Policy, the youth who refused meals were not otherwise fed – they simply did not eat those meals. The data from the Circleville facility therefore supports Ms. Moore's statement that since the enactment of the DYS Cafeteria Refusals Policy there have been multiple instances of youth not having eaten.

Ms. Moore clarified that to her knowledge from August 2009 to February 5, 2010, the DYS Cafeteria Refusals Policy was in full force and effect, but during that time the policy was followed inconsistently with "some unites when they had youth that were refusing to go to the cafeteria were providing carry back meals and some units were not." *Id*. at 12. After February 8th, Ms. Moore's understanding was that if a youth refused to go to the cafeteria at ORV he

would not be fed. *Id*. at 15.  Log books at ORV document youth who refused to eat and the reason for the refusal. *Id*. at 13.  Currently, there are separate log books for cafeteria refusals. *Id*. Prior to February 11, 2010 this information was kept in a log book, but not one that was maintained specifically on the issue of cafeteria refusals. *Id*.  Additionally, prior to February 11, 2010, the log books did not record the specific reason for the cafeteria refusal. *Id*.

Ms. Moore elaborated that in February 2010 youth refusing to go to the cafeteria at ORV have had food brought back from them and that this represented a policy shift from August of 2009, when DYS first promulgaged the Cafeteria Refusals Policy. *Id*. at 10-11.  According to Ms. Moore,

> February 5th is when we got direction that we were going to feed youth that were not going to the cafeteria, and I believe it was the following Monday, the 8th, that we went back tot he youth who were refusing to attend that cafeteria that we were not bringing carry backs with the exception of kids that have some medical conditions.

*Id*. at 11.

Ms. Money stated to the Court that the DYS Cafeteria Refusals Policy is "still in full force," but that DYS is "in the process of drafting an update to designate with more specificity of who has to contact who [sic] and it even has a time to alert the superintendent." *Id*. at 21. According to Ms. Money, "[a]ny youth that [sic] refuses to go to a meal and says that he is afraid gets fed...Any time a youth says they're [sic] afraid at that point we provide the meal, we figure out how to provide it. We might send it to the unit.  We might send a kid with staff." *Id*. Ms.  Money agreed that this practice is not reflected in the DYS Cafeteria Refusals Policy as it currently exists. *Id*. at 22.

> THE COURT: Now you would agree that's not reflected in the current policy as set forth, would you?

>MS. MONEY: Not specifically, but that's what we've always done, is any that any time a youth says that they're afraid for their safety, we do a safety plan.
>THE COURT: Is that written someplace?  Is that memorialized anyplace?
>MS. MONEY: There is a policy.
>THE COURT: In any of your rules and regulations?
>MS. AST: There's not a specific policy on safety plan.  We do have a policy, if we have a kid that we need to put in protective custody or something like that, but it's– to ask if there is a formal policy, Judge, the answer would be no.
>THE COURT: It would seem to me, it would make the most sense, and then we would avoid the inconsistency of the application of the policy to have it clearly crafted within the policy, in the language of the policy...to reflect that if a child refuses for safety reasons or out of fear...then that kid would be fed at that meal or at some alternate site or whatever.
>In other words, memorialize what you already have as a common practice.  That way, we will assure uniformity and application of the policy throughout.  And most importantly, the kids will get to eat.

>*Id*. at 22-23.

The Cafeteria Refusals Policy, as it was written is at odds with the guiding principle in the *S.H.* and *U.S.* cases that the health and safety of the youth is of paramount importance.  Thus, as this Court Ordered at the Status Conference, DYS will alter its Cafeteria Refusals Policy to reflect that: (1) the youth in DYS' custody and care must be fed and any youth articulating any fear for safety must be fed during the particular meal of refusal; and (2) when youth refuse to eat a meal in a facility cafeteria, DYS will keep records of the reason for that refusal.  Additionally, by March 3, 2010, DYS will provide to the Court summary information and data on meal refusals from the Scioto, ORV, and  Indian River facilities for the period of August 5, 2009, when the Cafeterial Refusals Policy was enacted, to February 23, 2010.  This summary information and data should be provided in the same format as the information DYS provided to this Court about the Circleville facility prior to the Status Conference.  The Court also directs

that copies of the log books from the Circleville, Indian River, ORV, and Scioto facilities be provided along with the summary information.[1]

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE**

**DATED:   February 26, 2010**

---

[1] The summary information should be submitted by the March 3, 2010 deadline set by the Court at the Status Conference.  DYS should submit the copies of the log books to the Court by March 10, 2010.